UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

— — — — — — — — — — — — — — — — — — — — — — — — — — — x

O.D.F. OPTRONICS LTD. and WAVE GROUP
LTD.,

                   Plaintiffs

-against-

REMINGTON ARMS COMPANY, INC., MIGUEL
PEREZ d/b/a TACTICAL DEPOT and John Does
1-10 being defendants whose names are currently
unknown but are engaged in the wrongdoing alleged
in the complaint herein,

                   Defendants.

— — — — — — — — — — — — — — — — — — — — — — — — — — x

Case No. 08-4746 (DLC)

**DECLARATION OF
ROBERT M. PANTLE**

ROBERT M. PANTLE, declares under penalty of perjury:

1.    I am a Vice President within the Government Sales Directorate of

Remington Arms Company, Inc. ("Remington"), and I am personally familiar with

the facts and circumstances described in this declaration, which is submitted in

opposition to plaintiffs O.D.F Optronics Ltd. and Wave Group Ltd.'s (together,

"ODF") application for injunctive relief.

2.    There is no basis for the extraordinary relief demanded by O.D.F.

From 2004 to 2008, Remington and ODF were parties to a Distribution Agreement

pursuant to which Remington was to resell Eyeball optical units in designated

areas and markets.  Dissatisfied with sales, the parties formally abandoned their

relationship in 2008.  The parties negotiated terms that afforded Remington two

short months, from February 12, 2008 until April 15, 2008, to sell off its remaining inventory, without restriction. Remington had paid ODF approximately $3.8 million for its remaining 1,097-unit inventory, and had suggested that ODF simply take back the stock. But ODF refused and instead granted Remington permission to sell the units without restriction, other than the April 15 sale deadline.

3.      Remington succeeded in selling the inventory – before the deadline. We sold to Blue Star Consortium, Inc. ("Blue Star"), a well-known North American distributor of military equipment. Even with additional payments from Blue Star to Remington for pre-delivery storage and maintenance of the units, Remington has suffered a loss of more than $3 million on this sale.

4.      ODF is trying to block delivery based on a false and unsupportable interpretation of the parties' written Termination Agreement.

5.      ODF wrongly states that Remington was restricted in how it priced the units. There was no price restriction on Remington.

6.      ODF wrongly states that Remington could not sell to a distributor. There was no such restriction on Remington's post-termination sales.

7.      And ODF wrongly infers that the sale to Blue Star was a sham designed to circumvent the April 15 deadline. The fact is that Blue Star has purchased the units, and fully owns them as of today as a matter of law and fact.

8.    In short, there is no basis whatsoever for the injunction that ODF demands.

***Background***

9.    Remington entered into a Distribution Agreement with ODF in July 2004 for sale of the Eyeball units in the USA, its territories, and Canada, to designated governmental agencies.  A copy of the Distribution Agreement is attached (Exhibit A).

10.    Upon information and belief, ODF is not licensed to sell Eyeball kits anywhere in the United States.

11.    Sales did not proceed as envisioned, with several developments affecting law enforcement purchases from the outset.

12.    For starters, the law enforcement market was affected by a surge in fuel prices.  Following this, state and federal agencies around the country experienced a reduction and redistribution of Homeland Security funding.  And in the wake of the national disaster experienced in Louisiana and other Gulf states, further budget redistributions were made to pay for Katrina-oriented Relief.

13.    Another source of unanticipated delay was the time required for Remington to obtain radio licensing from the Federal Communications Commission, necessary for the Eyeball to operate on a dedicated frequency within the United States.  Remington applied for the license after executing the 2004

3

Distribution Agreement with ODF, but did not receive FCC clearance until December 2, 2005, much later than expected.

14.    These unforeseen developments slowed the Eyeball's initial success in the United States.  The parties worked out two successive amendments to their original Distribution Agreement, to deal with the overall situation.  Copies of Amendment No. 1 and Amendment No. 2 are attached, respectively, as Exhibits B and C.

15.    Despite all the hurdles, by 2006 Remington had sold Eyeball units to 152 Police Departments, 11 federal agencies, and 22 military organizations.[1] Remington thus bought from ODF the required minimum initial purchase order of 3,000 units, as of 2006, in fulfillment of its commitment to ODF.

16.    On top of its outright purchases from ODF, Remington invested substantial other sums in the training, promotion and market development related to the Eyeball.  By mid-2006, Remington had spent upwards of $6 million on inventory, personnel and development solely for the Eyeball.

17.    Still by 2007, sales had not reached the originally projected volume and pace.  And by 2007, Remington had grown increasingly dissatisfied with the quality and sufficiency of ODF's warranty support, production and supply issues at

---

[1]  The Distribution Agreement as signed in July 2004 did not include the United States Department of Defense as part of the authorized "Market." This changed with the execution of Amendment No. 1 to the Distribution Agreement on September 11, 2005, which expanded the list of designated Market entities to include all branches of the U.S. military. *See* Amendment No. 1, Exh. B at p 18.

ODF, and what proved to be overly optimistic sales projections made by ODF from the start.

18.    By the end of 2007 Remington and ODF were discussing terms for ending their relationship.

19.    On February 12, 2008, after a period of negotiation, Remington and ODF entered into a "Termination, Settlement and Release Agreement," formally concluding the four-year distribution relationship.

20.    Paragraph 1 of the Termination Agreement states that the Distribution Agreement is terminated, effective February 15, 2008. *See* Exh. D.

21.    Except as regards the deadline for post-termination sales, all provisions and terms stated in the Distribution Agreement were formally abandoned and released.

22.    Under the original 2004 Distribution Agreement, it had been agreed that if the parties separated, Remington would have six (6) months to sell off remaining inventory. But during negotiation of the 2008 Termination Agreement, ODF demanded that Remington sell all remaining inventory within two (2) months – instead of six. The shortened two-month deadline was set at April 15, 2008.

23.    The Termination Agreement states at paragraph 2 that the former six-month deadline is replaced with the new two-month deadline. *See* Exh. D.

24.    ***In all other respects,*** Remington and ODF abandoned the Distribution Agreement's terms.  Except as to the post-termination deadline for final sales, the Termination Agreement expressly released all rights and claims under the Distribution Agreement, "***absolutely and irrevocably***."  Exh. D at¶ 12 (emphasis added).

25.    In relevant part, the Termination Agreement expressly states that, "each of the parties hereby ***releases and waives absolutely and irrevocably any demand, claim or right against the other party or any Related Party in connection with any matter related to the Distribution Agreement***, its execution, amendments, performance or termination."  Exh. D at ¶ 12 (emphasis added).

26.    At paragraph 11, the Termination Agreement further states that, "[e]ach of the parties confirms hereby that the rights granted under this Termination Agreement constitute, for all intents and purposes, ***full, final and complete settlement and release of all demand, claims and rights*** that each party may have against the other[.]"  Exh. D (emphasis added).

27.    The parties' thus abandoned the Distribution Agreement and supplanted its terms with the abbreviated Termination Agreement.  Notable for purposes of ODF's injunction application, the prior "Territory" and "Market" limits established under the Distribution Agreement were omitted altogether from the Termination Agreement.

6

28.    The Termination Agreement thus afforded Remington just two months to sell its inventory, without other restriction.

29.    The facts show that Remington complied with the two-month sell-off deadline.  And going further, Remington in fact has sold its inventory within the Territory and Markets as contemplated under the defunct 2004 Distribution Agreement, even though it had no obligation to do so.  ODF's injunction application is thus a groundless waste of time.

### *Remington Sold Within The Two-Month Deadline Imposed By ODF*

30.    Remington competed all sales of its inventory of Eyeball units before April 15, 2008.  The units were fully sold by April 14, 2008, within the time frame imposed by ODF.

31.    Attached as Exhibit E is a copy of Remington's Sales and Service Agreement executed with Blue Star dated April 14, 2008.  The Blue Star Agreement reflects the full and final disposition of Remington's remaining inventory of Eyeball units as of April 14, 2008.

32.    Blue Star has agreed to pay a minimum price of $400 each for Remington's final stock of 1,097 units.  *See* Exh. E at ¶ 5.

33.    Additionally, Blue Star has agreed to pay Remington for storage and maintenance of the units, pending re-sale by Blue Star.  Remington's payment for

this service is set by the formula stated within the Blue Star Agreement. *See* Exh. E at ¶ 4.

34.    Despite that the Termination Agreement did not impose geographic or market restrictions on Remington's final two months of sales, as a practical matter Remington in fact has sold its remaining units within the Territory and Markets, as originally contemplated in 2004. And in keeping with the spirit of the parties' original 2004 Distribution Agreement, Remington has used its "best efforts" to ensure that its buyer, Blue Star, is reselling within the originally agreed Territory and Markets.

35.    Notably, it is not even a contract breach, let alone sufficient ground for issuance of injunctive relief, for Blue Star to sell outside the Territory or Markets. For starters, those concepts ceased to apply upon execution of the Termination Agreement. And secondly, even under the original Distribution Agreement, even if it were still in force and effect (plainly, it is not), even then Remington's only obligation would have been to use its "best efforts" to ensure that Blue Star re-sold within the Territory and Markets. *See* Exh. A at ¶ 1(c) ("Remington will use its best efforts to ensure that its subdistributors or agents sell Products only in the Markets within the Territory.").[2]

---

[2]  Of course, any rights ODF formerly had under this paragraph 1(c) were "absolutely and irrevocably" waived and released by the express terms of the Termination Agreement. *See* Exh. D at ¶ 12.

*Remington Was Not Bound To Sell At Any Pre-Set Market Price*

36.    ODF makes reference to a "market price," a notion apparently concocted just for this injunction application. Remington has not "dumped" the units below any agreed "market price." We were given two months to sell our remaining inventory, at any price we chose, and we did so before the April 15 deadline passed.

37.    The Termination Agreement contains no price restriction.

38.    The fact that the Termination Agreement reduced Remington's time to sell off post-termination inventory from six months, down to two, bears on ODF's complaint about a "fire sale" and "dumping." A hasty sale was precisely the situation that ODF bargained for, demanded and received. ODF knew Remington was going to sell at least some portion of its remaining stock at historically low prices to meet the two-month deadline. And Remington had complete discretion to price the units as Remington chose.

39.    Indeed, the Termination Agreement contemplates pricing below $2,500 – with no downward floor. The Termination Agreement provides that for all sales below $2,500, ODF has no obligation to provide warranty support. *See* Exh. D at ¶ 8. The Termination Agreement is otherwise silent as to pricing – and thus does not restrict in any way Remington's ability to price its Eyeball units.

40.    ODF has no basis to claim that Remington was somehow restricted in setting price.  The Termination Agreement contains no such restriction, and the law certainly provides for none.

41.    During the negotiation of the Termination Agreement, we had asked ODF to take back Remington's remaining inventory of Eyeball units.  ODF refused, and instead gave us an abbreviated window to conduct the very "fire sale" that they are now complaining about.  It is inequitable for ODF to try to block this sale, after forcing Remington into this position.

42.    Put differently, a fire sale was the negotiated means for Remington to mitigate its substantial losses on units for which it had paid ODF nearly $4 million. The math is revealing:  Remington paid ODF approximately $3,800,000 for the 1,097 units sold to Blue Star.  Blue Star, in turn, has agreed to pay Remington a minimum price of $400 per unit for the 1,097 units sold, or approximately $439,000.  Remington is thus losing upwards of $3.4 million on these units – even with the resale to Blue Star.

43.    ODF has no equitable or other basis to complain about the sale, which was the negotiated and foreseeable result of the Termination Agreement.

**The Fresno Police Department Sale**

44.    Before our sale to Blue Star, we began discussions with the Fresno Police Department and on or about March 28, 2008 forwarded to them a price

quote for the sale of five (5) units. A copy of the Fresno Police Department price quote is attached as Exhibit F. The Fresno Police Department never accepted the terms of this quote prior to April 15, and Remington never completed any sales to them. Currently, the proposed deal between Remington and the Fresno Police Department is dead.

45. ODF is simply wrong to claim that the boilerplate legend on the price quote that all "Quotes are good for 90 days" somehow proves we were trying to sell units after April 15, 2008. This irrelevant, boilerplate language was not a material part of the proposed Fresno Police sale. As already noted, Remington is not in negotiations with the Fresno Police Department to sell any units and has not been at any time after April 15.

**The Tactical Depot Sale**

46. ODF also raises an issue regarding Miguel Perez d/b/a Tactical Depot. For a brief period, Remington relied upon Tactical Depot to promote the sale of units to law enforcement agencies within the Los Angeles area.

47. We sold a total of two (2) units to Tactical Depot – not "about 20" or 12 as ODF claims (albeit ambiguously, and only through a string of hearsay conversations with individuals who have not supplied affidavits to the Court[3]). We

---

[3] Eran Tibon, who signed the ODF declaration in support of injunctive relief, did not even speak to Mr. Perez himself. In his declaration, he describes second-hand a conversation that some other person at ODF had, with Mr. Perez. *See* Tibon Decl.. at ¶ 27 ("on May 8 . . . a director at ODF spoke with ... Perez..."). Tibon's hearsay story is just wrong.

did initially report 12 potential sales through Tactical Depot, but all 12 did not occur.

48.    The 12 sales initially reported by Remington were as follows:

a.  We sold two (2) units to Tactical Depot, at $2,500 per unit.

b.  We also started processing paperwork to sell five (5) more units to Tactical Depot, but the sale was not completed in time to meet the April 15, 2008 deadline, and we cancelled it accordingly.

c.  The final five (5) units were donated to federal and state law enforcement agencies in the Los Angeles area and drop shipped to the charitable recipient through Tactical Depot.

49.    In short, our initial report of 12 units having been distributed through Tactical Depot was completely appropriate.  And of those 12 units, only 7 actually were delivered, in each case before the April 15, 2008 deadline, and in each case to a United States-based law enforcement agency.[4]

50.    We neither authorized Mr. Perez, nor anyone else, to distribute or promote the Eyeball outside the Territory.  And to our knowledge, Mr. Perez never sold any unit outside the Territory, even as the term was defined under the defunct Distribution Agreement.  Again, the original Distribution Agreement required Remington only to use its "best efforts" to ensure that re-sales took place within

---

[4]  This, despite that the Market and Territory restrictions in the parties' original Distribution Agreement no longer apply.

12

the Territory (*see* Distribution Agmt. ¶ 1(c)).  Mr. Perez' supposed display of one

unit to an unidentified individual in Mexico does not even rise to the level of a

contract violation, let alone fair or sufficient basis for the extraordinary relief being

sought.

**Potential Sale of Eyeballs to the United States REF**

51.    ODF is also trying to create an issue regarding the United States

Rapid Equipment Force ("REF").  The relevant facts are as follows:

52.    Remington is not selling to the REF.  We sold to Blue Star on April

14, 2008 and that sale – our final sale of Eyeball units – is complete.

53.    Blue Star's CEO Daniel Barks has reported to Remington that he is

working on a sale to the REF, but nothing has been finalized as of today.  If a sale

does materialize, it will not violate the Termination Agreement between ODF and

Remington.  Even under ODF's misguided view that the defunct 2004 Distribution

Agreement "Territory" and "Market" provisions remain in force (they do not), still

the re-sale to REF would be within the 2004 Distribution Agreement's terms.  The

REF is a United States "Military Organization" and clearly within the former terms

of the abandoned Distribution Agreement.  *See* Exh. B at ¶ 17.

