Mark S. Mulholland
Matthew F. Didora
RUSKIN MOSCOU FALTISCHEK, P.C.
East Tower, 15th Floor
1425 RexCorp Plaza
Uniondale, New York 11556-1425
Phone: (516) 663-6600

John F. Morrow, Jr. – *pro hac vice*
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
One West Fourth Street
Winston-Salem, North Carolina 27101
Phone: (336) 721-3584

*Attorneys for Defendant*
*Remington Arms Company, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ — — - x

O.D.F. OPTRONICS LTD. and WAVE GROUP LTD.,

                              Plaintiffs

                                                 Case No. 08-4746 (DLC)

      -against-

REMINGTON ARMS COMPANY, INC., MIGUEL PEREZ
d/b/a TACTICAL DEPOT and John Does 1-10 being
defendants whose names are currently unknown but are
engaged in the wrongdoing alleged in the complaint herein,

                              Defendants.
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ — — - x

## DEFENDANT REMINGTON ARMS COMPANY, INC.'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## PRELIMINARY STATEMENT

Defendant Remington Arms Company, Inc. ("Remington") submits this Memorandum of Law in opposition to plaintiffs O.D.F. Optronics Ltd. and Wave Group Ltd.'s (together, "ODF") motion for a preliminary injunction. Through its motion ODF seeks to block Remington's valid sale of Eyeball R1 optical units ("Eyeball" units or kits) to Blue Star Consortium, Inc. ("Blue Star"), for which Remington previously paid ODF approximately $3.8 million. ODF's motion is based on its erroneous assertion that Remington failed to complete the sale of those Eyeball units to Blue Star by April 15, 2008, and is thus in breach of a "Termination Agreement" between Remington and ODF.

ODF's motion should be denied because Remington in fact completed the sale of the Eyeball units to ODF before the April 15 deadline. The Affidavits of Robert Pantle, Charles Lawson, Daniel Barks and Linda Duncan[1] provide a detailed chronology persuasively demonstrating that Remington and Blue Star reached a final agreement on the sale by the deadline.

Further, assuming *arguendo* that questions of fact exist concerning whether Remington and Blue Star reached a binding agreement by the deadline, ODF does not stand to suffer irreparable harm absent the requested injunctive relief. ODF's allegations amount to nothing more than a simple claim for breach of contract for which monetary damages would be adequate. ODF has merely speculated about potential harm that could occur, and has not persuasively demonstrated that monetary damages would be inadequate.

ODF's claim that it will be irreparably harmed by Remington's alleged violation of an amorphous "market price" restriction ignores the fact that the Termination Agreement between

---

[1] Daniel Barks and Linda Duncan are Blue Star employees, and Remington understands that Blue Star's counsel will be submitting affidavits on their behalf directly to the Court.

Remington and ODF contained no price restriction, and expressly recognized that Remington could sell the units for an amount less than $2,500 per unit.

Similarly, ODF's claim that it will be irreparably harmed if Blue Star resells the units outside of the "Territory" or "Market" set forth in the former Distribution Agreement between Remington and ODF,[2] ignores several facts including: (1) the "Territory" and "Market" restrictions that existed pursuant to the former Distribution Agreement were voided and superseded pursuant to the Termination Agreement; (2) Remington's sale to Blue Star was within the "Territory" or "Market" defined by the now defunct Distribution Agreement; and (3) Blue Star has assured Remington that it will only resell the Eyeball units to military and law enforcement agencies in the United States, its territories, and Canada.

As a final matter, the facts also show that ODF has failed to adhere to the warranty and support obligations to which it expressly agreed in the Termination Agreement. As a consequence, ODF has unclean hands, weighing strongly against the extreme relief ODF seeks.

For each of these reasons, Remington respectfully contends that ODF's motion for preliminary injunctive should be denied in all respects.

## FACTUAL BACKGROUND

### A.    Background Between Remington and ODF

From 2004 to 2008, Remington and ODF were parties to a "Distribution Agreement," pursuant to which Remington purchased Eyeball units from ODF and resold them to law enforcement and military agencies in the United States, its territories, and Canada. (Pantle Dec., at ¶ 2 and Exhibit DX 1). Remington was further authorized to use agents or subdistributors, as

---

[2] Pursuant to now defunct Distribution Agreement, Remington agreed that it would sell the units to law enforcement and military agencies in the United States, its territories, and Canada, and further agreed that it would exercise good faith efforts to ensure that any sub-distributors of the Eyeballs did so as well.

long as it used "best efforts" to ensure that any subdistributors or agents resold or promoted the units to the same markets and territories. (*See* DX 1, at ¶¶ 1(b) and (c)).[3]

From the outset sales did not materialize as both parties anticipated, with several developments affecting law enforcement purchases. For example, the law enforcement market was affected by a surge in fuel prices. (Pantle Dec., at ¶ 3). Following this, Remington was informed that state and federal agencies around the country experienced a reduction and redistribution of Homeland Security funding. (*Id.*). Further, in the wake of the national disaster experienced in Louisiana and other Gulf states, Remington was informed that further budget redistributions were made to pay for Katrina-oriented Relief. (*Id.*).

These and other unforeseen developments, combined with a general lack of market interest due to high prices, impeded sales. (*Id.* at ¶ 4). To account for the sales shortfalls, Remington and ODF negotiated two successive amendments to the Distribution Agreement. (*Id.* at ¶ 4, and DX 2 and DX 3).

