Mark S. Mulholland
Matthew F. Didora
RUSKIN MOSCOU FALTISCHEK, P.C.
East Tower, 15th Floor
1425 RexCorp Plaza
Uniondale, New York 11556-1425
Phone:  (516) 663-6600

John F. Morrow, Jr. – *pro hac vice*
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
One West Fourth Street
Winston-Salem, North Carolina 27101
Phone:  (336) 721-3584

*Attorneys for Defendant*
*Remington Arms Company, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – – – – – x

O.D.F. OPTRONICS LTD. and WAVE GROUP LTD.,

                             Plaintiffs

                     -against-

REMINGTON ARMS COMPANY, INC., MIGUEL PEREZ
d/b/a TACTICAL DEPOT and John Does 1-10 being
defendants whose names are currently unknown but are
engaged in the wrongdoing alleged in the complaint herein,

                          Defendants.

– – – – – – – – – – – – – – – – – – – – – – – – – – – x

Case No. 08-4746 (DLC)

**REMINGTON'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN
CONNECTION WITH PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## PROPOSED FINDINGS OF FACT

**Background Between Remington and ODF**

1.      From 2004 to 2008, Remington and ODF were parties to a "Distribution Agreement," pursuant to which Remington purchased Eyeball R1 optical units ("Eyeball" units or kits) from ODF and resold them to law enforcement and military agencies in the United States, its territories, and Canada. (Pantle Dec., at ¶ 2 and Exhibit DX 1).

2.      Pursuant to the Distribution Agreement, Remington was authorized to sell the units to agents or subdistributors, as long as it used "best efforts" to ensure that any subdistributors or agents resold or promoted the units to the same markets and territories. (DX 1, at ¶¶ 1(b) and (c)).

3.      For a variety of reasons, sales of the Eyeball units did not achieve the levels that Remington and ODF had hoped. (Pantle Dec., at ¶ 3).

4.      To account for the sales shortfalls, Remington and ODF negotiated two successive amendments to the Distribution Agreement. (*Id.* at ¶ 4, and DX 2 and DX 3).

5.      Notwithstanding the parties' attempt to salvage the distributorship relationship through contract amendments, it soon became clear that the Eyeballs would not achieve the level of market success that the parties had hoped. (Pantle Dec., at ¶ 5).

6.      During this time, Remington became increasingly dissatisfied with the quality and sufficiency of ODF's warranty and repair support and production capabilities. On numerous occasions ODF refused to provide warranty or repair support that Remington believed ODF was required to provide. (*Id.* at ¶ 6).

7.      ODF likewise became unhappy with the relationship, and felt that it could achieve higher sales in the United States without Remington's assistance. (*Id.* at ¶ 7).

**The Termination Agreement Between Remington and ODF**

8.      In early 2008, Remington and ODF decided to end their business relationship, and on February 12, 2008, they executed a Termination, Settlement and Release Agreement ("Termination Agreement") that was effective February 15, 2008.  (*Id.* at ¶ 8) (DX 4).

9.      Paragraph 1 of the Termination Agreement states, "The parties hereby agree that the [Distribution] Agreement shall terminate effective February 15, 2008."  (DX 4, at ¶ 1).

10.     The parties' respective obligations under the Distribution Agreement were voided and superseded by the Termination Agreement.  (*Id.*).

11.     Pursuant to the Termination Agreement the parties released one another from any and all demands, claims and rights they had in connection with the Distribution Agreement.  (*Id.* at ¶¶ 11 -12).

12.     At the time of execution of the Termination Agreement, Remington had more than 1,000 Eyeball units in its inventory.  (Pantle Dec., at ¶ 10).

13.     Remington had paid ODF approximately $3.8 million for that inventory, and spent considerable additional sums on training, promotion and market development, to ODF's benefit.  (*Id.*).

14.     Remington planned to recover some portion of its significant investment through subsequent sales of the units.   (*Id.*).

15.     Pursuant to the Termination Agreement, the parties agreed that Remington could sell its remaining inventory on or before April 15, 2008.  (DX 4).

16.     There were no restrictions in the Termination Agreement regarding pricing or the territory in which Remington could sell the units.  (DX 4).