54.    There is no price restriction on what Blue Star can charge the REF for

Eyeball units.  ODF incorrectly states in its injunction papers that, "[b]y possibly

dumping the Eyeballs, in a Department of Defense Tender, [Remington is]

destroying [ODF's] market for their goods." Tibon Decl. ¶ 9. In truth, ODF has no right to prevent the sale of Eyeball units to the United States REF at any particular price. Certainly the Termination Agreement provides no such restriction. And Remington is not trying to sell anything to the REF, as our sale to Blue Star marked our final sale of Eyeballs and the end of our saleable inventory.

### Remington's Sale To Blue Star Does Not Threaten ODF's Intellectual Property Rights

55.     Remington is not violating ODF's intellectual property rights. Up until April 15, 2008 we remained an authorized reseller of bona fide ODF brand products, and we were well within our rights to resell the existing inventory. The sale was completed as of April 14 and the clock cannot be turned back.

56.     Remington did not fail to maintain the Eyeball batteries, and ODF's claim in this regard is totally false. The very reason that Remington has maintained physical possession of the units pending resale by Blue Star is precisely due to Remington's superior capacity for properly storing and maintaining the units, and keeping the batteries properly charged. There is no reason contractual or otherwise that Remington cannot perform this service for Blue Star, and be compensated appropriately, as is provided for in the Blue Star Agreement. *See* Exh. E.

57.     The only battery "issue" – to the extent there is one at all – arises from the fact that towards the end of the relationship between the parties in 2007 ODF

knowingly shipped to Remington new units with integral batteries that were already two years old. All of this has been tacitly admitted by ODF's own technician, and cannot possibly serve as fair or equitable basis for enjoining Remington. Notably, ODF has presented no credible evidence supporting its story about battery maintenance.

***Expedited Discovery Should Only Proceed Mutually, In New York***

58.    As regards expedited discovery, at this point everything concerning Remington's sale of the Eyeball units has been fully and candidly disclosed, so that there is virtually nothing germane to this case that ODF does not already know. Already, we have produced all of the reports and information that ODF claims it is entitled to receive.

59.    So the record is clear, Remington has disclosed all sales activity following execution of the Termination Agreement on February 12, 2008. A chart summarizing the sales activity is attached as Exhibit G.[5]

60.    Based on the foregoing, we are unaware of additional information or data germane to this dispute that ODF reasonably requires, and certainly we are aware of nothing that warrants expedited discovery.

---

[5]  The sales activity summary reflects charitable donations of Eyeball units to law enforcement units between April 9 and April 14, 2008, in the days prior to the April 15 deadline. *See* Exh. G at p. 2. These donations, to entities such as the Clinton Police Department, New York Tactical Officers Association, Milwaukee County Sheriff's office, and similar organizations were completely appropriate and permissible. The sales summary at page 2 of Exhibit G reflects completion of internal IRS charitable donation documentation on dates after April 15th, all of which is irrelevant to ODF's claims and cannot fairly be construed as evidence of post-deadline transfers by Remington.

61.    In the event expedited discovery is granted, then the depositions of ODF representatives and production of records from both sides must proceed simultaneously.  In that regard, ODF's representatives should appear for deposition examination in New York, within the jurisdiction of this Court.

WHEREFORE, for all the foregoing reasons, defendant Remington Arms Company, Inc. respectfully requests that the Court deny plaintiffs' application in its entirety, and award the costs and expenses of this motion to defendant Remington along with such other and further relief as to the Court seems just and fair.

I declare under penalty of perjury that the forgoing is true and correct.

Executed on May 29, 2008.

_____
ROBERT M. PANTLE

## DISTRIBUTION AGREEMENT

THIS DISTRIBUTION AGREEMENT (the "Agreement"), is made and entered into this 19 day of July, 2004 (the "Effective Date"), by and between O.D.F. Optronics Ltd., a corporation organized under the laws of Israel, having offices at 65 Yigal Alon St., Tel-Aviv, 67443, Israel ("ODF"), and Remington Arms Company, Inc., a corporation organized under the laws of Delaware, having offices at 870 Remington Drive, Madison, North Carolina ("REMINGTON ").

## RECITALS

WHEREAS, ODF is engaged in the development, manufacturing, marketing, distribution and sale of vision-based systems and image processing and image understanding software for defense and security applications, including those products listed in the attached Schedule A ("Products"); and

WHEREAS, ODF desires to engage REMINGTON, and REMINGTON desires to be engaged by ODF, to market and distribute Products in certain market segments (the "Markets") throughout the territory (the "Territory") as described in Schedule A;

NOW, THEREFORE, in consideration of the premises and the mutual promises and covenants set forth herein, the parties hereby agree as follows:

## 1. RIGHTS GRANTED; APPOINTMENT

(a) Subject to the terms and conditions set forth herein, ODF hereby appoints REMINGTON as the exclusive distributor of Products in the Markets located in the Territory for the term of this Agreement. "Products" shall be deemed to include all improvements to, and new versions of, the items identified as "Products" on Schedule A.

(b) REMINGTON may appoint any subdistributors or agents to promote, sell or distribute Products in the Markets within the Territory and shall use its best efforts to ensure that such subdistributors or agents perform their duties consistent with the terms of this Agreement. REMINGTON shall provide ODF on a quarterly basis with a list of all subdistributors or agents employed by it in connection with the promotion, sale or distribution of Products.

(c) REMINGTON shall not advertise, promote, solicit sales or sell any of the Products outside of the Markets and outside of the Territory. REMINGTON will use its best efforts to ensure that its distributors or agents sell Products only in the Markets within the Territory.

(d) In its absolute discretion, REMINGTON shall be entitled to place on the Products and on packaging, advertising and marketing materials therefor, any trademarks, brand names or logos REMINGTON may select. Upon request by ODF, REMINGTON will also affix ODF trademarks, trade names or logos to the Products or their packaging, advertising and marketing materials, provided, however, that REMINGTON will have absolute discretion to affix ODF's trademarks, trade names and logos to the Products and their packaging, advertising and marketing materials, as REMINGTON deems appropriate. ODF agrees that REMINGTON's marks shall be prominently and primarily featured on the Products and their packaging, advertising and marketing materials (in the Markets within the Territory) and

ODF's marks, to the extent they are also included, shall be featured less prominently and shall be secondary to REMINGTON's marks. The placement of the parties' marks on the Products and their packaging, advertising and marketing materials will be developed with the consent of both parties on the basis of the above principles, and such consent shall not be unreasonably withheld.

(e) Nothing in this Agreement shall limit REMINGTON'S right to sell products competitive with the Products in the Territory or elsewhere in any channel of trade, provided, however, that any such competitive products (i) do not breach any intellectual property right of ODF or (ii) were not developed or manufactured as a result of ODF's transfer of confidential proprietary information to REMINGTON. Furthermore, REMINGTON will not cooperate in developing, re-designing, improving, marketing, manufacturing or selling such competitive products with any company or organization which is infringing upon ODF's intellectual property rights. If REMINGTON elects to sell products manufactured by third parties that are directly competitive with any of the Products in the Markets in the Territory, ODF shall be entitled to refrain from selling to REMINGTON additional units of the particular competitive Product that ODF manufactures and ODF will have the right, in its sole discretion, to revoke REMINGTON's exclusive right to sell and/or manufacture such Product or terminate REMINGTON's right to sell and/or manufacture such Product.

(f) Subject to receiving any required approvals from the government of Israel , ODF will negotiate in good faith and exclusively with REMINGTON the terms of a distribution agreement for any new products that ODF intends to distribute or have distributed in the Markets within the Territory. Such negotiations shall extend for a period of ninety (90) days after such new products are presented to REMINGTON. After the ninety (90) days period, or if REMINGTON declares its lack of interest to distribute the product, ODF will have the right to negotiate and cooperate with any third party regarding the new product and operate freely with regard to the new product in the Markets and in the Territory and elsewhere, with no liability to REMINGTON. If ODF does not receive the required approvals from the government of Israel to present such new product to REMINGTON, this will not be considered a breach of the Agreement by ODF, and ODF will not be subject to any claims by REMINGTON as a result.

(g) In consideration of the rights granted to REMINGTON under the terms of this Agreement, REMINGTON agrees to make the Distributor Fee Payment described in Schedule A net of any withholdings, if applicable.

(h) Remington and ODF will meet prior to the introduction of each Product to the Markets. During these meetings, the parties will determine, by mutual consent, a minimum sales target for each Product for each of the following three calendar years as well as the Royalty rate applicable to such Product. Notwithstanding the foregoing, no minimum sales targets will be established for any Product for years prior to 2006.
The parties shall similarly meet again to establish minimum sales targets for each of the Products and applicable Royalty rates for each subsequent three year period this Agreement remains in effect,.

2



*per annum*

(j) If REMINGTON fails to achieve the minimum sales established for a Product (a) for two consecutive years by thirty percent (15%) of the cumulative minimum sales for the two year period, or (b) in any single year by more than twenty-five percent (25%) (either of which shall be referred to as a "Failure to Meet Minimum Sales"), ODF may (x) leave this Agreement valid and in full force and effect (y) revoke REMINGTON'S status as the exclusive distributor of the Product or (z) revoke REMINGTON's right to sell the Product. Notwithstanding the foregoing, REMINGTON shall first have the right to pay to ODF the amount of earned Royalties (based on REMINGTON'S then-current sale price of the Product) REMINGTON would have paid to ODF to avoid a Failure to Meet Minimum Sales, and if REMINGTON chooses to make such payment, this Agreement shall continue in full force and effect, and REMINGTON shall not be otherwise penalized in any respect

(k) If the parties fail to reach an agreement regarding minimum sales targets or royalty rates regarding a specific Product after negotiating for a period not to exceed ninety (90) days, ODF will have the right to revoke REMINGTON's right to sell the Product and ODF will have the right to distribute that Product in the Markets and in the Territory and elsewhere without liability to REMINGTON.

## 2.    TERM

This Agreement shall commence on the Effective Date and shall continue in full force and effect for a period of ten (10) years from the Effective Date, subject to the terms of this Agreement. This Agreement shall automatically renew for successive terms of two (2) years unless either party shall give the other notice of such party's intent not to renew at least one-hundred and eighty (180) days prior to the end of the initial term or then-current renewal period.

## 3.    DUTIES OF REMINGTON

(a)    During the term of this Agreement, REMINGTON shall use commercially reasonable efforts to (i) market, promote and sell the Products in the Markets within the Territory; (ii) order and maintain sufficient quantities of Products to supply its customers on a timely basis; and (iii) perform any and all services necessary and appropriate to ensure the effective merchandising and sales support of the Products in the Markets within the Territory.

(c)    REMINGTON shall furnish sales forecasts at such intervals as may be reasonably requested by ODF and at least once a year. REMINGTON shall maintain complete and accurate records of its sales of Products and permit ODF to have access to those records upon ODF'S request and after receiving reasonable notice, but not more than twice each year.

(d)    REMINGTON shall be responsible for its sales and marketing costs relating to the distribution of the Products as permitted hereunder, including the following activities:

i.   Developing an advertising plan

3

O.D.F. Optronics Ltd.

ii.  Developing a strategic marketing plan
iii.  Developing sales support materials
iv.  Presenting the Products at appropriate conferences and trade shows
v.  Employing a sales staff as appropriate
vi.  Advertising the Products in the appropriate trade journals

(d)  REMINGTON shall be responsible for its general and administrative costs relating to the distribution of the Products as permitted hereunder, including the following activities:

i.  Establishing a customer order center to process orders
ii.  Establishing a customer after-market sales program
iii.  Establishing a billing and collection group
iv.  Paying all state and federal income taxes as required by law
v.  Providing post-sales services, including technical support

## 4.  DUTIES OF ODF

(a)  Provided that REMINGTON meets its obligations to sell the minimum amounts of Products as required by this Agreement, ODF shall not directly or indirectly sell or distribute Products in the Markets within the Territory and ODF will use its best efforts to ensure that its distributors do not resell the Products in the Markets in the Territory.

(b)  ODF will manufacture (or have manufactured) Products on the basis of firm orders received from REMINGTON. If ODF persistently and repeatedly fails to timely supply REMINGTON with sufficient quantities of Products to distribute, and such failures are attributable to delays caused by ODF's manufacturer, REMINGTON, after consulting with ODF, shall have the right to require ODF to appoint a new manufacturer satisfactory to REMINGTON or allow REMINGTON to produce an adequate supply of Products.

(c)  ODF will provide reasonable technical support to REMINGTON to ensure the effective merchandising and sales support of the Products in the Territory. The parties will establish a technical support model, defining the scope and pricing of the technical support services provided by ODF. The technical support model will be established before the introduction of each Product to the market and will be updated annually, or as necessary.

(d)  ODF, in consultation with REMINGTON, shall develop a production and prototype plan for all Products. The production and prototype plan shall establish a schedule relating to each Product for the (i) development of prototypes; (ii) delivery of prototypes to REMINGTON, and (iii) manufacture of such Product.

(e)  ODF shall at all times inform REMINGTON as early as possible of improvements to and new versions of Products, subject to the appropriate approval of the Israeli government.

(f)  ODF will have the sole responsibility to determine the specifications of the Products, including, but not limited to: technical performance, components, mechanical parameters, and required environmental operation conditions.

## 5. TERMS OF SALE AND PAYMENT

4

(a)    REMINGTON shall purchase Products from ODF at ODF's costs . Costs will be determined during the pre-production phase relating to each Product and shall include the cost of manufacture, royalties required to be paid to Israeli government offices (such as the Israeli Ministry of defense, the Office of the Chief Scientist, etc.), when applicable, cost of insurance incurred pursuant to Sections 11 and 13 of this Agreement, and overhead of twenty percent (20%) of manufacturing costs. ODF will notify REMINGTON of any demand made by the Israeli government to receive royalties from the sale of Products immediately when ODF becomes aware of such demand. ODF is not currently aware of any requirement or demand to pay royalties to any Israeli government office for any Product. Cost information shall be provided to REMINGTON upon request. REMINGTON agrees that regarding Products which are Software only, ODF may decide to sell software licenses to REMINGTON at a different cost than stipulated herein above and as will be mutually agreed by the parties

(b)    REMINGTON shall pay all invoices for the Products in U.S. dollars in two installments, namely (i) 40% within 10 days of approval of each order by ODF and (ii) the balance of 60% within seventy  (70) days of the date Products have been received by REMINGTON's designated carrier at the loading point. REMINGTON may be required to provide a letter of credit, on terms acceptable to ODF's banks, for payment of the balance of each order.

6.    **ORDERS AND DELIVERY**

(a)    REMINGTON shall submit written purchase orders for the Products containing complete information regarding the Product price, item number, quantity, requested delivery dates, shipping instructions and shipping address. REMINGTON will submit the purchase order in sufficient time prior to the requested delivery date. ODF will notify to REMINGTON within 7 days of receipt of any purchase order of its ability to meet the requested delivery date, and in case ODF is reasonably unable to meet the requested delivery date, a request by ODF to reasonably postpone delivery date will not be considered as "failure to supply".