**B.    The Termination Agreement Between Remington and ODF**

Notwithstanding the parties' attempt to salvage the distributorship relationship through contract amendments, it soon became clear that the Eyeballs would not achieve the level of market success that the parties had hoped. (Pantle Dec., at ¶ 5).

During this time, Remington became increasingly dissatisfied with the quality and sufficiency of ODF's warranty and repair support and production capabilities. On numerous occasions ODF refused to provide warranty or repair support that Remington believed ODF was required to provide. (*Id.* at ¶ 6). Similarly, ODF was continually unable to supply units by deadlines it had previously promised. (*Id.*). To be fair, Remington believes that ODF likewise

---

[3] In paragraph 13 of the Declaration of Eran Tibon that ODF filed with the Court on May 21, 2008, Mr. Tibon acknowledged that Remington could sell the Eyeballs "to a sub-distributor" in the relevant market. (*See* May 21, 2008 Tibon Decl., at ¶ 13).

became unhappy with the relationship, and felt that it could achieve higher sales in the United

States without Remington's assistance. (*Id.* at ¶ 7).

Accordingly, on February 12, 2008, the parties executed a Termination, Settlement and

Release Agreement ("Termination Agreement"), a true and correct copy of which is attached to

the Pantle Declaration as DX 4. (*Id.* at ¶ 8). The parties' respective obligations under the

Distribution Agreement were voided and superseded by the Termination Agreement, which

stated that it was effective February 15, 2008. (*Id.* at ¶ 9). Paragraph 1 of the Termination

Agreement states, "The parties hereby agree that the [Distribution] Agreement shall terminate

effective February 15, 2008." (DX 4, at ¶ 1).  Further, under the Termination Agreement the

parties released one another from any and all demands, claims ***and rights*** they had in connection

with the Distribution Agreement. (*Id.* at ¶ 11 -12).

At the time of execution of the Termination Agreement, Remington had a significant

quantity of Eyeball units (in excess of 1,000) in its inventory. (Pantle Dec., at ¶ 10). Remington

had paid ODF approximately $3.8 million for that remaining inventory, and spent considerable

additional sums on training, promotion and market development - - to ODF's benefit.[4] (*Id.*).

Accordingly, Remington planned to recover some portion of its significant investment through

subsequent sales of the units. (*Id.*).

Pursuant to the Termination Agreement, the parties agreed that Remington would sell its

remaining inventory on or before April 15, 2008. (DX 4).  There were no restrictions regarding

pricing or the territory in which Remington could sell the units. (DX 4).  Further, Remington's

intention in entering into the Termination Agreement was that there would be no such

restrictions. (Pantle Dec. at ¶ 11).  The Termination Agreement said nothing about where or to

---

[4] On top of its outright purchases from ODF, Remington had invested substantial other sums in the training, promotion and market development related to the Eyeballs.  All told, Remington spent approximately $6 million on inventory, personnel and market development solely for the Eyeballs. (*Id.*).

whom Remington could sell the inventory, and specifically contemplated that Remington would be allowed to sell the units for less than $2,500. For example, Paragraph 8 of the Termination Agreement states that if Remington chose to sell a unit for less than $2,500, then ODF would have no obligation to provide warranty and service support for that sale. (DX 4, at ¶ 8). Otherwise, ODF would continue to be obligated to provide warranty and service support for units sold by Remington at $2,500 or higher. (*Id.*).

C.  **Remington's Post-Termination Sales of the Eyeball Units**

On behalf of Remington, Robert Pantle negotiated the sale of Remington's inventory. (Pantle Dec., at ¶ 12). Mr. Pantle negotiated the sale with Blue Star (through its President, Daniel Barks), which is a distributor of military equipment based in Arlington, Virginia. (*Id.* at ¶ 13). Remington and Blue Star reached full agreement on all material terms for the sale of the inventory by April 15, 2008. (*Id.* at ¶ 13). The relevant chronology was as follows:

In February 2008, Mr. Pantle contacted Mr. Barks to inquire as to Blue Star's interest in purchasing Remington's Eyeball inventory. (*Id.* at ¶ 14). At that time and thereafter, Mr. Pantle informed Mr. Barks that Remington had a deadline of April 15, 2008, for completing the sale. (*Id.*).

On March 24, 2008, Mr. Barks proposed terms pursuant to which ODF would take ownership of the kits immediately. Sometime between March 24 and April 10th, Mr. Pantle informed Blue Star that Remington agreed to Blue Star's proposed terms. (Pantle Decl., at ¶ 15).

On April 10, 2008, Mr. Pantle again contacted Mr. Barks to reiterate that Remington agreed to the proposed terms. (*Id.* at ¶ 16). On that day, Mr. Barks confirmed that Blue Star was still in agreement, and informed Mr. Pantle that Blue Star was working on a written contract to memorialize our agreement. (*Id.*).

On April 11, 2008, Mr. Pantle responded to Mr. Barks by requesting that he send the written contract to others at Remington because Mr. Pantle was out of the office. (*Id.* at ¶ 17). Mr. Pantle also informed Mr. Barks that he could contact Chuck Lawson at Remington to obtain the exact number of Eyeball kits that Remington had, so that Blue Star could insert that number into the written contract. (*Id.*).