17.    The Termination Agreement said nothing about where Remington could sell the inventory, and contemplated that Remington would be allowed to sell the units for less than $2,500. (DX 4).

18.    Pursuant to the Termination Agreement, if Remington chose to sell a unit for less than $2,500, then ODF would have no obligation to provide warranty and service support for that sale. (DX 4, at ¶ 8). Otherwise, ODF would continue to be obligated to provide warranty and service support for units sold by Remington at $2,500 or higher. (*Id.*).

**Remington's Post-Termination Sales of the Eyeball Units**

19.    Remington and Blue Star reached full agreement on all material terms for the sale of the inventory by April 15, 2008.

20.    On behalf of Remington, Robert Pantle negotiated the sale of Remington's inventory, and had authority to do so. (Pantle Dec., at ¶ 12).

21.    Mr. Pantle negotiated the sale with Blue Star (through its President, Daniel Barks), which is a distributor of military equipment based in Arlington, Virginia. (*Id.* at ¶ 13).

22.    In February 2008, Mr. Pantle contacted Mr. Barks to inquire as to Blue Star's interest in purchasing Remington's Eyeball inventory. (*Id.* at ¶ 14).

23.    Mr. Pantle informed Mr. Barks that Remington had a deadline of April 15, 2008, for completing the sale. (*Id.*).

24.    On March 24, 2008, Mr. Barks proposed terms pursuant to which ODF would take ownership of the kits immediately. (Pantle Decl., at ¶ 15).

25.    Sometime between March 24 and April 10th, Mr. Pantle informed Blue Star that Remington agreed to its proposed terms. (Pantle Decl., at ¶ 15).

26.     On April 10, 2008, Mr. Pantle again contacted Mr. Barks to reiterate that Remington agreed to the proposed terms. (*Id.* at ¶ 16). On that day, Mr. Barks confirmed that Blue Star was still in agreement, and informed Mr. Pantle that Blue Star was working on a written contract to memorialize our agreement. (*Id.*).

27.     On April 11, 2008, Mr. Pantle responded to Mr. Barks by requesting that he send the written contract to others at Remington because Mr. Pantle was out of the office. (*Id.* at ¶ 17). Mr. Pantle also informed Mr. Barks that he could contact Chuck Lawson at Remington to obtain the exact number of Eyeball kits that Remington had, so that Blue Star could insert that number into the written contract. (*Id.*).

28.     Later on April 11, 2008, Chuck Lawson informed Blue Star that Remington had 1,097 Eyeball kits and 25 Pelican cases in its inventory (thus, 1,072 kits did not have Pelican cases). (Lawson Decl., at ¶ 19).

29.     Blue Star's CFO, Linda Duncan, responded later the same day (April 11, 2008) by expressing surprise about the fact that Remington only had 25 Pelican cases. (Pantle Decl., at ¶ 19). Mr. Pantle followed-up by leaving voicemails for Mr. Barks over the next few days, so that they could discuss the Pelican case issue. (*Id.*).

30.     On April 14, 2008, Ms. Duncan informed Mr. Pantle that Mr. Barks was in a law trial and that she would call Mr. Pantle the following day, April 15, 2008. (*Id.* at ¶ 20).

31.     The following day (April 15th), Ms. Duncan called Mr. Pantle. The two discussed the Pelican cases and Ms. Duncan seemed fine with Mr. Pantle's explanation. (*Id.* at ¶ 21).

32.     Later that day (still April 15th) Mr. Lawson (of Remington) and Mr. Pantle were driving in a rental car from Syracuse to Ilion, New York. (Pantle Decl., at ¶ 22). During the drive

Mr. Barks called Mr. Pantle, and informed him that he was in a law trial and did not have long to talk. (*Id.*). Mr. Barks then conveyed that Blue Star was fine with Remington's explanation of the Pelican cases, and confirmed that the parties had an agreement. (*Id.*) (Barks Aff., at ¶ 9).

33.    At the end of his conversation with Mr. Barks on the afternoon of April 15th, Mr. Pantle believed that Remington had reached agreement with Blue Star, notwithstanding the fact that he had not yet received a signed copy of a formal written contract memorializing the agreement. (*Id.* at ¶ 23). Mr. Barks of Blue Star likewise believed the parties had an agreement. (Barks Aff., at ¶ 9).