(b)    All costs of shipment of Products to REMINGTON, including freight, and insurance, shall be borne by ODF but will be considered as the cost of manufacture for the matter of section 5(a) above, however for freight and insurance REMINGTON shall not be required to pay overhead costs . Title and all risk of damage, loss or delay of the Products shall pass to REMINGTON upon their delivery to REMINGTON's designated carrier at the loading point.

7.    **ACCESSORIES**

It is anticipated that accessories will be developed for each of the products listed on Schedule A. To the extent that Accessories are developed, ODF will have the right to supply those accessories to Remington for resale  provided that ODF's price/quality to Remington is competitive with price/quality quotations received by Remington from third party vendors.

8.  **ROYALTY**

ODF Optronics Ltd.

5

(a)    In consideration of the rights granted by ODF to REMINGTON under this Agreement, REMINGTON agrees to pay to ODF a royalty (the "Royalty") as defined in Schedule A net of any withholdings, if applicable, on REMINGTON'S Net Sales of Products. For purposes of this Agreement, "Net Sales" is defined as gross sales less payment terms, volume discounts, excise taxes and returns.

(b)    REMINGTON will send Royalty payments owed for each calendar quarter to ODF by wire transfer within thirty (30) days following the end of each quarter. Along with such royalty payments, REMINGTON shall furnish ODF with a written statement setting forth the quantity and the calculation of Net Sales of Products sold in the preceding calendar quarter and all other relevant information reasonably necessary to facilitate verification of the Royalty owed to ODF.

(c)    REMINGTON shall cause its records to be available at reasonable times during REMINGTON's business hours, upon reasonable notice from ODF, for inspection and audit in such a manner as shall not disrupt REMINGTON's business operations by an accounting firm that (i) is reasonably acceptable to REMINGTON (and any one of the "Big Four" accounting firms that neither provides services to ODF nor has any other conflict of interest shall be so acceptable), and (ii) has executed an agreement protecting the confidentiality of the records and all other information disclosed to or otherwise learned by such accounting firm during such audit and limiting the disclosure of the records and such information to ODF to records and information directly relevant to such accounting firm's findings with respect to overpayment or underpayment of Royalties. ODF shall not conduct more than one such inspection per year, unless an inspection reveals that Royalties due have not been reported, in which case one further such inspection may be conducted in the course of the year in question. ODF shall be responsible for all costs related to such inspection and audit  unless the accounting firm certifies that REMINGTON has underpaid royalties to ODF by more than five percent (5%), in which event REMINGTON shall promptly pay the amount so determined and reimburse ODF for all of the actual, documented costs of having such accounting firm perform such audit; provided, however, that in paying such amount, REMINGTON shall not waive REMINGTON's right to dispute whether the amount of such payment is correct, ODF's entitlement to such payment or any other matter related to such payment.

## 9.    PRODUCT PRICING

The retail sale price for Products sold by REMINGTON will be determined by REMINGTON.

## 10.    PRODUCT WARRANTY

(a)    ODF warrants all Products to be free from defects in materials and workmanship and will repair or replace, at its sole option, any defective Product for a certain period of time following the date of sale of a Product by REMINGTON to REMINGTON's customer. The warranty period for each of the Products and for



6

A .

the components of each of the Products will be discussed and agreed upon by both parties in connection with the introduction of each Product to the market. The parties contemplate that such warranties will extend for a period of between six (6) and twelve (12) months, except for warranties for those Products that are "disposable" or "intended for single-use". ,. Each of the Products will conform to written specifications provided from time to time by ODF to REMINGTON and ODF's warranty shall be limited to those written specifications and subject to the terms and conditions specified in the warranty accompanying each Product.

(b)    REMINGTON shall inspect the Products within a reasonable period of time after delivery to REMINGTON, in no event more than thirty (30) days after delivery. Following REMINGTON'S inspection of the Products without finding any defects, shortage, damage or discrepancy, or upon REMINGTON'S failure to inspect within thirty (30) days after delivery, the Products will be deemed accepted by REMINGTON. If REMINGTON reasonably refuses to accept the Products, the Products will be returned to ODF at ODF's expense.

(c)    All costs of shipment of replacement Products to REMINGTON, including freight, insurance, taxes, import fees and duties, shall be borne by ODF.

(d)    REMINGTON'S EXCLUSIVE REMEDY FOR BREACH OF THE FOREGOING WARRANTY AND ODF'S SOLE LIABILITY IN THE EVENT OF SUCH BREACH IS LIMITED TO TIMELY REPLACEMENT OF PRODUCTS FAILING TO CONFORM TO THE FOREGOING WARRANTY. THERE ARE NO OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. In the event the foregoing limitation of liability is determined to be invalid by any competent court or governmental authority, or in the event ODF cannot timely replace such Products, REMINGTON agrees that its remedy shall be limited to the purchase price of Products failing to conform to the warranty in this Section 9.

## 11.    INDEMNIFICATION

ODF shall defend, indemnify and hold harmless REMINGTON and its officers, directors, agents and employees from and against any and all claims, causes of action, damages, losses, costs and expenses (including reasonable attorneys' fees), judgments and liabilities made against or incurred by REMINGTON arising out of, or in any way connected with, any claim or action for personal injury, death, property damage or other cause of action alleging product defect, negligence or any other claim involving the Products, provided, however, that ODF shall have no obligation to indemnify any person to the extent that claims, causes of action, damages, losses, costs and expenses (including reasonable attorneys' fees), judgments or liabilities arise from the negligence or willful conduct of REMINGTON or its officers, directors, agents, and employees . The indemnification obligation stated herein shall survive any termination or expiration of this Agreement. ODF will obtain the appropriate insurance in amounts reasonably acceptable to REMINGTON to cover such claims and will provide proof of such insurance to REMINGTON upon request on at least an annual basis.

7

12.    **CONFIDENTIALITY**

A party (the "Receiving Party") shall treat as confidential any and all information received from another party (the "Disclosing Party") in connection with the negotiation, execution and performance of this Agreement, including, without limitation, price lists, customer lists, marketing plans, product designs and developments, and technical know-how. The Receiving Party shall not use or disclose any such information to any third party without the prior written consent of the Disclosing Party, unless and only to the extent that such information becomes generally known to the public through no fault of the Receiving Party. The obligation of confidentiality stated herein shall survive any termination or expiration of this Agreement.

13.    **INTELLECTUAL PROPERTY**

(a)    REMINGTON shall promptly notify ODF of any use by any third party of any trademark, patent, trade secret or other proprietary right which may constitute an infringement or passing off of ODF'S intellectual property rights. ODF reserves the right, in its sole discretion, to institute any proceedings against such third party infringers, and REMINGTON shall refrain from doing so, provided, however, that if ODF unreasonably declines to enforce its intellectual property rights, ODF shall authorize REMINGTON to institute proceedings against such third party infringers and shall cooperate with REMINGTON as reasonably necessary. ODF will use commercially reasonable efforts to protect its intellectual property rights relating to the Products in the Territory, including filing and prosecuting patent applications relating to the Products which ODF sees as meeting the criteria of patentability as required by patent laws. REMINGTON agrees to cooperate fully with ODF in any action taken by ODF against such third parties, provided that all expenses of such action shall be borne by ODF and all damages which may be awarded or agreed upon in settlement of such action shall accrue to ODF.

(b)    ODF shall defend, at its own expense, any suit or proceeding against REMINGTON by third parties arising out of claims that REMINGTON'S use or sale of the Products in the Territory infringes or violates any trademark, copyright, patent, trade secret or other proprietary right of any third party. ODF will pay all sums which, by final judgment or decree of a court of last resort, may be assessed against REMINGTON in any such suit or proceeding on account of such infringement; provided that ODF shall be given (i) reasonable, prompt written notice of such claims; and (ii) authority to assume the sole defense through its own counsel and to compromise or settle any suits so far as this may be done without prejudice to the rights of REMINGTON. ODF will obtain the appropriate insurance to cover any such claims in amounts reasonably acceptable to REMINGTON and will provide proof of such insurance to REMINGTON upon request on at least an annual basis.

(c)    In the event that the sale of Products subjects REMINGTON to claims of intellectual property infringement by third parties, the parties will meet and confer to determine whether or how Products will continue to be sold and distributed in the Territory.

(d)    ODF warrants that it has the right to grant the rights conferred to REMINGTON under this Agreement and that the distribution and sale of Products in the Markets within the Territory does not infringe the rights of others.

8

**14.**    **TERMINATION**

(a)    Either party may terminate this Agreement upon at least ninety (90) days written notice in the event the other party fails to comply with any of the material terms of this Agreement and fails to cure such non-compliance within ninety (90) days of receiving written notice thereof.

(b)    Either party may terminate this Agreement immediately by written notice in the event that the other party enters or is placed in bankruptcy, receivership or liquidation, is nationalized, becomes insolvent or makes an assignment for the benefit of its creditors.

**15.**    **EFFECT OF TERMINATION**

(a)    Upon  expiration or termination of this Agreement for any reason, REMINGTON'S rights under this Agreement shall immediately terminate and REMINGTON shall cease selling, promoting or distributing the Products, and otherwise representing in any manner that REMINGTON is authorized to distribute the Products.

(b)    Upon expiration or termination of this Agreement for any reason, ODF shall, at its option, (i) repurchase REMINGTON'S inventory of the Products at the net invoice price paid to ODF by REMINGTON for such Products; or (ii) permit REMINGTON to sell such inventory, provided that REMINGTON must complete all such sales within six (6) months of the termination date and fully perform all its obligations required by this Agreement.

(c)    Neither termination nor expiration shall relieve either party from the duty to discharge in full all obligations accrued or due prior to the date thereof.

**16.**    **IMPORT AND EXPORT OF PRODUCTS**

(a)    ODF shall be responsible for obtaining all necessary approvals from the government of Israel, including the Israeli Ministry of Defense, to permit REMINGTON to purchase and distribute, and if and when necessary, to manufacture, Products as permitted hereunder.  REMINGTON shall be responsible for obtaining all licenses and permits and for satisfying all formalities as may be required to import Products into the Territory in accordance with then prevailing laws or regulations.  ODF shall furnish REMINGTON with all documents from the country of origin necessary for importation to the Territory as may be reasonably requested by REMINGTON.

(b)    REMINGTON shall supply ODF on a timely basis with all necessary information and documentation requested by ODF in order to permit ODF to export the Products with respect to any sale or order solicited by REMINGTON hereunder.

(c)    REMINGTON shall not dispose of any U.S. origin Products, software, know-how, technical data, documentation or other Products or materials furnished to it pursuant to this Agreement to any party or in any manner which would constitute a violation of the export control regulations of the United States now or hereafter in effect if the disposition was made by a U. S. corporation, or a non-U.S. corporation subject to those regulations.

9

(d)    Export of Products or know-how, including manufacture files for the Products, by ODF is subject to the approvals of Israeli government offices (including the Israeli Ministry of Defense and the Israeli Office of the Chief Scientist), and to any limitations imposed by these offices. ODF does not represent these offices will approve the export of the Products or know-how relevant to the Products or for their next generations versions or improvement, and any limitation imposed by these offices will be considered a Force Majeure. ODF will use its best efforts to obtain the necessary approvals, but will not be obligated to compensate REMINGTON or to provide REMINGTON with a replacement product in case any product of Product will be banned from export or subject to export limitations.

## 17.    COMPLIANCE WITH LAWS

The parties agree to cooperate in complying with all applicable laws and regulations during the course of performance of this Agreement, including, but not limited to, registration of this Agreement with local governmental authorities or any necessary governmental approvals or registrations relating to the sale or use of the Products in the Territory.

## 18.    FORCE MAJEURE

(a)    Neither party shall be liable to the other party for delay or failure of performance of this Agreement if the delay or failure is caused by acts of God, war, fire, embargo, strikes or other labor trouble, governmental regulations or actions, shortage of or inability to obtain material, equipment or transport, or any cause beyond the control of the parties; provided the parties shall use their best efforts to find reasonable means to avoid the delay or failure of performance.

(b)    If a delay or failure of performance caused by force majeure shall continue for a period of more than six (6) months, either party shall have the right to terminate this Agreement immediately upon written notice to the other party.

10



**19. LIMITATION OF LIABILITY**

EXCEPT AS EXPRESSLY PROVIDED HEREIN, ODF SHALL NOT BE LIABLE FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL OR OTHER DAMAGES ARISING OUT OF THIS AGREEMENT, ITS PERFORMANCE OR TERMINATION, OR IN CONNECTION WITH THE DELIVERY, USE, OR PERFORMANCE OF ANY PRODUCT BY REMINGTON AND ITS CUSTOMERS EVEN IF ODF HAD BEEN ADVISED, KNEW OR SHOULD HAVE KNOWN OF THE POSSIBILITY THEREOF INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, LOST BUSINESS REVENUES, FAILURE TO REALIZE EXPECTED SAVINGS, OTHER COMMERCIAL OR ECONOMIC LOSS OF ANY KIND, OR FOR ANY CLAIM AGAINST A DISTRIBUTOR BY ANY OTHER PARTY, NOR SHALL ODF BE LIABLE FOR ANY DAMAGES WHATSOEVER RESULTING FROM A FORCE MAJEURE OR AN ACT OF A THIRD PARTY OR OF NO FAULT ON ODF'S BEHALF. ANY LIABILITY OF ODF SHALL AT THE OPTION OF ODF BE LIMITED EXCLUSIVELY TO REPLACEMENT OF THE PRODUCT TO REMINGTON OR ITS CUSTOMERS, AS THE CASE MAY BE, OR REIMBURSEMENT OF ROYALTIES AND OTHER PAYMENTS RECEIVED BY ODF HEREUNDER.

This limitation of liability shall not apply to ODF'S indemnity obligations set forth in Sections 10 and 12 of this Agreement.

**20. RELATIONSHIP OF PARTIES**

This Agreement does not constitute and shall not be construed as constituting a partnership, joint venture, principal/agent, or employer/employee relationship between ODF and REMINGTON. Neither party shall have any right to obligate or bind the other party in any manner whatsoever, and nothing herein contained shall give, or is intended to give, any rights of any kind to any third persons.

**21.    ENTIRE AGREEMENT; VALIDITY**

(a)    This Agreement constitutes the entire agreement between the parties and supersedes all previous agreements, negotiations and commitments between the parties, and shall not be changed or modified in any manner, except by mutual written consent signed by duly authorized representatives of each of the parties.

(b)    Should any provisions of this Agreement be invalid or unenforceable under any applicable laws or regulations, all other provisions of the Agreement shall remain in effect.

**22.    ASSIGNABILITY**

Neither party shall have the right to assign or otherwise transfer its rights and obligations under this Agreement except with the prior written consent of the other party; provided, however, that either party shall be permitted to assign any or all of its rights and obligations hereunder in connection with a sale of substantially all of the party's assets or pursuant to a merger or a consolidation.

11



23.  **BINDING EFFECT**

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

24.  **WAIVER**

The terms and conditions of this Agreement may be waived only by a written instrument executed by the party waiving compliance. The failure of any party to require performance of any provision of the Agreement or to exercise any right hereunder shall not constitute a waiver or prejudice that party's right to enforce the same at any later date.