Later on April 11, 2008, Chuck Lawson informed Blue Star that Remington had 1,097 Eyeball kits and 25 Pelican cases[5] in its inventory (thus, 1,072 kits did not have Pelican cases). (Lawson Decl., at ¶ 19). Blue Star's CFO, Linda Duncan, responded later the same day (April 11, 2008) by expressing surprise about the fact that Remington only had 25 Pelican cases. (Pantle Decl., at ¶ 19). Mr. Pantle followed-up by leaving voicemails for Mr. Barks over the next few days, so that they could discuss the Pelican case issue. (*Id.*).

On April 14, 2008, Ms. Duncan informed Mr. Pantle that Mr. Barks was in a law trial and that she would call Mr. Pantle the following day, April 15, 2008. (*Id.* at ¶ 20). The following day (April 15th), Ms. Duncan called Mr. Pantle. The two discussed the Pelican cases and Ms. Duncan seemed fine with Mr. Pantle's explanation. (*Id.* at ¶ 21).

Later that day (still April 15th) Mr. Lawson (of Remington) and Mr. Pantle were driving in a rental car from Syracuse to Ilion, New York. (Pantle Decl., at ¶ 22). During the drive Mr. Barks called Mr. Pantle, and informed him that he was in a law trial and did not have long to talk. (*Id.*). Mr. Barks then conveyed that Blue Star was fine with Remington's explanation of the Pelican cases, and confirmed that the parties had an agreement. (*Id.*).

---

[5] For purposes of clarity, a Pelican case is a hard plastic case made by Pelican Products, Inc. (www.pelican.com). Pelican makes numerous types of cases, including one that is designed to hold the Eyeball kit. Each Eyeball kit can be sold in a Pelican case, but it need not be. ODF did not sell Pelican cases to Remington. Remington purchased them directly from Pelican.

At the end of his conversation with Mr. Barks on the afternoon of April 15th, Mr. Pantle believed that Remington had a deal with Blue Star, notwithstanding the fact that he had not yet received a signed copy of a formal written contract memorializing the agreement. (*Id.* at ¶ 23). After Mr. Pantle hung up from the call with Mr. Barks, he specifically remembers telling Chuck Lawson that they had a deal with Blue Star, and the two of them expressed relief. (*Id.*).

Mr. Barks of Blue Star likewise believed the parties had an agreement. (Barks Aff., at ¶ 9). As it turned out, Mr. Barks had signed the written contract on April 14, 2008, because Blue Star did not consider the Pelican case issue to be material. (Barks Aff., at ¶ 6, 8) (Duncan Aff., at ¶ 6, 7). Mr. Pantle received a copy of the contract as executed by Blue Star sometime between April 15 and April 21st. (*Id.* at ¶ 24). On April 22, 2008, Mr. Pantle signed the contract on behalf of Remington and sent a copy to Ms. Duncan.

DX 5 is a true and correct copy of the final "Sales and Service Agreement" as executed by both Remington and Blue Star. (*Id.*). As shown by the written contract with Blue Star, full title to Remington's inventory of Eyeball units transferred to Blue Star. (DX 5, at ¶ 1).

1.     **The Fresno Police Department Price Quote**

ODF has also raised concerns about a price quote that Remington sent to the Fresno Police Department ("Fresno") prior to the April 15th deadline. It is true that before the sale to Blue Star was finalized, Remington considered selling some Eyeball units to Fresno, and on or about March 28, 2008, forwarded Fresno a price quote for the sale of five (5) units. Such conduct was permitted by the Termination Agreement. Further, Fresno never accepted the terms of this quote prior to April 15, and Remington never completed any sales to Fresno. (Lawson Decl., at ¶ 2). The boilerplate legend on the price quote that all "Quotes are good for 90 days" does not prove that Remington was trying to sell units after April 15, 2008. The fact of the

matter is that Remington would not have sold, and did not sell any Eyeball units to Fresno at any time, including after April 15th. (*Id.* at ¶ 3).

**D.    ODF's Concern About Sales Outside of the U.S.**

Although Remington does not believe that Remington was precluded under the Termination Agreement from selling units outside of the U.S., Remington has nevertheless complied with ODF's concerns in that respect. First, Remington sold the units to Blue Star, which is a military equipment distributor based on Arlington, Virginia. (Pantle Dec., at ¶ 26). Second, after receiving ODF's demand letter preceding this litigation, Mr. Pantle requested Mr. Barks to agree that Blue Star would only resell the Eyeball units to military and law enforcement agencies within the U.S. Mr. Barks confirmed to Mr. Pantle that he would do so, which Remington conveyed to ODF prior to the time that ODF filed suit. (*Id.*). Further, under the former Distribution Agreement with ODF, Remington was only required to use "Best Efforts" to ensure that any agents or subdistributors resold the units to military and law enforcement agencies in the U.S., its territories, and Canada. (*See* DX 1 at ¶ 1(c) ("Remington will use its best efforts to ensure that its subdistributors or agents sell Products only in the Markets within the Territory.").