34.    After Mr. Pantle hung up from the call with Mr. Barks, he told Chuck Lawson that they had a deal with Blue Star, and the two of them expressed relief. (*Id.*).

35.    Mr. Barks of Blue Star likewise believed the parties had an agreement. (Barks Aff., at ¶ 9). As it turned out, Mr. Barks signed the written contract on April 14, 2008, because Blue Star did not consider the Pelican case issue to be material. (Barks Aff., at ¶ 6, 8) (Duncan Aff., at ¶ 6, 7).

36.    Mr. Pantle received a copy of the contract as executed by Blue Star sometime between April 15 and April 21st. (*Id.* at ¶ 24). On April 22, 2008, Mr. Pantle signed the contract on behalf of Remington and sent a copy to Ms. Duncan. (*Id.*).

37.    DX 5 is a true and correct copy of the final "Sales and Service Agreement" as executed by both Remington and Blue Star. (*Id.*).

38.    Pursuant to the written contract with Blue Star, full title to Remington's inventory of Eyeball transferred to Blue Star. (DX 5, at ¶ 1).

**The Fresno Police Department Price Quote**

39.    On or about March 28, 2008, Remington forwarded Fresno a price quote for the sale of five (5) units.  Fresno never accepted the terms of this quote prior to April 15, and Remington never completed any sales to Fresno.  (Lawson Decl., at ¶ 2).

**ODF's Concern About Sales Outside of the U.S.**

40.    Under the former Distribution Agreement with ODF, Remington was only required to use "best efforts" to ensure that any agents or subdistributors resold the units to military and law enforcement agencies in the U.S., its territories, and Canada.  (*See* DX 1 at ¶ 1(c)).

41.    Pursuant to the Termination Agreement, Remington was not required to sell the units to law enforcement and military agencies in the U.S., its territories, or Canada.

42.    Remington nevertheless complied with the former "best efforts" requirement of the Distribution Agreement.

43.    Remington sold the units to Blue Star, which is a military equipment distributor based on Arlington, Virginia.  (Pantle Dec., at ¶ 26).

44.    After receiving ODF's demand letter preceding this litigation, Mr. Pantle requested Mr. Barks to agree that Blue Star would only resell the Eyeball units to military and law enforcement agencies within the U.S.  (*Id.*)

45.    Mr. Barks confirmed to Mr. Pantle that he would do so, which Remington conveyed to ODF prior to the time that ODF filed suit.  (*Id.*).

**The Tactical Depot Sale**

46.    For a brief period of time prior to April 15, 2008, Remington relied upon Tactical Depot to promote the sale of units to law enforcement agencies within the Los Angeles area. (Lawson Decl., at ¶ 4).

47.    Remington ultimately sold a total of two (2) units to Tactical Depot. (*Id.* at ¶ 5).

48.    Remington initially reported 12 potential sales through Tactical Depot, but all 12 did not occur.  The 12 sales initially reported by Remington were as follows: (a) Remington sold two (2) units to Tactical Depot, at $2,500 per unit, prior to April 15, 2008; (b) Remington also started processing paperwork to sell five (5) more units to Tactical Depot, but the sale was not completed in time to meet the April 15, 2008 deadline, and Remington cancelled it accordingly; (c) the final five (5) units were donated to federal and state law enforcement agencies in the Los Angeles area and drop shipped to the charitable recipient through Tactical Depot, prior to April 15, 2008.  (Lawson Decl., at ¶ 6).

49.    Remington's initial report of 12 units having been distributed through Tactical Depot was appropriate.  (*Id.* at ¶ 7).  Of those 12 units, only 7 were actually delivered, in each case before the April 15, 2008 deadline, and in each case to a United States-based law enforcement agency.  (*Id.*).

50.    Remington neither authorized Mr. Perez, nor anyone else, to distribute or promote the Eyeballs outside of the United States, and to Remington's knowledge Tactical Depot never sold any units outside the United States.  (*Id.* at ¶ 8).

**ODF's Concern Regarding Low Sales Prices**

51.    The Termination Agreement contains no price restriction, and contemplates pricing below $2,500 – with no downward floor.  (DX 4, at ¶¶ 6 and 8).