25.  **NOTICE**

Unless otherwise specified herein, all notices, demands and other communications that may be or are required to be given hereunder or with respect hereto shall be in writing and shall be given either by personal delivery, by overnight delivery service or by certified mail, return receipt requested, postage prepaid, and shall be deemed to have been given or made when personally delivered, the next business day following the date such notice was sent by overnight delivery service, or seven (7) days after the date such notice was deposited in the mail, as the case may be, and shall be addressed as follows:

If to REMINGTON:
Remington Arms Company, Inc.
870 Remington Drive
P. O. Box 700
Madison, NC  27025-0700
Attn:  Jann Jones

If to ODF:
O.D.F. Optronics Ltd
65 Yigal Alon St.,
Tel-Aviv, 67443, Israel
Attn:  Mr. Itsik Kattan

Either party may change its address for purposes of notice pursuant to the Agreement by notifying the other party of such change of address in the manner set forth above.

26.  **GOVERNING LAW AND VENUE**

This Agreement shall be governed by and construed in accordance with the laws of the State of New York and the United States, without regard to conflict of laws rules. Any suits or actions arising out of or relating to this Agreement shall be brought exclusively in the federal courts sitting in New York, New York, and the parties expressly consent and submit to the jurisdiction of such courts.

12

27.  **SEVERABILITY**

If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect.

28.  **CONFIDENTIALITY OF THIS AGREEMENT**

This Agreement and its terms shall be confidential. Neither party will disclose any such information to any third party without the prior written consent of the other party, unless and only to the extent that such information becomes generally known to the public through no fault of either party. The obligation of confidentiality stated herein shall survive any termination or expiration of this Agreement.

29.  **GOVERNING LANGUAGE**

This Agreement is entered into in the English language. Should a translation of this Agreement into any other language be required or desired for any reason, it is understood that in all matters involving the interpretation of this Agreement, the English version shall govern.

IN WITNESS WHEREOF, the parties hereto, through their duly authorized officers, have executed this Agreement as of the date first written above.

O.D.F. Optronics Ltd.

By: _Ehud_____

Title: _CEO_____

Remington Arms Company, Inc.

By: _____

Title: _COO_____

13

## SCHEDULE A

1.    **Products:**
     (a) Eyeball R1
     (b) GateKeeper
     (c) Lightball
     (d) VODR
     (e) Smart VMD 100

2.    **Royalty Rates:**

Royalty Rates shall be calculated based upon REMINGTON's retail sale price for Products as set forth in the table below:

| PRODUCT | RETAIL PRICE | RETAIL PRICE | RETAIL PRICE | RETAIL PRICE |
|---|---|---|---|---|
| | $0-$2,910 | $2,911 - $4,850 | $4,851 - $7,500 | >$7,500 |
| Eyeball R1 | 9% | 12% | 15% | > TBD |

| PRODUCT | RETAIL PRICE | RETAIL PRICE | RETAIL PRICE | RETAIL PRICE |
|---|---|---|---|---|
| | TBD | TBD | TBD | TBD |
| Gate Keeper | TBD | TBD | TBD | TBD |

| PRODUCT | RETAIL PRICE | RETAIL PRICE | RETAIL PRICE | RETAIL PRICE |
|---|---|---|---|---|
| | TBD | TBD | TBD | TBD |
| Light Ball | TBD | TBD | TBD | TBD |

| PRODUCT | RETAIL PRICE | RETAIL PRICE | RETAIL PRICE | RETAIL PRICE |
|---|---|---|---|---|
| | TBD | TBD | TBD | TBD |
| VODR | TBD | TBD | TBD | TBD |

| PRODUCT | RETAIL PRICE | RETAIL PRICE | RETAIL PRICE | RETAIL PRICE |
|---|---|---|---|---|
| | TBD | TBD | TBD | TBD |
| Smart VMD100 | TBD | TBD | TBD | TBD |

3.    **Territory:** United States and its territories and possessions (which include American Samoa, Baker Island, Guam, Howland Island, Jarvis Island, Johnston Atoll, Kingman Reef, Midway Islands, Navassa Island, Northern Mariana Islands, Palmyra Atoll, Puerto Rico, Virgin Islands, and Wake Island); Canada

4.    **Markets:**

a) All State and Local Law Enforcement Groups as defined by the U.S. Department of Justice, including local police, sheriffs, primary State and Provincial police, Special Jurisdiction, Texas Constable Departments and Provincial Police

14

O.D.F. Optronics Ltd.

b) All Federal Agencies. For the avoidance of doubt, these will not include the U.S. Department of Defense, its branches and/or divisions or any agency under the DoD, nor will it include the U.S. military or any form of U.S. military force.

c) Private/Industrial Security companies, defined as those that provide security to above and below mentioned entities, not to the private sector

d) Local and National Fire & Rescue Departments under FEMA (which is a Federal Agency)

e) Royal Canadian Mounted Police (RCMP)

5.    Distribution Fee Payment:  $500,000 payable upon execution of this Agreement

15

D.D.E. Optronics Ltd.

## Amendment No.1 of Distribution Agreement

This Amendment No. 1 ("**Amendment No. 1**") of the Distribution Agreement dated July 19, 2004 (the "**Agreement**") between O.D.F. Optronics Ltd. ("**ODF**") and Remington Arms Company, Inc. ("**REMINGTON**") is made and entered into on this __ day of Sep 11, 2005.

WHEREAS, ODF and REMINGTON wish to amend certain other terms and provisions of the Agreement;

WHEREAS, the parties desire that Wave Group Ltd, a corporation organized and existing under the laws of Israel, with its principal offices located at 65 Yigal Alon Street, Tel Aviv, Israel ("**WAVE GROUP**"), and which is the parent company of ODF, become a party to the Agreement; and

WHEREAS, WAVE GROUP desires to become a party to the Agreement and to assume the obligations stated herein;

NOW THEREFORE, in consideration of the mutual promises and covenants set forth in the Agreement and herein, the parties hereby agree to amend the Agreement as set forth below:

1.      In Section 1(d) of the Agreement, the sentence beginning "Upon request by ODF" shall be replaced by the following:

"REMINGTON agrees to affix ODF's trademarks, trade names and logos to the Products and their packaging, advertising and marketing materials in a prominent manner (but less prominent than those of REMINGTON) subject to ODF's reasonable approval. REMINGTON shall not use any material promotional, advertising or marketing materials not previously approved by ODF with respect to the Products. ODF shall reply to any request for approval within two (2) business days, failing which the material shall be deemed approved. All materials which have been prepared prior to the effective date of this Amendment No. 1 shall be provided to ODF and to the extent that outstanding copies of such material exist may still be used."

2.      In Section 1 (e) of the Agreement, the following shall be added at the end of the section:

"REMINGTON shall advise ODF promptly if REMINGTON shall enter into any agreement for the sale of any competitive product or granting REMINGTON any rights to sell, market or otherwise promote any competitive product and the execution of any such agreement shall be considered an election by REMINGTON to sell such competitive product. REMINGTON also undertakes that no attempt shall be made to modify, improve, reverse engineer or otherwise use any Product, in developing any competitive product. ODF acknowledges that REMINGTON currently markets a product that reads license plate numbers, and that this product is not competitive with any of ODF's Products."

- 1 -

3.   In section 1 (f) the following shall be added at the end of the section:

"The obligation to offer new products under this Section 1(f) shall only apply to products which may be handheld (or are soldier/officer deployable) by combatants or law enforcement agency personnel and are intended for standalone deployment in the course of combat or law enforcement".

4.   Section 1 (h) of the Agreement shall be replaced by the following:

(h)   The chief executive officer, president, or chief operating officer of REMINGTON and ODF will meet prior to the introduction of each Product to each of the Markets. During these meetings, the Parties will determine, by mutual consent, minimum orders, in U.S. dollars, for each Product and Market for the balance of the calendar year in which the Product is being introduced and the purchase price for each Product in each Market. Thereafter the parties shall set (i) minimum orders and purchase prices for the non-military Market every six months and (ii) minimum orders and  purchase prices for the military Market each calendar year. Each calendar year period during the term of this Agreement shall be a "Sales Period".  For this purpose, the parties shall meet in the last quarter of each Sales Period.

Notwithstanding the aforesaid and the provisions of Section 1 (k), the pricing of the Eyeball R1 Product and the first Gatekeeper Product released for commercial sale shall be fixed as specified in Section 5 for the term of the Agreement. For the avoidance of doubt, and without derogating from REMINGTON's right to sell the Eyeball R1 to the military Market, any military version of the Eyeball Product shall be considered a different product from the Eyeball R1 Product.

Without derogating form the foregoing, a new version of a Product shall be deemed a new Product hereunder. An improvement of a Product shall be the same Product hereunder.

The term 'new version' means a product which includes a significant new feature or materially different specifications or which features have been materially enhanced enabling broader application of the products. Likewise, a Product which is enhanced to enable new uses or application shall be deemed a new version, and as such, a new product.

The term 'improvement' means the enhancement of a Product which does not constitute a new version.

5.   Section 1 (j) shall be replaced by the following:

(j)   If REMINGTON fails to achieve the minimum sales established for a Product for any Sales Period  (a "Failure to Meet Minimum Sales"), ODF may (x) leave this Agreement valid and in full force and effect, or (y) revoke REMINGTON'S status as the exclusive distributor of the Product(s) or (z)  revoke REMINGTON's right to sell the Product(s).

- 2 -

Notwithstanding the foregoing, REMINGTON shall first have the right to pay to ODF an amount equal to the difference between the profit made by ODF on sales to REMINGTON for the relevant Sales Period and the gross profit ODF would have made from sales of Products to REMINGTON had REMINGTON avoided a Failure to Meet Minimum Sales, and if REMINGTON chooses to make such payment, this Agreement shall continue in full force and effect, and REMINGTON shall not be otherwise penalized in any respect.

6.    Section 1 (k) of the Agreement shall be replaced by the following:

In the event the parties are unable to agree on minimum orders or prices for any Product in any Market by the commencement of any Sales Period, the minimum orders and price set for the previous period shall continue to apply for the next six month period. In the case of a new Product which the parties agree REMINGTON shall distribute and on which they cannot agree on pricing, the pricing mechanism specified in Section 5 shall apply for the first six months of distribution of that Product or for such time as REMINGTON has ordered $4,500,000 of that Product, whichever is earlier, commencing from the date ODF has advised REMINGTON that such Products may be ordered, provided that (x) REMINGTON shall not make orders during such period for which it does not have firm customer orders, and (y) in determining COG, a fair proportion of R&D expenses will be added to COG.

At the end of any of the six month periods specified in this Section 1(k), if no agreement has been reached on minimum orders and prices, ODF will have the right to revoke REMINGTON's right to sell the Product and ODF will have the right to distribute that Product in the Markets and in the Territory and elsewhere without liability to REMINGTON. During the first three months of such six month periods, ODF will not negotiate with any third party regarding the distribution of such Products.

7.    Section 3(b) shall be added as follows:

(b)    REMINGTON's records shall contain, inter alia, specific information regarding the sale price of Products in each transaction and shall specify any discounts granted.

8.    After Section 3 (d) of the Agreement, the following shall be added:

(e)    REMINGTON can bundle Products for sale with other goods in any manner, provided REMINGTON's purchase price for said Product remains as agreed between the parties (i.e., any bundling discount to REMINGTON customer shall be absorbed by REMINGTON).

(f)    REMINGTON will pursue promptly after execution of this Amendment No. 1, sales of existing Products, without modifications, to the U.S. military. In addition, REMINGTON will review with U.S. military

- 3 -

representatives and others suggested modifications and configurations of Products to enhance the marketability of such Products and will provide ODF with detailed advice on such matters. ODF and REMINGTON will work together to determine feasibility, marketability, availability, configuration, as well as target cost and volumes regarding such Products.

(g)    REMINGTON will pursue with U.S. governmental authorities the possibility of obtaining research and development grants for ODF for product development, it being agreed that both ODF and REMINGTON will review each project and mutually agree on the appropriate revenue split consistent with applicable laws and regulations.

(h)    REMINGTON will assign senior level management, reporting directly to the COO or President of REMINGTON, to be responsible for the distribution of Products and engage lobbying firms to enhance marketing efforts to the U.S. military.

9.    Section 5 of the Agreement shall be deleted and replaced by the following:

(a)    For the purposes of Sections 5(a) to (f), the term Product shall mean only the Eyeball R1 and the first Gatekeeper Product introduced to the marketplace (including improvements thereof). In the case of any other Product, the parties will agree on a pricing mechanism prior to introduction of such Product. As specified in Section 1(h), REMINGTON shall purchase each Product from the Company at a price which shall be calculated in accordance with the following formula:

$$PPU = (SP - COG)/2 + COG$$

Where

PPU – price per Product unit payable by REMINGTON to ODF.

SP – the actual sale price of each Product unit as payable by end users for their use and not for resale, provided that SP will be the recommended end user sale price determined by the parties in the following cases: (a) if such end user sales price is not known by REMINGTON at the time of placing an order, or (b) if REMINGTON's customer is not the ultimate end user and is not a REMINGTON affiliate.

COG – the actual production costs of the Product to ODF as determined by using U.S. Generally Accepted Accounting Principles as reviewed by the auditors of ODF, plus product liability insurance premiums, shipping costs and duties. Such production costs will be calculated on a product by product basis, with ODF's auditors to determine the allocation of production overhead and other production costs which are shared between different products of ODF.

(b)    REMINGTON shall furnish ODF within thirty (30) days following the end of each calendar year quarter with a written statement of Net Sales of each Product in that quarter and all other information reasonably necessary to

facilitate the verification of the SP. "Net Sales" is defined as gross sales less volume discounts, excise taxes and returns. The SP of each Product shall be the Net Sales of such Product in the quarter divided by the number of units of Product sold (excluding returns). In addition, REMINGTON will supply ODF with a report detailing the number of each Product sold, categorized by "Markets" (as categorized in Schedule A).

(c)     ODF shall furnish REMINGTON within thirty (30) days following the end of each calendar year quarter with a written statement of COG of each Product in that quarter and all other information reasonably necessary to facilitate the verification of the COG. Within ninety (90) days of the end of each calendar year, ODF will provide REMINGTON with a statement signed by its auditors confirming COG of each Product, to be based on the audited financial statements of ODF for that Year.

(d)     Prior to the introduction of each Product, and thereafter on an annual basis prior to the start of each calendar year, the parties will agree upon an estimate of the average PPU for that year. Such estimate shall be referred to as the Interim PPU for such Product. REMINGTON shall pay for all Product ordered in any quarter on the basis of the Interim PPU. After receipt of the calculation of SP and COG for each quarter, the Interim PPU shall be readjusted on a quarterly basis.

(e)     In the event that the PPU as determined for any period is higher than the Interim PPU at which a Product was ordered in that quarter, REMINGTON shall pay the difference within thirty (30) days. In the event that the PPU as determined for any period is lower than the Interim PPU at which a Product was ordered in that quarter, ODF shall issue to REMINGTON a credit note for such difference, which shall be credited against future PPUs payable by REMINGTON to ODF. Except upon termination of this Agreement, in no event shall ODF be required to refund payments made by REMINGTON. Once an annual audit is completed there is no right on behalf of either party to demand payment for past miscalculation of COG.

(f)     Notwithstanding the foregoing, the PPU per Product shall in any event not be less than the following price (the "Base Price"):

Base Price = (0.8SP-COG)/2 + COG

For the purpose of this Section 5(f), SP shall mean the recommended end user sales price of REMINGTON as agreed upon by the parties.