**2.    The Tactical Depot Sale**

ODF has also raised concerns regarding purported sales to Miguel Perez d/b/a Tactical Depot ("Tactical Depot"). For a brief period of time prior to April 15, 2008, Remington relied upon Tactical Depot to promote the sale of units to law enforcement agencies within the Los Angeles area. (Lawson Decl., at ¶ 4). Remington ultimately sold a total of two (2) units to Tactical Depot – not "about 20" as Mr. Tibon of ODF claims. (*Id.* at ¶ 5).[6]

---

[6] Eran Tibon, who signed a declaration in support of ODF's original motion to show cause, did not even speak to Mr. Perez himself. In his declaration, Mr. Tibon describes second-hand a conversation that some other person at

Remington did initially report 12 potential sales through Tactical Depot, but all 12 did not occur. The 12 sales initially reported by Remington were as follows: (a) Remington sold two (2) units to Tactical Depot, at $2,500 per unit, prior to April 15, 2008; (b) Remington also started processing paperwork to sell five (5) more units to Tactical Depot, but the sale was not completed in time to meet the April 15, 2008 deadline, and Remington cancelled it accordingly; and (c) The final five (5) units were donated to federal and state law enforcement agencies in the Los Angeles area and drop shipped to the charitable recipient through Tactical Depot, prior to April 15, 2008. (Lawson Decl., at ¶ 6).

In sum, Remington's initial report of 12 units having been distributed through Tactical Depot was appropriate. (*Id.* at ¶ 7). Of those 12 units, only 7 were actually delivered, in each case before the April 15, 2008 deadline, and in each case to a United States-based law enforcement agency. (*Id.*). Further, Remington neither authorized Mr. Perez, nor anyone else, to distribute or promote the Eyeballs outside of the United States, and to Remington's knowledge Tactical Depot never sold any units outside the United States. (*Id.* at ¶ 8).

**E.    ODF's Concern Regarding Low Sales Prices**

ODF should not be heard to complain about the sales price for the Eyeballs in question. First, the Termination Agreement contains no price restriction, and contemplates pricing below $2,500 – with no downward floor. Specifically, The Termination Agreement provides that for all sales below $2,500, ODF has no obligation to provide warranty support. (*See* DX 4, at ¶¶ 6 and 8). The Termination Agreement is otherwise silent as to pricing – and thus did not restrict in any way Remington's ability to sell the Eyeball units at low prices. (DX 4).

---

ODF allegedly had with Mr. Perez. (*See* Tibon Decl., filed May 21, 2008, at ¶ 27). Mr. Tibon's speculation is simply wrong.

**F.   ODF's Concern Regarding Low Battery Life and Improper Storage**

ODF has also raised concerns relating to alleged improper maintenance and storage of the Eyeball units in question. The units are being stored in a storage facility in Memphis, Tennessee, which is leased by Remington and Ozburn-Hessey Logistics, Inc. ("OHL"). (Lawson Decl., at ¶ 9). OHL is a global supply chain management company. (*See* www.ohl.com/globalsupplychain). The personnel working at the storage facility are employed by OHL, with the exception of one quality control manager who is employed by Remington. (*Id.*). During the term of the Distribution Agreement with ODF, Remington used the facility to store the units because it has superior storage and maintenance capabilities. (*Id.*). Post-sale to Blue Star, Remington believed that continuing to use the facility for storage and shipping would help ensure that the Eyeballs were well-conditioned when they reached Blue Star's customers. (*Id.*). Consistent with the above, Remington has worked with OHL to ensure that the units have always been stored, maintained and charged in compliance with ODF's stated protocol, which protocol was referenced as an appendix to the contract between Remington and Blue Star. (*Id.* at ¶ 10).

Notwithstanding these good faith efforts, the Termination Agreement between Remington and ODF did not state that Remington could only sell remaining inventory that had optimal remaining battery life, or that otherwise had been properly stored. (*See* DX 4). Further, the Termination Agreement did not put any time limit on when Remington's customers (in this case Blue Star) could resell the inventory. (*Id.*).

**G.   ODF's Failure to Adhere to Warranty and Support Obligations Post-Termination**

Pursuant to the Termination Agreement, ODF was required to handle all warranty and service obligations for units sold by Remington prior to April 15, 2008, at a sales price of $2,500 or higher. (DX 4, at ¶¶ 6 and 8). Notwithstanding this obligation, post-termination several

customers have informed Remington that ODF has failed to adequately and timely respond to warranty and repair requests for units sold by Remington well in advance of April 15, 2008, at prices above $2,500. (Lawson Decl., at ¶ 12).

One example involves a unit that Remington sold to the Tarrant County sheriff's department for $4,800 on March 29, 2007. On July 8, 2008, Lieutenant Tommie L. Hathorn of Tarrant County emailed Chuck Lawson to inform him that he had shipped the unit to ODF's designated support agent in the United States (Mr. John Blake) in May 2008, requesting repairs for the unit. (*Id.* at ¶ 13). A true and correct copy of the email Mr. Lawson received from Mr. Hathorn is attached to Mr. Lawson's declaration as DX 6. As shown by the email, after approximately 5 weeks Lieutenant Hathorn began to e-mail Mr. Blake about the repair status, and Mr. Blake failed to respond to any of the emails. (*See* DX 6). Lieutenant Hathorn further conveyed to Mr. Lawson that "customer service is certainly lacking," and asked Mr. Lawson if Remington could assist in getting the unit repaired. (*Id.*). (Lawson Decl., at ¶ 13).

Attached to Mr. Lawson's declaration as DX 7 is a true and correct copy of another such email that was forwarded by Lieutenant Hathorn to Mr. Lawson. (Lawson Decl., at ¶ 14). The email shows that Lieutenant Hathorn emailed Mr. Blake of ODF on June 14, 2008, stating, "Wanted to know if you have the status of the monitor, that was returned to you about 3 weeks ago for warranty. Lt. T.L. Hathorn Tarrant county Sheriff Department. Thanks." (DX 7).