52.     The Termination Agreement provides that for all sales at a price of $2,500 or above, ODF is obligated to provide warranty and repair support, and for all units sold for less than $2,500, ODF is not required to provide warranty and repair support.  (DX 4, at ¶¶ 6 and 8).

53.     The Termination Agreement is otherwise silent as to pricing – and thus did not restrict in any way Remington's ability to sell the Eyeball units at low prices.  (DX 4).

**ODF's Concern Regarding Low Battery Life and Improper Storage**

54.     The Termination Agreement between Remington and ODF did not state that Remington could only sell remaining inventory that had optimal remaining battery life, or that otherwise had been properly stored.  (*See* DX 4).

55.     The Termination Agreement did not put any time limit on when Remington's customers (in this case Blue Star) could resell the inventory.  (*Id.*).

56.     The units are being stored in a storage facility in Memphis, Tennesssee, which is leased by Remington and Ozburn-Hessey Logistics, Inc. ("OHL").  (Lawson Decl., at ¶ 9).  OHL is a global supply chain management company. (*See* www.ohl.com/globalsupplychain).

57.     The personnel working at the storage facility are employed by OHL, with the exception of one quality control manager who is employed by Remington.  (*Id.*).

58.     During the term of the Distribution Agreement with ODF, Remington used the facility to store the units because it has superior storage and maintenance capabilities.  (*Id.*).

59.     Post-sale to Blue Star, Remington believed that continuing to use the facility for storage and shipping would help ensure that the Eyeballs were well-conditioned when they reached Blue Star's customers.  (*Id.*).

60.     Consistent with the above, Remington has worked with OHL to ensure that the units have always been stored, maintained and charged in compliance with ODF's stated protocol,

which protocol was referenced as an appendix to the contract between Remington and Blue Star. (*Id.* at ¶ 10).

**Findings Regarding the Equities**

61.    Pursuant to the Termination Agreement, ODF was required to handle all warranty and service obligations for units sold by Remington prior to April 15, 2008, at a sales price of $2,500 or higher. (DX 4, at ¶¶ 6 and 8).

62.    Post-termination, ODF failed to adequately and timely respond to warranty and repair requests for units sold by Remington well in advance of April 15, 2008, at prices above $2,500. (Lawson Decl., at ¶ 12).

63.    One example involves a unit that Remington sold to the Tarrant County sheriff's department for $4,800 on March 29, 2007. (Lawson Decl., at ¶¶ 12-16) (DX 6-9).

64.    Another example of ODF's failure to adhere to its warranty and repair obligations post-termination involves a unit sold by Remington to the Mason County Sheriff's department on December 31, 2007, for a price of $2,500.   (Lawson Decl., at ¶ 17).

65.    The above are just examples, and Remington received complaints from other customers regarding ODF's failure to timely or adequately handle warranty or repair obligations since entering into the Termination Agreement. (Lawson Decl., at ¶ 18).

66.    ODF's failures in this regard have tarnished Remington's relationships with its customers. (Lawson Decl., at ¶ 18).

67.    Remington paid ODF upwards of $3.8 million for the units sold to Blue Star, and thus ODF has already profited substantially from the sale of those units.  In contrast, Blue Star, has agreed to pay Remington a minimum price of $400 per unit for the 1,097 units sold, or

approximately just $439,000. Remington is thus losing upwards of $3.4 million on these units – even with the resale to Blue Star.

68.    If ODF's application for an injunction is granted, Remington will be left holding significant inventory, and its reputation and goodwill with Blue Star would be impaired immeasurably by inability to deliver the goods.

69.    The expectations and safety of Blue Star's customers, which include federal and state law enforcement agencies and the military, are relevant to the overall equitable analysis. If injunctive relief is granted, those public protection organizations will be faced with the choice of either paying much higher prices in order to purchase the Eyeball units directly from ODF (a minimum of $4,800 per unit), or going without them.

## PROPOSED CONCLUSIONS OF LAW

### Standard for Preliminary Injunction

1.      A preliminary injunction may only be granted where the moving party

demonstrates the existence of "(a) irreparable harm and (b) either (1) a likelihood of success on

the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for

litigation and a balance of hardships tipping decidedly toward the party requesting the

preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.