(g)     REMINGTON agrees that regarding Products which include Hardware and Software, REMINGTON will be required to purchase the Product in its entirety from ODF, and will not sell ODF's Software as an addition to other products, nor combine software of other origin into ODF's Hardware, without prior consent of ODF, such consent not to be unreasonably withheld.

(h)     All payments to be made by REMINGTON to ODF hereunder shall be net of any withholding or other taxes, if applicable, and shall be paid without deduction or set-off. If it is determined that REMINGTON as the withholding agent is liable for additional tax or withholdings that should have been withheld pursuant to Internal Revenue Code section 1441 and 1442 or as determined under the treaty between the U.S.A. and the government of the State of Israel, or as required by any other applicable law or regulation on any payments made to ODF, ODF will reimburse REMINGTON for the aforementioned tax. REMINGTON shall (i) notify ODF prior to making a deduction; (ii) give ODF such assistance and cooperation as may be reasonably necessary to enable or assist ODF to claim exemption therefrom or credit therefor; and (ii) upon ODF's reasonable request, furnish to ODF such certificate or other evidence of deduction and payment thereof as ODF may properly require in order to obtain a tax credit under applicable tax treaties between Israel and the applicable territories.

(i)     Notwithstanding anything in this Agreement to the contrary, from time to time, REMINGTON shall place orders for a number of Products reasonably acceptable to ODF to be used for training, demonstration, and evaluation purposes ("Demo Products"). The total price for Demo Products shall be equal to COG plus twenty percent (20%) of COG. REMINGTON will pay 40% of the purchase price to ODF upon ODF's acceptance of REMINGTON's order for Demo Products, and the balance of 60% of the purchase price upon delivery to and acceptance of the Demo Products by REMINGTON. If Demo Products are sold by REMINGTON, REMINGTON shall pay ODF the difference between the price initially paid for such Demo Products and the amount REMINGTON would have paid had such Products been sold according to the pricing mechanism established by the parties for such Products. ODF shall not be liable to REMINGTON for charges associated with late delivery set forth in Section 6 with respect to Demo Products.

(j)     Each party (the "Audited Party") shall cause its records to be available at reasonable times during the Audited Party's business hours, upon reasonable notice from the other party (the "Auditing Party") for inspection and audit in such manner as shall not disrupt the Audited Party's business operations by an accounting firm that (i) is reasonably acceptable to the Audited Party and any one of the "Big Four" accounting firms shall be acceptable unless a material conflict of interest is apparent, and (ii) has executed an agreement protecting the confidentiality of the records and other information disclosed to or otherwise learned by such accounting firm during such audit and limiting the disclosure of the records and such information to the Auditing Party to records and information directly relevant to such accounting firm's findings with respect to the overpayment or underpayment of fees or reporting of sales. Each party shall be entitled to conduct no more than one audit in every 12 month period, unless an inspection reveals that underpayment or overpayment or failures in reporting have occurred, in which case one

- 6 -

further inspection may be conducted in the course of the year in question. The scope of an audit shall not be limited to reviewing the events of the year preceding the audit but shall not include periods already audited other than if underpayments or incorrect reporting occurred during such period. The Auditing Party shall be responsible for all audit and inspection costs unless the accounting firm certifies that the Audited Party has misreported sales or costs in the access of 5% (in US$), in which case the Audited Party shall promptly pay the amount so determined and reimburse the Auditing Party for all cost related to the audit and the inspection and any collection fees (including reasonable legal fees) as may be incurred in connection therewith. The Audited Party shall be entitled to dispute the findings of the auditors but such claims shall not delay the performance of the payment as stated above.

Notwithstanding the aforesaid, in the case of REMINGTON, the Audited Party shall be REMINGTON TECHNOLOGIES, a division of REMINGTON, if such division is established by REMINGTON; provided, however, that if REMINGTON TECHNOLOGIES markets Products through any other division or affiliate of REMINGTON, such other division or affiliate will also be considered an Audited Party in respect of any Product sales.

The foregoing provisions shall not require any Party to deviate from its internal accounting practices as of the date hereof

10.    In Section 6 of the Agreement, the following will be added at the end of Section 6(a):

ODF shall issue to REMINGTON, and REMINGTON shall pay to ODF all invoices for the Products in U.S. dollars as follows, upon confirmation and approval of an order:

|  | Production Year One | Production Year Two and forward |
|---|---|---|
| Initial Amount | 40% of PPU | 40% of PPU |
| Due Date | Within 10 days of order confirmation IF timing below is approved, failing which payment will be 80 days prior to agreed shipment date. | Within 10 days of order confirmation IF timing below is approved, failing which payment will be 50 days prior to agreed shipment date. |
| Timing | Up to 90 days from confirmed ship date | Up to 60 days from confirmed ship date |

| Final Amount | 60% of PPU | 60% of PPU |
|---|---|---|
| Due Date | 45 days from delivery, duty unpaid, to US port of Entry. | 45 days from delivery, duty unpaid, to US port of Entry |

Production Year One shall mean the first twelve month period commencing the date a Product is approved for mass production for the first time. For the Eyeball R1, calendar year 2005 shall be Production Year One.

Other than in the circumstances set forth in Section 9 (b) below, in the event ODF fails to deliver a shipment of Products in accordance with the delivery schedule, ODF will pay in full any liquidated damages which REMINGTON is obliged to pay to its customer, to the extent previously disclosed and approved by ODF, and such payment shall be made within ten (10) days following notice to ODF.

If ODF fails to deliver Products to REMINGTON within a period which is double the delivery period provided by this Agreement, REMINGTON shall be entitled to cancel its order for such Products at any time thereafter with written notice to ODF, and such cancellation shall be effective thirty (30) days after such notice is given, provided that if delivery is made within such thirty (30) day period such cancellation shall not be made. ODF shall promptly refund all deposit payments made by REMINGTON for such Products after cancellation is effective, together with interest on the said sums at the rate of 12% per annum or the highest rate permitted by law (whichever is lower), during the period from the original delivery date until repayment is effected. Further, such cancelled orders shall be counted against any minimum sales targets agreed upon by the parties. In addition, provided an order has not been cancelled, ODF shall be liable to pay REMINGTON the following amounts for all Products which are delayed (excluding the first 1000 units):

(a)    On the date when REMINGTON would have been entitled to cancel the order, but has not yet done so, a sum equal to twenty-five percent (25%) of REMINGTON's profit calculated pursuant to Section 5 (Profit = (SP – COG)/2).

(b)    On Day 180 following the date of acceptance of the order, a sum equal to an additional (25%) of REMINGTON's profit calculated pursuant to Section 5 (Profit = (SP – COG)/2).

Payments under paragraphs (a) and (b) above shall become due upon delivery of the Product and shall not be due if REMINGTON cancels the order.

By way of example, if the agreed delivery date is 60 days from the date of acceptance of the order, the date for cancellation shall be 120 days from the date of acceptance, while if the agreed delivery date is 90 days from the date of acceptance of the order, the date for cancellation shall be 180 days from the date of acceptance. An example is provided below.

| Time | Action |
|------|--------|
| Day 1 | Order accepted by ODF |
| Day 60 | Delivery Date |
| Day 120 | Delivery sixty (60) days late, REMINGTON may cancel any time thereafter, effective thirty (30) days after written notice is given provided order is not delivered within such 30 day period |
| Day 120 | If order is not cancelled, and Products are not yet delivered, ODF shall pay REMINGTON 25% of REMINGTON'S Profit (Profit = (SP – COG)/2 |
| Day 180 | If order is not cancelled, and Products are not yet delivered, ODF shall pay REMINGTON an additional 25% of REMINGTON'S Profit (Profit = (SP – COG)/2 |

11.    Section 8 of the Agreement shall be deleted.

12.    In Section 10(a) of the Agreement, the words "defects" shall be replaced by "material defects" and the words "by REMINGTON to REMINGTON's customer" shall be replaced by "to REMINGTON".

13.    In Section 10 (c) of the Agreement, the following will be added at the end, "provided however that if REMINGTON has received or is entitled to a refund on taxes, import fees or duties in respect of Product returned to ODF, then taxes, import fees and duties that REMINGTON would have had to bear had the Product not been replaced shall be borne by REMINGTON". In Section 10 (d), the number "9" shall be replaced by "10".

14.    In Section 11 of the Agreement, the following will be added at the end:

If the parties are unable to agree on the appropriate amount of insurance required, ODF shall be entitled to refrain from supplying such Products. For the removal of doubt, the insurance premium paid by ODF pursuant hereto shall be calculated as part of the COG of the Products. To the extent claims result in financial loss or other damage to REMINGTON exceeding the limits of ODF's insurance, once ODF's insurance coverage has been exhausted, REMINGTON will submit such claims to REMINGTON's insurers (provided a good faith basis exists for doing so). If REMINGTON's insurance fails to provide complete coverage for such claims, REMINGTON shall be entitled to seek any appropriate relief, including money damages, from ODF, provided, however, that ODF's liability, whether or not covered by insurance, shall be limited to an amount to be determined within ninety (90) days of the execution of this Amendment. The parties shall use reasonable efforts to obtain from their respective insurers a waiver of any

subrogation claim by the insurer against the other party for any claim covered by insurance.

15.    Section 14 of the Agreement will be replaced with the following:

    (a)    Either party may terminate this Agreement upon at least ninety (90) days written notice in the event the other party fails to comply with any of the material terms of this Agreement and fails to cure such non-compliance within ninety (90) days of receiving written notice thereof.

    (b)    Either party may terminate this Agreement immediately by written notice in the event that the other party enters or is placed in bankruptcy, receivership or liquidation, is nationalized, becomes insolvent or makes an assignment for the benefit of its creditors.

    (c)    In the event of the occurrence of one of the following:

        (i)    The sale of all or substantially all of ODF's or WAVE GROUP LTD's shares, property, business, intellectual property rights and/or assets (including, without limitation, by way of share swap);

        (ii)    The merger or consolidation of ODF or WAVE GROUP LTD with or into another company following which more than fifty percent (50%) of ODF's shares are held by persons or related persons or organizations who prior to the said transaction held, in the aggregate, less than five percent (5%) of ODF's shares; or

        (iii)    Any of the foregoing to occur to WAVE GROUP LTD, for as long as WAVE GROUP LTD. is the majority interest holder in ODF; then

ODF shall be entitled to terminate this Agreement by the payment to REMINGTON of the higher of $5,000,000 (five million US dollars) or the aggregate gross sales of Products by REMINGTON in the twelve (12) month period prior to such termination, minus any PPU paid or payable on account of the Products during such period. Termination by ODF pursuant to this Section 14(c) shall not relieve ODF and/or its successors and assigns from performing any service and maintenance obligations and undertakings (to the extent required) for Products sold to customers prior to the date of such termination. Further, ODF agrees that REMINGTON shall have no obligation to provide any service or maintenance of any kind for Products sold to customers prior to the date of such termination, and REMINGTON shall refer all customer inquiries relating to ODF Products to ODF or its designee.

16.    In Schedule A of the Agreement, Section 2 is deleted.

17.    In Schedule A of the Agreement, Section 4 is replaced with the following text:

    (a)    All State and Local Law Enforcement Groups as defined by the U.S. Department of Justice, including local police, sheriffs, primary State and Provincial police, Special Jurisdiction, Texas Constable Departments and Provincial Police

(b)    All Federal Agencies.

c)    The following departments of the U.S. Department of Defense – U.S. Army, U.S. Air Force, U.S. Marine Corps, U.S. Coast Guard and the U.S. Navy and their respective special forces commands; the Canadian Military Organization, including the Department of National Defense and Canadian Forces.

a.    Including FMS AND FMF SALES – REMINGTON shall be entitled to negotiate and perform sales under the US Government Foreign Military Financing Program or the Foreign Military Sales Program, with the prior written consent of ODF. In the event ODF has a local distributor in the country participating in such FMF or FMS sale, ODF shall facilitate the fair compensation of the local distributor by REMINGTON, unless such compensation is expressly prohibited under the terms of the FMF or FMS sale.

d)    Local and National Fire & Rescue Departments under FEMA (which is a Federal Agency)

e)    Royal Canadian Mounted Police (RCMP)
f)    Local, State and Federal Correctional Institutions
g)    U.S. based private securities companies which provide security services solely within the Territory (for US based personnel only).

18.    In Schedule A of the Agreement, a new Section 6 shall be added as follows:

"6.    Minimum Orders. For 2005, REMINGTON will order 800 Eye Ball R1 Kits, of which 550 have already been ordered. Payment for these units will be made in accordance with the anticipated delivery schedule agreed by the parties. The Interim PPU for this order shall be $3,150. To date, REMINGTON has paid an advance of $180,000. The balance of the 40% down payment on the 550 units will be paid subject to the terms set forth in Section 6(a) of the Agreement as amended by this Amendment No. 1. The balance of 250 units will be ordered on October 1, 2005. Thereafter, on each of November 1, 2005, December 1, 2005, January 1, 2006, and February 1, 2006 REMINGTON will order 500 units per month and a further 200 units will be ordered on March 1, 2006, in each case subject to ODF having met delivery schedules for prior orders, failing which the timetable shall be extended. The parties will meet between October 15 – 31, 2005 to review whether the order schedule is still reasonable and will make any changes which they may consider reasonably necessary ▬▬▬▬▬▬▬▬▬▬

19.    In consideration of the grant of additional marketing rights pursuant to this Amendment No. 1, REMINGTON shall pay ODF an additional amount of $250,000, net of any withholdings or other taxes, if applicable, as follows:

(a)    a sum of $50,000 on signing this Amendment No. 1;

(b)    a sum of $50,000 shall be payable ten (10) days after the Eyeball Product receives the approval of the U.S. Federal Communications Commission; and

(c)    a sum of $150,000 will be paid in two equal installments of $75,000 each, each installment to be payable after ODF duly delivers to REMINGTON 1,000 Products for delivery to military customers according to the minimum orders to be made by REMINGTON pursuant to Section 18 of this Amendment No. 1.

(d)    notwithstanding the foregoing, REMINGTON shall not be required to pay any additional amount provided in this Section until the parties have agreed upon ODF's insurance limits as provided by Section 11 of the Agreement.

20.    The new pricing terms agreed in this Amendment No. 1 shall apply to the existing orders for 550 Eyeball Products as described above.

21.    Any capitalized term not defined herein shall have the meaning attached thereto in the Agreement. Except as amended hereby, the terms of the Agreement shall remain unchanged and in full force and effect.

22.    WAVE GROUP expressly adopts and agrees to be bound by all of the terms of the Agreement, as amended, guarantees the performance of ODF's obligations under the Agreement, and shall be jointly and severally liable with ODF to REMINGTON for any breach of this Agreement by ODF.


        IN WITNESS WHEREOF, the parties hereto, through their duly authorized officers, have executed this Amendment No. 1 as of the date first written above.

ODF Optronics Ltd.

By: _____            Remington Arms Company, Inc.

Title: C.E.O          chairman            By: _____

Date: Sep 11, 2005                       Title: COC

                                         Date: 9.21.2005

Wave Group Ltd.

By: _____

Title: C.E.O          chairman

Date: Sep 11, 2005

- 12 -

Amendment No. 2 of Distribution Agreement

This Amendment No. 2 ("Amendment No. 2") of the Distribution Agreement dated July 19, 2004 between O.D.F. Optronics Ltd. ("ODF") and Remington Arms Company, Inc. ("REMINGTON"), as amended on September 11, 2005 with the addition of Wave Group Ltd. as a party (the "Agreement") is made and entered into on this 23 day of November 2006.