Attached to Mr. Lawson's declaration as DX 8 is a true and correct copy of another such email that was forwarded to Mr. Lawson by Lieutenant Hathorn. (Lawson Decl., at ¶ 15). The email was originally sent by Lieutenant Hathorn to Mr. Blake of ODF on June 18, 2008, and states, "Several weeks ago we returned a monitor for warranty. Have not heard from you as to the status of repair. Any info would be appreciated. Thank You Lt. T.L. Hathorn Tarrant County Sherriff Dept." (DX 8).

Attached to Mr. Lawson's declaration as DX 9 is a true and correct copy of a string of emails between Lieutenant Hathorn and Mr. Lawson, further discussing this issue. (Lawson Decl., at ¶ 16). These emails show that Lieutenant Hathorn contacted Asher Gendelman of ODF as recently as August 13, 2008, and that although Mr. Gendelman stated that he would look into the matter and respond, he had not done so as of August 22, 2008. (DX 9).

Another example of ODF's failure to adhere to its warranty and repair obligations post-termination involves a unit sold by Remington to the Mason County Sheriff's department on December 31, 2007, for a price of $2,500. (Lawson Decl., at ¶ 17). Since April 2008, Mr. Brad Mandeville of the Mason County Sheriff's department has called Mr. Lawson on several occasions to complain about ODF's failure to service the unit. (*Id.*).

The above are just examples, and Remington has received complaints from other customers regarding ODF's failure to timely or adequately handle warranty or repair obligations since entering into the Termination Agreement. Remington believes ODF's failures in this regard have tarnished Remington's relationships with its customers, who appear to hold Remington partially responsible for ODF's inability or unwillingness to repair or replace the units in question. (Lawson Decl., at ¶ 18).

## ARGUMENT

### A.    Standard for Preliminary Injunction

In the Second Circuit, a preliminary injunction may only be granted where the moving party demonstrates the existence of "(a) irreparable harm and (b) either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.

1979); *Morgan Stanley & Co., Inc. v. Archer Daniels Midland Co.*, 570 F. Supp. 1529, 1533–34 (S.D.N.Y. 1983).

The *sine qua non* of injunctive relief is that the moving party will suffer irreparable injury if the injunction is not granted. *See Gidatex, S.R.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998). A preliminary injunction is an extraordinary remedy that should be granted only in exceptional circumstances where the threat of irreparable injury to the moving party is "actual and imminent, not remote and speculative." *See Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999); *Lanvin Inc. v. Colonia, Inc.*, 739 F. Supp.182, 193 (S.D.N.Y. 1990). "It should issue *not upon a plaintiff's imaginative, worst case scenario of the consequences flowing from the defendant's alleged wrong but upon a concrete showing of imminent irreparable injury.*" *USA Network v. Jones Intercable, Inc.*, 704 F. Supp. 488, 491 (S.D.N.Y. 1989) (emphasis added).

An "irreparable injury" is one for which monetary damages would not be adequate. *Jackson Dairy, Inc.*, 596 F.2d at 72; *World Love Prods., Inc. v. Keepers Indus., Inc.*, 1993 WL 6591 *2 (1993) ("If a wrong can be redressed by a payment of money, irreparable harm is not established and any request for preliminary injunctive relief must be denied."). Consequently, injunctive relief is not generally available in breach of contract actions. *See United Retail Inc. v. Main Street Mall Corp.*, 903 F. Supp. 12, 14 (S.D.N.Y. 1995) ("In the contract setting, injunctive relief is the exception and not the rule."); *see also USA Network*, 704 F. Supp. at 491 (noting that the rule against awarding injunctive relief in the contract setting "is so because the injury must be one requiring a remedy of more than mere money damages.").

**B.    There Is No Danger that ODF Will Suffer "Imminent, Irreparable Injury"**

Despite the general proscription against awarding injunctive relief in breach of contract actions, that is exactly what ODF seeks. ODF previously submitted a single statement from its

chief operating officer, Eran Tibon, which consists primarily of speculation about potential harm and summarily concludes that ODF "will suffer tremendous irreparable harm as a result of Remington's various violations of both the Termination Agreement and the Distribution Agreement." (*See* May 21, 2008 Declaration of Eran Tibon, at ¶ 34).

This Court has previously denied injunctions based exclusively on unsupported predictions. For example, in *Lanvin Inc.*, the plaintiff claimed that defendant's termination of the parties' distribution agreement would disrupt the plaintiff's sales and cause the plaintiff to lose customers. *See Lanvin Inc.*, 739 F. Supp. at 193. The court responded that conclusory allegations of irreparable injury through lost sales "without adequate evidence of how such losses would take place and how the movant would be injured thereby," did not justify an injunction. *See id.; see also Grand Light & Supply Co. v. Honeywell, Inc.*, 80 F.R.D. 699, 702 (D. Conn. 1978) (injunction denied where evidence of potential lost customers was essentially a prediction from plaintiff's principal). Similarly, ODF's claims of potential lost sales and adverse impacts to its business are wholly speculative, and unsupported by testimony from any prospective customers.

Indeed, in order for alleged threats to the continued viability of ODF's business to rise to the level of "irreparable injury" sufficient to warrant imposition of a preliminary injunction, Remington's conduct must be so egregious as to imperil ODF's entire business. *See United Retail Inc.*, 903 F. Supp. at 14; *see also Roso-Lino Distrib., Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 126 (2d Cir. 1984) (granting a preliminary injunction where the plaintiff stood to lose its entire business). Consistent with this rule, applications for preliminary injunctions have been denied in situations where the challenged acts were predicted to have an even greater impact on a plaintiff's business than the speculative harm alleged here.