1979); *Morgan Stanley & Co., Inc. v. Archer Daniels Midland Co.*, 570 F. Supp. 1529, 1533–34

(S.D.N.Y. 1983).

2.      The *sine qua non* of injunctive relief is that the moving party will suffer

irreparable injury if the injunction is not granted. *See Gidatex, S.R.L. v. Campaniello Imports,

Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998).

3.      A preliminary injunction is an extraordinary remedy that should be granted only

in exceptional circumstances where the threat of irreparable injury to the moving party is "actual

and imminent, not remote and speculative." *See Forest City Daly Hous., Inc. v. Town of N.

Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999); *Lanvin Inc. v. Colonia, Inc.*, 739 F. Supp.182, 193

(S.D.N.Y. 1990).  "It should issue *not upon a plaintiff's imaginative, worst case scenario of the

consequences flowing from the defendant's alleged wrong but upon a concrete showing of

imminent irreparable injury*." *USA Network v. Jones Intercable, Inc.*, 704 F. Supp. 488, 491

(S.D.N.Y. 1989) (emphasis added).

4.      An "irreparable injury" is one for which monetary damages would not be

adequate. *Jackson Dairy, Inc.*, 596 F.2d at 72; *World Love Prods., Inc. v. Keepers Indus., Inc.*,

1993 WL 6591 *2 (1993) ("If a wrong can be redressed by a payment of money, irreparable harm is not established and any request for preliminary injunctive relief must be denied.").

5.      Injunctive relief is not generally available in breach of contract actions. *See United Retail Inc. v. Main Street Mall Corp.*, 903 F. Supp. 12, 14 (S.D.N.Y. 1995) ("In the contract setting, injunctive relief is the exception and not the rule."); *see also USA Network*, 704 F. Supp. at 491 (noting that the rule against awarding injunctive relief in the contract setting "is so because the injury must be one requiring a remedy of more than mere money damages.").

**Conclusions Regarding "Imminent, Irreparable Injury" to ODF**

6.      ODF has not met its burden of proving that it will suffer imminent, irreparable injury absent a preliminary injunction.

7.      The alleged irreparable harm ODF claims it would suffer absent a preliminary injunction is speculative, and could otherwise be adequately cured through monetary damages.

**Conclusions Regarding ODF's Likelihood of Success on the Merits**

8.      ODF did not carry its burden of proving that it was likely to succeed on the merits of its claims.

9.      The Termination Agreement permitted Remington to sell off its remaining inventory of Eyeball kits on or before April 15, 2008, without restriction as to territory, market, or price.

10.     Blue Star and Remington reached agreement on all material terms by April 15, 2008. (Pantle Decl., at ¶ 23) (Barks Decl., at ¶ 4-8).

11.     The fact that the parties memorialized their agreement in a subsequent written contract (which was signed by Mr. Barks on April 14th and signed by Mr. Pantle on April 22nd), does not alter this conclusion.

12. Under New York law, an enforceable agreement can exist even if the parties intend to execute a later, more formal written agreement. The key is the whether the parties intended to be bound even though they contemplated subsequently executing a formal written contract. *I.R.V. Merchandising Corp. v. Jay Ward Productions*, 856 F. Supp. 168 (S.D.N.Y. 1994) ("if the parties intend to, they can enter into a binding contract based on verbal discussions or preliminary writings even if they contemplate a later formal writing to memorialize the agreement."); *Hostcentric Technologies, Inc. v. Republic Thunderbolt, LLC*, No.04Civ.1621, 2005 WL 1377853, at *5 (S.D.N.Y. 2005) ("'It is well established that parties are bound to the terms of a contract even though it is not signed [or even written].") (bracketed language in original).

13. ODF has not proven that Remington and ODF understood their agreement was of no legal effect, or that one party knew that the other party contemplated that no obligations should arise, until after the formal written contract was executed by both parties.