WHEREAS, the parties wish to amend certain terms and provisions of the Agreement;

NOW THEREFORE, in consideration of the mutual promises and covenants set forth in the Agreement and herein, the parties hereby agree to amend the Agreement as set forth below:

1.   The parties hereby agree that the Minimum Orders of Eyeball Kits (the "Eyeball Units") for the period from October 1, 2005 to December 31, 2006 are 3,000 Eyeball Units. Of this quantity, a total of 1,683 Eyeball Units have been ordered and delivered and a balance of 1,317 remains.

Of the amount already shipped, 576 Eyeball Units were shipped in September and October 2006 and the final payment due for these units, in the amount of $1,087,955, will be paid by February 5, 2007. The terms specified in the shipping notification will amended accordingly

2.   REMINGTON hereby orders delivery of 1,317 Eyeball Units, of the same specifications as the previous shipment, for delivery on the following dates:

| Delivery Date FOB Israel | Number of Eyeball Units |
|---|---|
| About November 23, 2006 | 152 |
| Between December 24-31, 2006 | 448 |

The balance of 717 Eyeball Units will be ordered no later than December 15, 2006, for delivery FOB Israel in the first quarter of 2007, with actual shipment dates at REMINGTON's discretion, subject to ODF confirmation of the delivery dates. These Eyeball Units may be either the Eyeball RI, which is the product delivered to REMINGTON to date, or any newer version which ODF will have available at that time, which may include B&W, replaceable battery (PDU and Sensor), new chargers or whatever other features are available.

3.   The unit price of the Eyeball RI Kit is $3,055 each (without the Pelican suitcase). The unit price of any newer version will be notified by ODF prior to December 15, 2006.

1

4.   Payment for the Eyeball Units will be as follows:

    a.   November Delivery Order - 40% has been paid and the balance of $290,419 will be due on February 15, 2007.

    b.   December Delivery Order —  This order is scheduled to arrive at REMINGTON's warehouse on or about January 5, 2007. On the scheduled arrival date, REMINGTON will make the initial payment of $505,908. The balance of $823,824 will be paid on April 9, 2007.

    c.   January – March Delivery Orders – Forty Percent (40%) of each order will be due and payable upon the scheduled date of arrival at REMINGTON's warehouse, while the balance of Sixty Percent (60%) will be due and payable 100 days later.

5.   The parties acknowledge and agree that neither side will have any claim against the other in respect of the supply of products for 2006. The above ordering and payment procedure shall only apply to the balance of orders for 2006 and shall not affect the provisions of the Agreement affecting orders to be made from January 2007 on.

6.   The parties will meet prior to December 31, 2006 to determine the minimum orders for the next sales period, which will be the first half of 2007.

7.   For the avoidance of doubt, confirmation and approval of an order pursuant to Section 6 (a) of the Agreement shall constitute a firm commitment by both parties to deliver, and receive, the products ordered, subject to the provisions of the Agreement.

8.   Any capitalized term not defined herein shall have the meaning attached thereto in the Agreement. Except as amended hereby, the terms of the Agreement shall remain unchanged and in full force and effect.

IN WITNESS WHEREOF, the parties hereto, through their duly authorized officers, have executed this Amendment No. 2 as of the date first written above.

ODF Optronics Ltd.

By: _____ Eran Tibon

Title:        CFO

Date: 23.11.2006

Wave Group Ltd

By:        Eran Tibon

Title:        CFO

Date: 23.11.2006

Remington Arms Company, Inc.

By: _____

Title: _____

Date: _____

3

FROM :TIBON +972-3-6850256          FAX NO. :97236850256          Feb. 12 2008 09:58PM  P2

<u>Termination, Settlement and Release Agreement</u>

This Termination, Settlement and Release Agreement of the Distribution Agreement dated July 19, 2004 between O.D.F. Optronics Ltd. (**"ODF"**) and Remington Arms Company, Inc. (**"REMINGTON"**), as amended (the **"Agreement"**), is made effective as of the 15th day of February 2008.

WHEREAS, the parties wish to terminate the Agreement and settle and release all claims relating thereto, on the terms specified herein:

NOW THEREFORE, in consideration of the mutual promises and covenants set forth in the Agreement and herein, the parties hereby agree to terminate the Agreement, and settle and release all claims relating thereto, as set forth below:

1.  The parties hereby agree that the Agreement shall terminate effective February 15, 2008.

2.  Section 15 (b) of the Agreement shall be amended by replacing "six (6)" by "two (2"), it being thereby agreed that REMINGTON must complete all sales of existing Products, Units, spare parts and demo systems in its inventory ("Existing Inventory") by no later than April 15, 2008, and shall not be entitled to sell, promote or distribute any Existing Inventory after that date. Remington will provide to ODF a list of the remaining inventory on or before May 16, 2008.

3.  On or before March 15th 2008, REMINGTON shall provide ODF with its existing customer list and any new customer information that may be obtained during future sales of Existing Inventory. All such information shall be provided to ODF in a customer database layout format, and shall contain contact details (addresses, phone and e-mail details, names of contact persons), details of the number of Products or Units sold to each customer (including registration and part number), the date at which Products or Units were sold, and any other information, such as customer requests or service issues that are materially relevant to ODF's ongoing business.

4.  REMINGTON will assist ODF in the best possible way to ensure an ordinary transition of customers from REMINGTON to ODF, including providing:

    a.  A list of all open quotations to customers;

    b.  A list of all service/repair/replacement activities done in the last 12 months for customers; and

    c.  A list of all trial and evaluation systems issued within the last 12 months.

This information shall be provided from Remington to ODF by email sent to the attention of Eran Tibon at the following email address: eran@odfopt.com.





1

FROM :TIBON +972-3-6850256          FAX NO. :97236850256          Feb. 12 2008 09:59PM P3

5. ODF will be allowed to solicit and use the services of Mr. John Blake and other former Remington employees who were involved in the marketing or sale of Products or Units, if it chooses to do so.

6. Remington will resolve all currently open customer issues that do not involve warranty claims that Remington is aware of prior to March 31, 2008. As detailed below in Paragraph 8, ODF shall assume and be responsible for handling and resolving all warranty claims for all Units or Products sold by Remington on or before April 15, 2008 at a customer's sales price of at least $2,500 per Unit.

7. To the best of its ability and through exercising reasonable efforts, Remington shall provide ODF with contact information of the following, and ODF may freely engage in any relationship with any of the following:

    a. All distributors who were engaged in marketing and/or selling the Eye Ball; and

    b. All former sales agents who were engaged in marketing and/or selling the Eye Ball.

This information shall be provided from Remington to ODF by email sent to the attention of Eran Tibon at the following email address: eran@odfopt.com.

8. ODF will assume all warranty claims from Remington, and will provide all warranty and service obligations on its existing terms for all Units or Products that have been sold by Remington through April 15, 2008, at a customer's sales price of at least $2,500 per Unit.

9. REMINGTON will pay, by wire transfer without deduction or set off, an amount of $465,820 (Four Hundred and Sixty Five Thousand, Eight Hundred and Twenty US Dollars), to ODF, no later than February 22, 2008, in payment for any and all Units or Products that have been supplied prior to the date hereof. Subject to receipt of this payment, ODF waives any claim to payment of any further sums from REMINGTON in respect of any and all matters related to the Agreement.

10. REMINGTON hereby waives any and all claims to payment of any sums from ODF in respect of any matters related to the Agreement, including any claim for monies for REMINGTON's sales of all remaining Units or Products held in Remington's inventory at prices below $4,800. This waiver shall not derogate from ODF's obligation to take over all warranty and service obligations that may exist for Units or Products sold by REMINGTON on or before April 15, 2008 (as detailed above in Paragraph 8), and any claim by REMINGTON arising from a breach of such obligation.

11. Each of the parties confirms hereby that the rights granted under this Termination Agreement constitute, for all intents and purposes, full, final and complete settlement and release of all demands, claims and rights that each party may have against the other, its shareholders, directors, employees, subsidiaries, affiliates or representatives and any person or body connected with any of them (any such person or body to be referred to hereinafter as a "Related Party").



2

FROM :TIBON +972-3-6850256          FAX NO. :97236850256          Feb. 12 2008 10:02PM  P1



12. Other than any claims arising out of the non-performance of this Termination Agreement, each of the parties hereby releases and waives absolutely and irrevocably any demand, claim or right against the other party or any Related Party in connection with any matter related to the Distribution Agreement, its execution, amendments, performance or termination.

IN WITNESS WHEREOF, the parties hereto, through their duly authorized officers, have executed this Termination Agreement as of the date first written above.

ODF Optronics Ltd.

By: _ErAN Tibon_

Title: _CEO_

Date: _12/1/08_

Wave Group Ltd.

By: _Eran Tibon_

Title: _CEO_

Date: _12/1/08_

Remington Arms Company, Inc.

By: _Robert McPartle_

Title: _VP Sales_

Date: _12/2/08_

3



# BLUE STAR CONSORTIUM, INC.



2300 Clarendon Blvd, Suite 306
Arlington. Virginia 22201
PH +1-703-527-2620
FAX +1-703-527-2841

APRIL 14 2008

## Sales to and Service Agreement with Blue Star Consortium Inc. for ODF R1 Eyeball kits

This Agreement ("Agreement ") is entered into as of the 14th day of April, 2008, by and between Blue Star Consortium, Inc ("Blue Star"), a Delaware incorporated company with offices at 2300 Clarendon Boulevard, suite 306, Arlington, Virginia. and Remington Arms Company, with its principal offices at 870 Remington Drive, Madison, NC 27025 hereinafter individually and collectively referred to as the "Party" or "Parties":

NOW, THEREFORE, for and in consideration of the mutual promises and conditions herein contained, the Parties hereby agree as follows:

1. SALE OF ASSETS

Remington will transfer all their remaining inventory of ODF R1 eyeballs, consisting of 25 Kits with Pelican Cases and another 1,072 Kits without the Pelican Cases, making a total of 1097 kits, and full title to Blue Star, for the sum of $1.

2. SERVICES

Remington will store and maintain the eyeball kits in accordance with ODF maintenance protocol as per Appendix A and ship directly to customers in accordance with instructions from Blue Star and in Pelican Cases to be supplied by Remington where the kit does not already have one.

3. PRODUCT WARRANTY

Remington warrant that the 1097 ODF eyeball kits to be sold to Blue Star are to their knowledge in good working order as of the time of sale to Blue Star and will be tested prior to dispatch to customer to establish that they are free from defects in materials, design and workmanship. Any single eyeball that does not pass testing, as per ODF standard testing procedures, will not be accepted for sale by Blue Star, however the remaining elements of the kit may be sold singly by Blue Star, with 50% revenue share continuing to be applied as set out in the Pricing and Payment section of this agreement, however no minimum price will apply to the sale of individual eyeballs or other individual components of the kits sold.

ITAR WARNING: this document may contain or attach defense technical data covered by the U.S. Munitions List and International Traffic in Arms Regulations. US State Dept. authority for export of such technical data from US is required. Re-export, re-transfer, or disclosure to unauthorized parties, including non-US Persons is prohibited.
Confidentiality Note:
The information in this communication and any attachments herein is confidential and may be legally privileged. It is intended solely for the use of the individual or entity to whom it is addressed and others authorized to receive it. If you are not the intended recipient you are hereby notified that any disclosure, copying, distribution or taking action in reliance of the contents of this information is strictly prohibited and may be unlawful.



# BLUE STAR CONSORTIUM, INC.
2300 Clarendon Blvd, Suite 306
Arlington, Virginia 22201
PH +1-703-527-2620
FAX +1-703-527-2841

### 4.  PERIOD OF AGREEMENT
Remington shall not have to pay for storage and maintenance and shipping of the kits for a period of greater than 24 months from the date of this agreement, after which this agreement will expire. If any eyeballs remain unsold after expiry of this agreement, they will be removed and stored by Blue Star in return for a payment of $400.00 per remaining kit to Remington and the agreement will terminate.

### 5.  PRICES AND PAYMENT
In consideration for these services by Remington during the 24 month period, Blue Star agrees to pay 50% of revenue raised from every eyeball kit sold during the period, after deduction of the cost of purchased Pelican cases at an agreed cost rate of $60 per Pelican Case or the cost price paid by Remington, whichever is the lower.  Blue Star will pay to Remington, not less than $400 per kit sold.

Remington agrees to provide a copy of shipping information within 24 hours of dispatch of individual orders.  In return, Blue Star agrees to provide a statement of monthly sales for revenue sharing reconciliation purposes.  On agreement of this statement each month, Remington will raise an invoice for the agreed amount and send to Blue Star for payment. Payment to Remington of invoices will be made within 10 days of receipt of income by Blue Star from the customer.

### 6.  FORCE MAJEURE
Neither Remington nor Blue Star shall be liable to the other for any failure to perform any obligations under this Agreement due to causes which are beyond their reasonable control or are of a nature which neither has the authority or power to remedy, including, without limitation, acts of God, acts of civil or military authority, including governmental acts, strikes or other labor disturbances, fires, floods, epidemics, wars, riots, and delays in transportation.  In the event of such an occurrence, the Party claiming relief thereon shall give prompt written notice thereof to the other Party at any time for performance of an obligation, which shall be extended by a time equal to the length of any delay attributable to such occurrence.

### 7.  CONTRACT LIMITATIONS
Nothing in this Contract limits the ability of Blue Star to sell the products across the Globe with the exception of local, federal, international laws, treaties or agreements

### 8.  SEVERABILITY
In the event that any provision of the Agreement should be held to be void, voidable, unlawful, or for any reason unenforceable, the remaining provisions or portions of the Agreement shall remain in full force and effect, unless the provision found to be void, voidable, unlawful or unenforceable goes to the essence of this Agreement.

ITAR WARNING: this document may contain or attach defense technical data covered by the U.S. Munitions List and International Traffic in Arms Regulations. US State Dept. authority for export of such technical data from US is required. Re-export, re-transfer, or disclosure to unauthorized parties, including non-US Persons is prohibited.
Confidentiality Note:
The information in this communication and any attachments herein is confidential and may be legally privileged. It is intended solely for the use of the individual or entity to whom it is addressed and others authorized to receive it. If you are not the intended recipient you are hereby notified that any disclosure, copying, distribution or taking action in reliance of the contents of this information is strictly prohibited and may be unlawful.





# BLUE STAR CONSORTIUM, INC.

2300 Clarendon Blvd, Suite 306
Arlington, Virginia 22201
PH +1-703-527-2620
FAX +1-703-527-2841

## 9.  NEGOTIATED AGREEMENT

The terms of the Agreement are the result of negotiations between Parties, by and through their counsel, and no ambiguities shall be construed against either Party by reason of the drafting of the Agreement.

## AUTHORITY

The individuals executing this document certify that they are authorized to execute this Agreement and bind their respective Companies.

## 10. MODIFICATIONS

No modification of any of the provisions contained in the Agreement shall be binding upon any Party to the Agreement unless made in writing and signed by such Party.

IN WITNESS WHEREOF, Parties hereto, intending to be legally bound, have executed this Agreement on the date first written above.