Illustrative is *Litho Prestige v. News Am. Pub'g, Inc.*, 652 F. Supp. 804, 807 (S.D.N.Y. 1986), where this Court denied the plaintiff's request to preliminarily enjoin the defendant from terminating an agreement between the parties pursuant to which the plaintiff was the exclusive printer of *New York Magazine*. In denying the injunction, the Court stated: "[I]t is not seriously contended that the loss of the *New York Magazine* printing business will threaten the ability of plaintiff to continue in business or even seriously cripple it." The court explained that injunctive relief in arbitrated contract cases is reserved for instances where the breach will cause plaintiff's business to close completely. *Id.*; *see also United Retail Inc.*, 903 F. Supp. at 14 (denying preliminary injunction where plaintiff failed to demonstrate that the breach jeopardized plaintiff's solvency or required substantial modification of its business plan).

ODF's application misses this mark dramatically, as ODF has submitted no evidence that its operations may cease if Blue Star is allowed to resell the units in question. Instead, Blue Star raises the following speculative arguments regarding irreparable harm: (1) harm stemming from potential sales to those outside of the former "market" or "territory"; (2) harm stemming from sales at low prices; and (3) harm stemming from sales of units that may have low battery life. None of these arguments are persuasive.

Regarding potential sales outside of the market or territory, those restrictions were abrogated by the Termination Agreement. (DX 4, at ¶ 1). Further, pursuant to the Termination Agreement the parties released one another from any and all demands, claims *and rights* they had in connection with the Distribution Agreement. (*Id.* at ¶ 11 -12). Notwithstanding these facts, Remington sold the units to Blue Star, which is a military equipment distributor based on Arlington, Virginia. (Pantle Dec., at ¶ 26). Moreover, after receiving ODF's demand letter preceding this litigation, Remington received Blue Star's assurances that it would only sell the Eyeball units to military and law enforcement agencies within the U.S. (*Id.*). Thus, Remington

has adhered to territory, market, and loose "best efforts" provisions of the defunct Distribution Agreement, despite the fact that those provisions were abrogated by the Termination Agreement.

Regarding potential sales by Blue Star at low prices, the Termination Agreement contains no price restriction, and contemplates pricing below $2,500 – with no downward floor. Specifically, The Termination Agreement provides that for all sales below $2,500, ODF has no obligation to provide warranty support. (*See* DX 4, at ¶¶ 6 and 8). The Termination Agreement is otherwise silent as to pricing – and thus did not restrict in any way Remington's ability to sell the Eyeball units at low prices. (DX 4).

Regardless, the fact that the Termination Agreement reduced Remington's time to sell post-termination inventory from six months down to two months, bears on ODF's complaint about a "fire sale" and "dumping." A hasty sale at low prices was precisely the situation that ODF bargained for. (Pantle Dec., at ¶ 28). Given the difficulties Remington encountered selling Eyeball units from 2004-2008, ODF knew or should have known that Remington was going to sell its remaining stock at low prices to meet the two-month deadline. (*Id.*).

Regarding potential sales of units allegedly having low battery life, the Termination Agreement between Remington and ODF did not state that Remington could only sell remaining inventory that had optimal remaining battery life, or that otherwise had been properly stored. (*See* DX 4). Further, the Termination Agreement did not put any time limit on when Remington's customers (in this case Blue Star) could resell the inventory. (*Id.*). Indeed, there can be no dispute that throughout the term of the parties' formal Distribution Agreement, Remington was free to sell to sub-distributors and others, who could then resell the Eyeballs with no restriction as to time. (*See* Declaration of Eran Tibon that ODF filed with the Court on May 21, 2008, at ¶ 13, acknowledging that Remington could sell the Eyeballs "to a sub-distributor" in the relevant market) (DX 1, at ¶ 1(b) and (c)). ODF has failed to explain why Remington's sale

to a United States military equipment supplier such as Blue Star during the term of the parties'

Distribution Agreement would *not have caused* irreparable injury, whereas the same conduct as

of April 15, 2008 somehow would.

In conclusion, each of ODF's claims regarding alleged irreparable harm is purely

speculative, and even if true, could be adequately addressed through monetary damages. For this

reason alone, ODF's application should be denied.

**C.    ODF Is Not Likely To Succeed on the Merits of its Underlying Claims**

Even assuming *arguendo* that ODF could show irreparable harm (plainly it cannot), ODF

would still not be entitled to an injunction because it is not able to meet the second prong of the

*Jackson Dairy* test (either a likelihood of success on the merits, or a balance of hardships tipping

decidedly in favor of granting preliminary relief). *Jackson Dairy, Inc.*, 596 F.2d at 72.

Remington has not breached the Termination Agreement, and thus it is far from "likely"

that ODF will be succeed on the merits at the conclusion of this case. The Termination

Agreement permitted Remington to sell off its remaining inventory of Eyeball kits on or before

April 15, 2008 — without restriction as to territory, market, or price. As extensively detailed in

the declaration of Robert Pantle and Affidavit of Daniel Barks, the actual signatories to the Blue

Star Agreement believed they had reached agreement on all material terms by April 15, 2008.

(Pantle Decl., at ¶ 23) (Barks Decl., at ¶ 4-8).