14. Remington's March 28, 2008 offer to the Fresno Police Department did not violate the Termination Agreement.

15. Remington's sales to Miguel Perez d/b/a The Tactical Depot did not violate the Termination Agreement.

16. ODF's patent and trademark infringement claims are barred by the exhaustion or "first sale" doctrine.

17. ODF's sale of the Eyeball units to Remington exhausted ODF's patent rights and prevents ODF from invoking patent law to control post-sale disposition of the Eyeball units by Remington. *Quanta Computer, Inc. v. LG Electronics, Inc.*, 128 S.Ct. 2109, 2115, 170 L.Ed.2d (June 9, 2008); *Innomed Labs, LLC v. Alza Corp.*, 368 F.3d 148, 161 (2d Cir. 2004) ("The first

sale doctrine stands for the proposition that, absent unusual circumstances, courts infer that a patent owner has given up the right to exclude concerning a patented article that the owner sells.") (citation excluded); *Kitty Walk Systems, Inc. v. Midnight Pass Inc.*, 431 F. Supp. 2d 306, 310 (E.D.N.Y. 2006) ("Under the 'first sale' doctrine, a patent owner who transfers his goods to another has given up any right to restrict the re-sale of those goods to a consumer."); *Forest Labs., Inc. v. Abbott Labs.*, 1999 WL 33299123 * 22–23 (W.D.N.Y. 1999), *aff'd* 239 F.3d 1305 (recognizing that a patent holder surrenders its monopoly by selling the patented product).

18.     The exhaustion doctrine applies equally to ODF's trademark infringement claim. The Second Circuit has held that a distributor who resells branded goods is not an infringer and thus needs no license. *Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 61–62 (2d Cir. 1992) (*citing* McCarthy on Trademarks § 25:41)); *see also Luxottica Group S.p.A. v. Bausch & Lomb Inc.*, 160 F. Supp. 2d 545, 552 (S.D.N.Y. 2001) (manufacturer who sells branded product to distributor without restriction on use cannot prevent the distributor from reselling the branded goods, preliminary injunction for trademark infringement denied).

## Conclusions Regarding Balancing of the Equities

19.     The equities do not tip decidedly in ODF's favor, and actually favor Remington.

20.     ODF's has unclean hands by virtue of failing to adhere to warranty and support obligations it undertook pursuant to the Termination Agreement.

21.     ODF's unclean hands weigh against granting the injunctive relief ODF seeks. See *Marathon Outdoor, LLC v. Vesconti*, 107 F. Supp. 2d 355, 360 n.9 (S.D.N.Y. 2000) (even if a plaintiff demonstrates both irreparable injury and a likelihood of success, "[a] court may deny injunctive relief based on the defense of unclean hands where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at

issue .....") (citing *Estate of John Lennon*, 939 F. Supp. at 293 (denying preliminary injunction based on unclean hands defense)) (internal quotations omitted).  For this reason alone, ODF's motion should be denied.

Dated:     Uniondale, New York              Respectfully submitted,
           August 28, 2008

                                            RUSKIN MOSCOU FALTISCHEK, P.C.

                                      By: _____
                                            Mark S. Mulholland
                                            Matthew F. Didora
                                            East Tower, 15th Floor
                                            1425 RexCorp Plaza
                                            Uniondale, New York 11556-1425
                                            Phone:  (516) 663-6600

                                            *Of Counsel:*

                                            John F. Morrow, Jr. – *pro hac vice*
                                            WOMBLE CARLYLE SANDRIDGE & RICE,
                                            PLLC
                                            One West Fourth Street
                                            Winston-Salem, North Carolina  27101
                                            Phone:  (336) 721-3584

                                            *Attorneys for Defendant*
                                            *Remington Arms Company, Inc.*

## CERTIFICATE OF SERVICE

I, Matthew F. Didora, hereby certify that on August 28, 2008, I caused to be served a true copy of the foregoing annexed **PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN CONNECTION WITH PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**, to be filed with the Clerk of the Court and served in accordance with the Southern District rules on electronic service **and** by depositing a true copy thereof enclosed in a post-paid wrapper in the custody of FedEx for overnight delivery, prior to the latest time designated by that service for overnight delivery, addressed to each of the following persons at the last known address set forth after each name:

> GOLDBERG & RIMBERG, PLLC
> Joel S. Schneck, Esq.
> Robert L. Rimberg, Esq.
> 115 Broadway, 3rd Floor
> New York, New York 10006
>
> *Attorneys for Plaintiffs*

Dated:  August 28, 2008

Matthew F. Didora