Daniel D Barks                                              Robert M. Pantle

*President / CEO*                                           *Vice President Sales*
Blue Star Consortium Inc.                                  Remington Arms Company Inc.

ITAR WARNING: this document may contain or attach defense technical data covered by the U.S. Munitions List and International Traffic in Arms Regulations. US State Dept. authority for export of such technical data from US is required. Re-export, re-transfer, or disclosure to unauthorized parties, including non-US Persons is prohibited.
Confidentiality Note:
The information in this communication and any attachments herein is confidential and may be legally privileged. It is intended solely for the use of the individual or entity to whom it is addressed and others authorized to receive it. If you are not the intended recipient you are hereby notified that any disclosure, copying, distribution or taking action in reliance of the contents of this information is strictly prohibited and may be unlawful.

# QUOTE



**Remington**

TECHNOLOGIES DIVISION

**Remington Arms Company, Inc.**
870 Remington Drive
P.O. Box 700
Madison, NC 27025-0700

| | |
|---|---|
| *DATE:* | March 28, 2008 |
| *Quote Ref #:* | 20080328 - CA - Fresno PD |
| *Quotation valid until:* | **June 26, 2008** |

*Prepared by:* Chuck Lawson, CSR



| | |
|---|---|
| Cust: | **Fresno Police Dept.** |
| Add: | **Homeland Security Coord.** |
| ATTN: | **Sgt. Ronald Grimm** |
| Phone: | **(559) 621-2329** |
| Email: | ron.grimm@fresno.gov |

*Referred by:* ALW Name:
ALW Acct#:
Contact Name:
Phone:
Email:

R-

## QUOTES ARE GOOD FOR 90 DAYS

| RAMAC | QUANTITY | DESCRIPTION | UNIT PRICE | AMOUNT | SHIP/HAND |
|---|---|---|---|---|---|
| 70006 | 5 | R1 Eyeball Camera Kit | $2,500.00 | $12,500.00 | |
| | | | | $0.00 | |
| | | | | $0.00 | |
| | | | | $0.00 | |
| | | | | $0.00 | |
| | | | | $0.00 | |
| | | | | $0.00 | |
| | | | | $0.00 | |
| | | | | $0.00 | |
| | | | | $0.00 | |
| | | | Subtotal: | $12,500.00 | |
| | | | Tax - Local* | | |
| | | | Tax - State* | | |
| | | | CONUS Shipping | $25.00 | |
| Shipping based on Delivery w/in US | | | TOTAL | | $12,525.00 |

\* = If applicable to your state
All Prices based off the updated MAR 2007 Price List

**Comments or special instructions:**
1) The Eye Ball R1 Kit is delivered in a rugged case and includes:
   a. Two Eye Ball R1s
   b. One Personal Display Unit with Jacket
   c. One Training Ball
   d. Two AC Power Chargers & Cords
   e. One Lowering Wire/ Pole Fitting
   f. One Cleaning Brush & Cloth
2) Payment Terms net 30 or Credit Card
3) Non Government Entities subject to Tax based on State Guidelines.

**Remington Tax I.D. # 51-0350935**

FORM R1-2 QUOTE

05/28/2008    Dynamic List Display    1

List of Sales Orders By material - Items

Material    EYE BALL R1 KIT - 4790    70006
Doc. date    02/12/2008 To 06/28/2008

| Shipto Name1 | Shipto Name2 | Shipto City | SHR | Committed Purchase order number | SD Doc. | SaTy | Doc. Date | ItemSold-to p | Material | Net price | Order qty | SU | Net | Curr. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ARMY / USS GOVT | CCO 1-10 SFG ATTN: CPT TOR | APO | AE | CC TROY BELL | 899203 | OR | 2/14/2008 | T9224011 | 70006 | 2,500.00 | 3 | EA | 7,500.00 | USD |
| FORT STEWART/Directorate of Em | Svcs (DES) Stephen W. Podmor | FORT STEWART | GA | W912AM-08-P-0174 | 899107 | OR | 2/14/2008 | T3235068 | 70006 | 2,500.00 | 1 | EA | 2,500.00 | USD |
| PEARLAND POLICE DEPARTMENT | POLICE DEPARTMENT | PEARLAND | TX | 81539 | 891621 | OR | 2/15/2008 | T6858927 | 70006 | 2,500.00 | 1 | EA | 2,500.00 | USD |
| LAPD OPERATIONS CENTRAL | | LOS ANGELES | CA | 81228 | 901216 | OR | 2/15/2008 | T5310268 | 70006 | 2,500.00 | 1 | EA | 2,500.00 | USD |
| TULARE, CITY OF POLICE DEPT | | TULARE | CA | 9425 | 901218 | OR | 2/21/2008 | T9046015 | 70006 | 2,500.00 | 1 | EA | 2,500.00 | USD |
| COLLIERVILLE POLICE DEPT | | COLLIERVILLE | TN | 83829 | 901196 | OR | 2/21/2008 | T1197846 | 70006 | 2,500.00 | 1 | EA | 2,500.00 | USD |
| SANTA FE DETECTIVE UNIT | | SANTA FE | NM | 1165704 | 901642 | OR | 2/22/2008 | T0808631 | 70006 | 2,499.00 | 1 | EA | 2,499.00 | USD |
| ST. BERNARD SHERIFFS OFFICE | ATTN: CAPT. JOHN VICKERS | CHALMETTE | LA | 2007B2P05 | 901639 | OR | 2/25/2008 | T1392586 | 70006 | 2,500.00 | 1 | EA | 2,500.00 | USD |
| LINCOLN COUNTY SHERIFFS OFFIC | ATTN:JERRY W. RUST, UNDERSHERI | LIBBY | MT | Michelle Barney Email | 901895 | OR | 2/26/2008 | T5230864 | 70006 | 2,500.00 | 1 | EA | 2,500.00 | USD |
| WASHINGTON COUNTY SHERIFFS OF | ATTN: SHERIFF FRED NEWMAN | ABINGDON | VA | 7119 | 902291 | OR | 2/27/2008 | T9492011 | 70006 | 2,500.00 | 2 | EA | 5,000.00 | USD |
| TULARE, CITY OF POLICE DEPT | | TULARE | CA | Replacement for Damaged Kit | 903547 | OR | 3/3/2008 | T9046016 | 70006 | 0 | 1 | EA | 0 | USD |
| SALT RIVER PIMA-MARICOPA | INDIAN COMMUNITY | SCOTTSDALE | AZ | GOVMT-0000034347 | 903178 | OR | 3/3/2008 | T7846724 | 70006 | 2,500.00 | 2 | EA | 5,000.00 | USD |
| RICHMOND POLICE DEPARTMENT | TRAFFIC - SOD | RICHMOND | VA | PD 20080207074 | 903416 | OR | 3/4/2008 | T7567512 | 70006 | 2,500.00 | 1 | EA | 2,500.00 | USD |
| RACINE CO SHERIFF DEPT | ATTN: SGT THOMAS LAMKE | RACINE | WI | 800047-3-000 OP | 903547 | OR | 3/4/2008 | T7552304 | 70006 | 2,500.00 | 1 | EA | 2,500.00 | USD |
| CITRUS COUNTY SHERIFFS OFFICE | ATTN: LT. BUDDY GRANT | INVERNESS | FL | 800091 | 903889 | OR | 3/5/2008 | T1838227 | 70006 | 2,500.00 | 1 | EA | 2,500.00 | USD |
| MINNEHAHA COUNTY SHERIFF | ATTN: CAPT. PAUL NIEDINGHAUS | SIOUX FALLS | SD | Minnehaha-Niedinghaus | 904748 | OR | 3/10/2008 | T5948218 | 70006 | 2,500.00 | 5 | EA | 12,500.00 | USD |
| LEAVENWORTH COUNTY SHERIFF | ATTN: DETECTIVE MIKE WEHMEYER | LEAVENWORTH | KS | WEH 03007 | 905052 | OR | 3/10/2008 | T5125804 | 70006 | 2,500.00 | 1 | EA | 2,500.00 | USD |
| CRYPTOMETRICS INC. | ATTN: STUART CARD | MCLEAN | VA | P06-0084 | 905050 | OR | 3/11/2008 | T2249294 | 70006 | 2,900.00 | 1 | EA | 2,900.00 | USD |
| BCPD MATERIALS & FACILITIES | | TOWSON | MD | 3031117 | 905048 | OR | 3/11/2008 | T0920973 | 70006 | 2,500.00 | 1 | EA | 2,500.00 | USD |
| FORT MADISON POLICE DEPT | ATTN: DUSTIN FULLHART | FORT MADISON | IA | Mike@Wagner | 905047 | OR | 3/11/2008 | T3234532 | 70006 | 2,500.00 | 1 | EA | 2,500.00 | USD |
| NORTHEAST - MCPSC | ATTN: BOB WERTS | STROUDSBURG | PA | 42580703061 | 905987 | OR | 3/13/2008 | T6915823 | 70006 | 2,500.00 | 1 | EA | 2,500.00 | USD |
| CENTRAL POLICE SERVICES/BUFFAL | | BUFFALO | NY | 4500013079 | 905663 | OR | 3/13/2008 | T2819724 | 70006 | 2,500.00 | 1 | EA | 2,500.00 | USD |
| GEORGE HOPSTETTER | | LEBANON | PA | 20080314-OH-TOA | 908891726 | OR | 3/14/2008 | T9981726 | 70006 | 0 | 2 | EA | 0 | USD |
| CARLSBAD POLICE DEPARTMENT | ADMINISTRATION | CARLSBAD | CA | P119204 | 906956 | OR | 3/17/2008 | T1552018 | 70006 | 2,500.00 | 1 | EA | 2,500.00 | USD |
| EUGENE POLICE DEPARTMENT | ATTN: CASEY B. FROEHLICH/Polic | EUGENE | OR | Froehlich, Email | 906991 | OR | 3/19/2008 | T2950126 | 70006 | 2,500.00 | 1 | EA | 2,500.00 | USD |
| PROVIDENCE POLICE DEPARTMENT | POLICE DEPARTMENT | PROVIDENCE | RI | 523585-0-PO | 906973 | OR | 3/20/2008 | T7224023 | 70006 | 2,500.00 | 5 | EA | 12,500.00 | USD |
| GEORGIA NATIONAL GUARD | 4TH CST (WMD) | DOBBINS AIR FORCE BASE | GA | Breese-CC-Order | 907651 | OR | 3/25/2008 | T3460209 | 70006 | 2,500.00 | 1 | EA | 2,500.00 | USD |
| MONROE COUNTY SHERIFFS OFFICE | ATTN: SGT. FRANK ATKINSON | MONROE | MI | Atkinson-Email | 907700 | OR | 3/25/2008 | T6023114 | 70006 | 2,500.00 | 1 | EA | 2,500.00 | USD |
| CATAWBA COUNTY SHERIFF DEPT | | NEWTON | NC | 2860000783 | 907837 | OR | 3/26/2008 | T1591862 | 70006 | 2,500.00 | 1 | EA | 2,500.00 | USD |
| COLUMBIAN AIR FORCE | | FORT LAUDERDALE | FL | W15P7T-08-F-0234 | 908012 | OR | 3/26/2008 | T2223894 | 70006 | 1,500.00 | 1 | EA | 1,500.00 | USD |
| PRO-TECH SALES | ATTN: ED | BEREA | OH | 032706-01 | 909552 | OR | 3/28/2008 | T2223976 | 70006 | 2,500.00 | 6 | EA | 15,000.00 | USD |
| SOUTH SIOUX CITY POLICE DEPT | ATTN: GREG KONZAN | SOUTH SIOUX CITY | NE | 7555 | 908491 | OR | 3/28/2008 | T2321836 | 70006 | 1,500.00 | 34 | EA | 51,000.00 | USD |
| CATTARAUGUS COUNTY SHERIFF | Attn: Cindy | LITTLE VALLEY | NY | CO - CATTCO - Cindy | 908489 | OR | 3/28/2008 | T1650288 | 70006 | 2,500.00 | 1 | EA | 2,500.00 | USD |
| LICKING COUNTY SHERIFFS OFFIC | ATTN: DARL EVANS | NEWARK | OH | 08-01213 | 908494 | OR | 3/28/2008 | T5214204 | 70006 | 2,500.00 | 1 | EA | 2,500.00 | USD |
| LAS VEGAS METRO POLICE DEPT | LOGISTICS BUREAU | LAS VEGAS | NV | 450007013-005 | 908637 | OR | 3/28/2008 | T5090277 | 70006 | 2,500.00 | 1 | EA | 2,500.00 | USD |
| TACTICAL DEPOT | ATTN: MIGUEL | LOS ANGELES | CA | Text-Dept - Phone Call | 909212 | OR | 4/1/2008 | T8781828 | 70006 | 2,500.00 | 4 | EA | 10,000.00 | USD |
| Remington Arms Company, Inc. | Attn: Rick Johnson | MECHANICSVILLE | AR | Rick Johnson (to Donate) | 909617 | OR | 4/3/2008 | R9154303 | 70006 | 0 | 1 | EA | 2,500.00 | USD |
| Remington Arms Company, Inc. | Attr: Bob Pantie | FAYETTEVILLE | AR | Bob Pantie (to Donate) | 909617 | OR | 4/3/2008 | R9154303 | 70006 | 0 | 10 | EA | 0 | USD |
| Remington Arms Company, Inc. | Attn: Cory Nissen | Columbus | GA | Cory Nissen (to Donate) | 909566 | OR | 4/3/2008 | R9154303 | 70006 | 0 | 10 | EA | 0 | USD |
| Remington Arms Company, Inc. | Attn: Craig Clark | FAYETTEVILLE | AR | Craig Clark (to Donate) | 909567 | OR | 4/3/2008 | R9154303 | 70006 | 0 | 10 | EA | 0 | USD |
| Remington Arms Company, Inc. | Attn: Ed Ryan | Riverside | MO | Ed Ryan (to Donate) | 909566 | OR | 4/3/2008 | R9154303 | 70006 | 0 | 10 | EA | 0 | USD |
| Remington Arms Company, Inc. | Attn: Greg Garand | Lakewood | WA | BARACAT - WA (to Donate) | 909654 | OR | 4/3/2008 | R9154303 | 70006 | 0 | 10 | EA | 0 | USD |
| GRACO ENTERPRISES | Attn: Robert Evans | Phoenix | AZ | Ventive-Repairs (Repairs) | 909654 | OR | 4/3/2008 | R9154303 | 70006 | 0 | 3 | EA | 0 | USD |
| PORT NECHES POLICE DEPT | Attn: C.E. MARSH | PORT NECHES | TX | 08-01213 | 909534 | OR | 4/3/2008 | T7161803 | 70006 | 2,500.00 | 2 | EA | 5,000.00 | USD |
| Remington Arms Company, Inc. | Attn: Mike Chamberlain | Granbury | TX | Mike Chamberlain (to Donate) | 909533 | OR | 4/3/2008 | R9154303 | 70006 | 0 | 6 | EA | 0 | USD |
| Remington Arms Company, Inc. | Attn: Bob Eaves | Pinetown | SC | Bob Eaves (to Donate) | 909567 | OR | 4/3/2008 | R9154303 | 70006 | 0 | 6 | EA | 0 | USD |
| Remington Arms Company, Inc. | Attn: John Spees | Simpsonville | SC | John Spees (to Donate) | 909567 | OR | 4/4/2008 | R9154303 | 70006 | 0 | 10 | EA | 0 | USD |
| Remington Arms Company, Inc. | Attn: John Spees | Simpsonville | SC | John Spees (to Donate) | 909567 | OR | 4/4/2008 | R9154303 | 70006 | 0 | 10 | EA | 0 | USD |
| Bethlehem Police Dept | Attn: Jeremy Albahouse | Bethlehem | PA | Bethlehem PD (to Donate) | 909910 | OR | 4/4/2008 | R9154303 | 70006 | 0 | 1 | EA | 0 | USD |
| Remington Arms Company, Inc. | Attn: Dan Curtis | Lehi | UT | Dan Curtis (to Donate) | 909967 | OR | 4/4/2008 | R9154303 | 70006 | 0 | 5 | EA | 0 | USD |
| Riverside Police Dept | Attn: Chief of Police | Riverside | OH | Riverside (to Donate) | 909769 | OR | 4/4/2008 | R9154303 | 70006 | 0 | 1 | EA | 0 | USD |