The fact that the parties memorialized their agreement in a subsequent written contract

(which was actually signed by Mr. Barks on April 14th and signed by Mr. Pantle on April 22nd),

does not alter this conclusion. Under New York law, an enforceable agreement can exist even if

the parties intend to execute a later, more formal written agreement. They key is the whether the

parties intended to be bound even though they contemplated executing a formal written contract.

*See I.R.V. Merchandising Corp. v. Jay Ward Productions*, 856 F. Supp. 168 (S.D.N.Y. 1994) ("if

the parties intend to, they can enter into a binding contract based on verbal discussions or preliminary writings even if they contemplate a later formal writing to memorialize the agreement."); *See also Hostcentric Technologies, Inc. v. Republic Thunderbolt, LLC*, No.04Civ.1621, 2005 WL 1377853, at *5 (S.D.N.Y. 2005) ("'It is well established that parties are bound to the terms of a contract even though it is not signed [or even written].") (bracketed language in original); *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir. 1985) ("In any given case it is the intent of the parties that will determine the time of contract formation. To discern that intent a court must look to the 'words and deeds [of the parties] which constitute objective signs in a given set of circumstances.'") (quoting *R.G. Group., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir. 1984)).

Over twenty years ago, Judge Leval (then a District Court judge, now a Judge on the Second Circuit Court of Appeals) explained that a "preliminary" agreement is binding and effective despite the desire for a later formal document "when the parties have reached complete agreement (including the agreement to be bound) on all issues perceived to require negotiation." *Teachers Ins. And Annuity Ass'n of America v. Tribune Co.*, 670 F. Supp. 491, 499 (S.D.N.Y. 1987). Judge Leval stated:

> Such an agreement is preliminary in form—only in the sense that the parties desire a more elaborate formalization of the agreement. The second stage [the written contract] is not necessary; it is merely considered desirable.... "[T]he mere fact that the parties contemplated memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event...."

*Id.* at 498 (quoting Restatement (Second) of Contracts § 26).

In *V'Soske v. Barwick*, 404 F.2d 495 (2d Cir. 1968), the Second Circuit stated that "the mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event." *Id.* at 499. In

19

*V'Soske*, the court held that the parties intended to be bound by their January 1, 1964 agreement to sell plaintiff's business to defendant despite the absence of a formal contract. The court stated:

> To overcome the reasonable inference we draw from the language of the correspondence that the parties did indeed intend thereby to create a binding contract, **appellees must do more than merely point to the circumstances that a formal document was contemplated: they must show either that both parties understood that their correspondence was to be of no legal effect or that [one party] had reason to know that [the other party] contemplated that no obligations should arise until a formal contract was executed.**

*Id.* (emphasis added). Since there was no such evidence in *V'Soske*, the court held that the preliminary agreement was a binding and effective contract.

Similarly, in this case ODF has not and cannot prove that both parties understood their agreement was of no legal effect, or that one party knew that the other party contemplated that no obligations should arise until after the formal written contract was executed by both parties. To the contrary, both Blue Star and Remington intended and understood that the agreement was effective by the April 15th deadline, notwithstanding their intention to memorializing the agreement in writing.[7] Accordingly, ODF has not presented the type of evidence the Second Circuit deems necessary to rebut the reasonable inference that Remington and Blue Star had entered into a binding agreement by April 15th, and ODF's claim of delinquency cannot support the drastic relief it seeks. For this additional reason ODF's motion should be denied.

### 1.    ODF's Patent and Trademark Infringement Claims are Barred by the Exhaustion or "First Sale" Doctrine.

ODF's sale of the Eyeball units to Remington exhausted ODF's patent rights and prevents ODF from invoking patent law to control post-sale disposition of the Eyeball units by

---

[7] The fact that both Mr. Pantle and Mr. Barks knew about the April 15 deadline is further evidence that they intended to complete the sale on or before April 15.

Remington. Recently, in *Quanta Computer, Inc. v. LG Electronics, Inc.*, 128 S.Ct. 2109, 2115,

170 L.Ed.2d (June 9, 2008), Justice Thomas stated that "[t]he longstanding doctrine of patent

exhaustion provides that the initial authorized sale of a patented item terminates all patent rights

to that item." *See also Innomed Labs, LLC v. Alza Corp.*, 368 F.3d 148, 161 (2d Cir. 2004)

("The first sale doctrine stands for the proposition that, absent unusual circumstances, courts

infer that a patent owner has given up the right to exclude concerning a patented article that the

owner sells.") (citation excluded); *Kitty Walk Systems, Inc. v. Midnight Pass Inc.*, 431 F. Supp.

2d 306, 310 (E.D.N.Y. 2006) ("Under the 'first sale' doctrine, a patent owner who transfers his

goods to another has given up any right to restrict the re-sale of those goods to a consumer.");

*Forest Labs., Inc. v. Abbott Labs.*, 1999 WL 33299123 * 22–23 (W.D.N.Y. 1999), *aff'd* 239 F.3d

1305 (recognizing that a patent holder surrenders its monopoly by selling the patented product).

Here, ODF's authorized sales to Remington took the Eyeball units outside of ODF's patent

monopoly and, as a result, ODF can no longer assert its patent rights against Remington. *See*

*Quanta*, 128 S.Ct. at 2122 (limitations in license agreement requiring licensee to give notice

about patent rights did not preclude application of exhaustion doctrine). To the extent ODF has

any claim, it is for breach of contract rather than patent infringement. *Id.* at 2122 n.7 (noting in

dicta that contract rights may exist even if patent exhaustion doctrine applies).