| Shipto Name1 | Shipto Name2 | Shipto City | St | Doc. Date | Purchase order number | SaTy | SD Doc. | Material | Sold-to p | Net price | Order qty | SU | Net | Curr. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NASHUA POLICE DEPARTMENT | Attn: Trenton Johnson | NASHUA | NH | 4/4/2008 | C72848 | OR | 909750 | T6220488 | 70006 | 2,500.00 | 1 | EA | 2,500.00 | USD |
| CERES POLICE DEPARTMENT | Attn: Trenton Johnson | CERES | CA | 4/7/2008 | 7277 | OR | 909916 | T1677841 | 70006 | 2,500.00 | 1 | EA | 2,500.00 | USD |
| CERES POLICE DEPARTMENT | Attn: Brad Mandeville | CERES | CA | 4/7/2008 | Donation for Shipping Error | OR | 910218 | T1677941 | 70006 | 0 | 1 | EA | 0 | USD |
| MASON COUNTY SHERIFFS OFFICE | Attn: Trenton Johnson | Shelton | WA | 4/7/2008 | Mason County Sheriff Dept - WA | OR | 910169 | R9154303 | 70006 | 0 | 3 | EA | 0 | USD |
| GLASTONBURY TOWNSHIP | Attn: Robin Timmer | Glastonbury | CT | 4/7/2008 | Glastonbury | OR | 910130 | R9154303 | 70006 | 0 | 1 | EA | 0 | USD |
| Easton Police Dept. | Attn: Sgt Ed Patrone | Easton | MD | 4/7/2008 | Easton PD - MD | OR | 910048 | R9154303 | 70006 | 0 | 1 | EA | 0 | USD |
| Bellevue Police Dept. | Attn: Steve Hatfield | Bellevue | NE | 4/7/2008 | Bellevue PD - NE | OR | 910048 | R9154303 | 70006 | 0 | 1 | EA | 0 | USD |
| LEE COUNTY SHERIFF | Attn: David Thompkins | Opelika | AL | 4/7/2008 | Lee County Sheriff | OR | 910040 | R9154303 | 70006 | 0 | 1 | EA | 0 | USD |
| PA Dept of Corrections | | Albion | PA | 4/7/2008 | Hopsteller - Dept of Corrections | OR | 909996 | R9154303 | 70006 | 0 | 1 | EA | 0 | USD |
| Pittsburgh SWAT | Attn: Brian Simon | Pittsburgh | PA | 4/7/2008 | Hopsteller - Pittsburgh SWAT | OR | 909992 | R9154303 | 70006 | 0 | 1 | EA | 0 | USD |
| DHS (TUCSON) | | Tucson | AZ | 4/7/2008 | Hopsteller - DHS (Tucson) | OR | 909906 | R9154303 | 70006 | 0 | 1 | EA | 0 | USD |
| CAPE CORAL POLICE DEPT. | Attn: JJ O'Brien / Asst TLdr SW | Cape Coral | FL | 4/8/2008 | Donated - FL - CapeCoralPD | OR | 910486 | R9154303 | 70006 | 0 | 1 | EA | 0 | USD |
| CAPE CORAL POLICE DEPT. | Attn: Chad Clark | Cape Coral | FL | 4/8/2008 | Donated - FL - CapeCoralPD | OR | 910474 | R9154303 | 70006 | 0 | 1 | EA | 0 | USD |
| SKAGIT COUNTY SHERIFF | Attn: Christopher Cockle | Mount Vernon | WA | 4/8/2008 | Donated - WA - Skagit County | OR | 910474 | R9154303 | 70006 | 0 | 1 | EA | 0 | USD |
| ROCKLEDGE POLICE DEPT. | Attn: Warren Brown | Rockledge | FL | 4/8/2008 | Donated - FL - Rockledge PD | OR | 910469 | R9154303 | 70006 | 0 | 1 | EA | 0 | USD |
| MONTROSE POLICE DEPT. | | Montrose | CO | 4/8/2008 | Donated - CO - Montrose PD | OR | 910457 | R9154303 | 70006 | 0 | 1 | EA | 0 | USD |
| TIPPECANOE CO. SHERIFF | Attn: Maj Charlie Williams | Lafayette | IN | 4/8/2008 | Donated - IN - Tippecanoe Co. | OR | 910424 | R9154303 | 70006 | 0 | 1 | EA | 0 | USD |
| PARM POLICE DEPT | Attn: Thomas Desmartieau | Parma | OH | 4/8/2008 | Donated - OH - Parma PD | OR | 910340 | R9154303 | 70006 | 0 | 1 | EA | 0 | USD |
| CHATTANOOGA POLICE DEPT | Attn: Sgt Albert Talliant | Chattanooga | TN | 4/8/2008 | Donated - TN - Chatt Bomb Squad | OR | 910316 | R9154303 | 70006 | 0 | 1 | EA | 0 | USD |
| MONTGOMERY COUNTY SHERIFF | Attn: CPT Daryl Wilson | Dayton | OH | 4/8/2008 | Donated - OH - Montgomery Co. Sher. | OR | 910409 | R9154303 | 70006 | 0 | 1 | EA | 0 | USD |
| WILMINGTON POLICE DEPT | Attn: Sean Finnerty | Wilmington | DE | 4/8/2008 | Donated - Wilmington PD-DE | OR | 910406 | R9154303 | 70006 | 0 | 1 | EA | 0 | USD |
| PITTSBURGH POLICE DEPT | Attn: Steve Albanese | PITTSBURGH | PA | 4/8/2008 | Donated - Pittsburgh - PA | OR | 910396 | R9154303 | 70006 | 0 | 1 | EA | 0 | USD |
| REMINGTON ARMS COMPANY, INC. | Attn: Allan Thompson | ParkLand | FL | 4/9/2008 | Allan Thompson (Donate) | OR | 910785 | R9154303 | 70006 | 0 | 1 | EA | 0 | USD |
| BLOOMINGTON POLICE DEPT | Attn: Troy Doza | Bloomington | IL | 4/9/2008 | Donated - IL - Bloomington | OR | 910784 | R9154303 | 70006 | 0 | 10 | EA | 0 | USD |
| HAMILTON COUNTY SHERIFFS OFFI | Attn: Mark King / Allen Branum | Hixson | TN | 4/9/2008 | Donated - TN - Hamilton Reg'l TF | OR | 910763 | R9154303 | 70006 | 0 | 2 | EA | 0 | USD |
| FLORIDA SWAT ASSOCIATION | Attn: Dave Arnott | Longwood | FL | 4/9/2008 | Donated - FL - SWAT Assoc | OR | 910575 | R9154303 | 70006 | 0 | 5 | EA | 0 | USD |
| SALEM POLICE DEPARTMENT | Attn: Dennis Engel / Street Cr | Salem | OR | 4/9/2008 | Donated - OR - SalemPD | OR | 910573 | R9154303 | 70006 | 0 | 10 | EA | 0 | USD |
| UTAH COUNTY SHERIFF | Attn: James O. Tracy | Spanish Fork | UT | 4/9/2008 | Donated - UT - Utah Co. Sheriff | OR | 910570 | R9154303 | 70006 | 0 | 1 | EA | 0 | USD |
| BLOOMINGTON POLICE DEPARTMENT | ATTN: SGT. TROY DOZA | BLOOMINGTON | IL | 4/9/2008 | 200804/10 DOZA | OR | 910310 | R9154303 | 70006 | 0 | 1 | EA | 0 | USD |
| Tactical Depot | ATTN: Miguel Perez | Los Angeles | CA | 4/11/2008 | Donated - CA - Fed Offices | OR | 911087 | R9154303 | 70006 | 2,500.00 | 1 | EA | 2,500.00 | USD |
| CROSSVILLE POLICE DEPARTMENT | Attn: LT Becky Wright | Crossville | TN | 4/11/2008 | Donated - TN - Crossville PD | OR | 911021 | R9154303 | 70006 | 0 | 5 | EA | 0 | USD |
| **Transfer of Ownership to BlueStar Cons.** | | | VA | 4/14/2008 | | | | | 70006 | | **1097** | | | **USD** |
| CLINTON POLICE DEPT | Attn: Todd Peterson | Clinton | MS | 4/9/2008 | Donated - MS - Clinton PD | OR | 913249 | R9154303 | 70006 | 0 | 7 | EA | 0 | USD |
| CALIFORNIA TACT OFF ASSOC | Attn: Ken Hubbs | Alpine | CA | 4/25/2008 | Donated - CA - TOA | OR | 913311 | R9154303 | 70006 | 0 | 2 | EA | 0 | USD |
| GALLATIN TACT OFF ASSOC | Attn: Larry Severonyi | Elizabethton | MT | 4/25/2008 | Donated - MT - Gallatin Co Sheriff | OR | 913308 | R9154303 | 70006 | 0 | 3 | EA | 0 | USD |
| NEW YORK TACTICAL OFFICERS ASS | Attn: Larry Severonyi | Middletown | NY | 4/25/2008 | Donated - NY - NYTOA | OR | 913300 | R9154303 | 70006 | 0 | 6 | EA | 0 | USD |
| MONTGOMERY COUNTY | Attn: Capt. Mark Thompson | Montgomery | AL | 4/10/2008 | Donated - AL - Montgomery County | OR | 913295 | R9154303 | 70006 | 0 | 1 | EA | 0 | USD |
| NATIONAL TACTICAL OFF. ASSOC | Attn: Corey Luby | DOYLESTOWN | PA | 4/10/2008 | Donated - PA - National TOA | OR | 913293 | R9154303 | 70006 | 0 | 5 | EA | 0 | USD |
| KC METRO TACTICAL OFF ASSOC | Attn: Steve Smith | Lenexa | KS | 4/25/2008 | Donated - KS - KC Metro TOA | OR | 913292 | R9154303 | 70006 | 0 | 5 | EA | 0 | USD |
| LOUISIANA TACT. POLICE OFF ASS | Attn: Bud Crowe | DeRidder | LA | 4/25/2008 | Donated - LA - Tact. Police Assoc. | OR | 913292 | R9154303 | 70006 | 0 | 4 | EA | 0 | USD |
| MICHIGAN TACTICAL OFF. ASSOC | Attn: Tim Liess | Harper Woods | MI | 4/25/2008 | Donated - MI - MTOA | OR | 913291 | R9154303 | 70006 | 0 | 5 | EA | 0 | USD |
| EAST WEST SHIELD COUNCIL OF G | Attn: Lee Sterman | SAINT LOUIS | MO | 4/25/2008 | Donated - MO - East West Shied Gtwy COG | OR | 913281 | R9154303 | 70006 | 0 | 2 | EA | 0 | USD |
| MILWAUKEE CO. SHERIFF | Attn: Toba Weberg | Franklin | WI | 4/25/2008 | Donated - WI - Milwaukee Co Sheriff | OR | 913281 | R9154303 | 70006 | 0 | 3 | EA | 0 | USD |
| GEORGIA TACT OFFICERS ASSOC | Attn: Gregg Boyer | Dawsonville | GA | 4/10/2008 | Donated - GA - Tact Off. Assoc | OR | 913279 | R9154303 | 70006 | 0 | 5 | EA | 0 | USD |
| Leon County Sheriff | Attn: Clifton Couch | Tallahassee | FL | 4/25/2008 | Donated - FL - Leon Co Sher | OR | 913278 | R9154303 | 70006 | 0 | 5 | EA | 0 | USD |
| ROCKY MTN TACT. OFF. ASSOC | Attn: George Mumma | Golden | CO | 4/10/2008 | Donated - CO - Rocky Mtn Tact Assoc | OR | 913275 | R9154303 | 70006 | 0 | 5 | EA | 0 | USD |
| OHIO TACTICAL OFFIC. ASSOC (OT | Attn: Samuel Todd | Atwater | OH | 4/25/2008 | Donated - OH - Tact Off Assoc. | OR | 913273 | R9154303 | 70006 | 0 | 10 | EA | 0 | USD |
| VIRGINIA TACT. OFF. ASSOC | Attn: Glenn Glikas | Chesterfield | VA | 4/25/2008 | Donated - VA - Tact Off Assoc | OR | 913267 | R9154303 | 70006 | 0 | 5 | EA | 0 | USD |
| CLARKSVILLE POLICE DEPT | Attn: Shane Bassett | Clarksville | TN | 4/28/2008 | Donated - TN - Clarksville PD | OR | 913886 | R9154303 | 70006 | 0 | 1 | EA | 0 | USD |
| **ORDERS SHIPPED TO OTHER BLUESTAR CUSTOMERS** | | | | | | | | | | | | | | |
| **CITY OF LOS ANGELES CHECKED CARD CUSTOMERS** | Attn: Wanda Bell 213-473-5571 | Los Angeles | CA | 5/27/2008 | 9680/89 | OR | 919064 | T1113203 | 70006 | 0 | 2 | EA | 0 | USD |
| Department of State Police | Attn: Carol Courington 804-674- | Richmond | VA | 5/27/2008 | EP262883 | OR | 919075 | T1113203 | 70006 | 0 | 1 | EA | 0 | USD |
| PWR - Yosemite National Park | Attn: Karen Kotlecki 209-379-11- | El Portal | CA | 5/28/2008 | R9806580009 | OR | 919886 | T1113203 | 70006 | 0 | 1 | EA | 0 | USD |

This starts a new order because it started coming in on their CC card. They had to put the last dollar of cost and accessories to a separate order.

NOTE: "1" This was a special case where the organization could not put the entire amount on their CC card. They had to put the last dollar of cost and accessories to a separate order.

## CERTIFICATE OF SERVICE

I, Matthew F. Didora, hereby certify that on May 30, 2008, I caused to be served a true copy of the annexed **Declaration of Robert M. Pantle**, by ECF filing same with the Clerk of the Court and served in accordance with the Eastern District rules on electronic service **and** by e-mail sent to the address provided by the parties set forth after each name:

> Joel S. Schneck
> Goldberg & Rimberg PLLC
> 115 Broadway, Suite 302
> New York, NY  10006
> (212) 697-3250
> jss@grlpllc.com

Matthew F. Didora
*Attorney for Defendant*
Remington Arms Company, Inc.
Ruskin Moscou Faltischek, P.C.
1425 RexCorp Plaza
Uniondale, New York 11556
(516) 663-6600