    The exhaustion doctrine applies equally to ODF's trademark infringement claim. The

Second Circuit has held that a distributor who resells branded goods is not an infringer and thus

needs no license:

> As a general rule, trademark law does not reach the sale of genuine goods bearing
> a true mark even though the sale is not authorized by the mark owner. . . Thus, a
> distributor who resells trademarked goods without change is not liable for
> trademark infringement.

*Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 61–62 (2d Cir. 1992) (*citing* McCarthy on Trademarks § 25:41)); *see also Luxottica Group S.p.A. v. Bausch & Lomb Inc.*, 160 F. Supp. 2d 545, 552 (S.D.N.Y. 2001) (manufacturer who sells branded product to distributor without restriction on use cannot prevent the distributor from reselling the branded goods, preliminary injunction for trademark infringement denied).

In sum, both ODF's patent and trademark infringement claims are barred by the exhaustion or "first sale" doctrine, and those claims should be summarily dismissed to as to avoid the unnecessary complexity, time and expense that they will inevitably add to this simple breach of contract action.[8]

### D.    The Equities Does Not Tip Decidedly in ODF's Favor

ODF cannot prevail under the alternative second prong of *Jackson Dairy*, as the equities here do not tip decidedly in ODF's favor. First and foremost, ODF has unclean hands as the evidence shows that it has repeatedly failed to adhere to the warranty and support obligations it agreed to undertake pursuant to the Termination Agreement. ODF has thus breached the very agreement it accuses Remington of breaching. (*See* Lawson Decl., at ¶¶ 11-18) (DX 6-9). ODF's unclean hands weigh strongly against granting the injunctive relief ODF seeks. *See Marathon Outdoor, LLC v. Vesconti*, 107 F. Supp. 2d 355, 360 n.9 (S.D.N.Y. 2000) (even if a plaintiff demonstrates both irreparable injury and a likelihood of success, "[a] court may deny injunctive relief based on the defense of unclean hands where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue .....") (*citing Estate of John Lennon*, 939 F. Supp. at 293 (denying preliminary injunction

---

[8] If the terms of the original Distribution Agreement continue to exist as ODF argues, various provisions of that agreement and the first amendment thereto provide Remington the right to use ODF's trademarks in reselling the units. *See* Distribution Agmt. at ¶¶ 1(d) and 13, and First Amendment at ¶ 1 (Pantle Decl. Exhs. A and B). Thus, ODF's trademark claim fails even if ODF is to be believed that the Distribution Agreement remains in force.

based on unclean hands defense)) (internal quotations omitted).  For this reason alone, ODF's motion should be denied.

Further, Remington paid ODF upwards of $3.8 million for the units sold to Blue Star, and thus ODF has already profited substantially from the sale of those units.  In contrast, Blue Star, has agreed to pay Remington a minimum price of $400 per unit for the 1,097 units sold, or approximately just $439,000.  Remington is thus losing approximately $3.4 million on these units – even if the sale to Blue Star is not enjoined.

Moreover, if ODF's application for an injunction is granted, Remington will be left holding significant inventory, and its reputation and goodwill with Blue Star would be impaired immeasurably by its inability to deliver the goods.  *See Litho Prestige*, 652 F. Supp. at 810.

As a final matter, the expectations and safety of Blue Star's customers, which include federal and state law enforcement agencies and the military, should be considered in the overall equitable analysis.  If ODF has its way, those public protection organizations will be faced with the choice of either paying ODF's exorbitant prices for Eyeball units (a minimum of $4,800 per unit), or going without them.

In sum, far from tipping decidedly in ODF's favor, the equities tip decidedly against ODF.  For this final reason ODF's motion should be denied.

## CONCLUSION

For the aforementioned reasons, Remington respectfully requests that ODF's request for preliminary injunctive relief be denied in all respects. If injunctive relief is granted, Remington further respectfully requests that ODF be required to post a bond in an amount determined reasonable by the Court.

Dated:     Uniondale, New York          Respectfully submitted,
              August 28, 2008

RUSKIN MOSCOU FALTISCHEK, P.C.

By: _____
Mark S. Mulholland
Matthew F. Didora
East Tower, 15th Floor
1425 RexCorp Plaza
Uniondale, New York 11556-1425
Phone: (516) 663-6600

*Of Counsel:*

John F. Morrow, Jr. – *pro hac vice*
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
One West Fourth Street
Winston-Salem, North Carolina 27101
Phone: (336) 721-3584

*Attorneys for Defendant*
*Remington Arms Company, Inc.*

## CERTIFICATE OF SERVICE

I, Matthew F. Didora, hereby certify that on August 28, 2008, I caused to be served a true copy of the foregoing annexed **DEFENDANT REMINGTON ARMS COMPANY, INC.'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**, to be filed with the Clerk of the Court and served in accordance with the Southern District rules on electronic service and by depositing a true copy thereof enclosed in a post-paid wrapper in the custody of FedEx for overnight delivery, prior to the latest time designated by that service for overnight delivery, addressed to each of the following persons at the last known address set forth after each name:

GOLDBERG & RIMBERG, PLLC
Joel S. Schneck, Esq.
Robert L. Rimberg, Esq.
115 Broadway, 3rd Floor
New York, New York 10006

*Attorneys for Plaintiffs*

Dated:  August 28, 2008

_____
Matthew F. Didora