UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
O.D.F. OPTRONICS LTD. and
WAVE GROUP LTD.                                     Docket No. 1:08-cv-04746(DLC)

                        Plaintiffs,

      -against-                                         **PLAINTIFF'S PROPOSED**
                                                                **FINDINGS OF FACT AND**
REMINGTON ARMS COMPANY, INC.,                       **CONCLUSIONS OF LAW**
MIGUEL PEREZ d/b/a TACTICAL DEPOT
And John Does 1-10 being defendants whose
names are currently unknown but are engage
in the wrongdoing alleged in the complaint herein,

                       Defendants.
-------------------------------------------------------X

      ODF Optronics Ltd. ("ODF") and Wave Group Ltd. ("Wave") (collectively referred to as the "Plaintiffs") submit the following as its proposed Findings of Fact and Conclusions of Law with respect to its application seeking orders: (a) pursuant to F.R.C.P.R. 65 (a) and (b) granting a temporary restraining order and preliminary injunction enjoining Remington Arms Company, Inc. ("Remington") from selling, promoting, distributing or otherwise disbursing any ODF Eyeball kits, spare parts, demo systems or other ODF or Wave products, and (b) granting such other and further relief as to this Court seems just and proper.

**Proposed Findings of Fact**

    1.    ODF is a foreign corporation based in Israel which creates technologies that utilize optics to enhance surveillance in urban settings. Wave is ODF's parent corporation.

    2.    ODF is best known for its "Eyeball R1 Surveillance System" ("Eyeball"), which consists of a hardened sphere that houses a sophisticated camera system (with IR lamination) and comes with a wireless display unit.

3. The Eyeball has unique characteristics covered by various patents, including two United States Patents registered to ODF: (a) 7,253,969, "Spherical and nearly spherical view imaging assembly", and (b) 7,362,516, "Optical lens providing omni-directional coverage and illumination".

4. ODF has registered the "Eyeballs" mark with the United States Patent and Trademark Office, Serial Number 78535193.

5. Since its release, the Eyeballs have garnered many accolades and awards as well as a good reputation in its market.

6. On July 19, 2004 ODF entered into a "Distribution Agreement" with defendant Remington.

7. Pursuant to the Distribution Agreement, subject to the terms and conditions contained therein, ODF appointed Remington as the "exclusive distributor of Products in the Markets located in the Territory for the term of" the Agreement. Distribution Agreement, Section 1(a). The Eyeball was included in the Products defined in the Distribution Agreement.

8. By agreement dated February 15, 2008, ODF, Wave, and Remington entered into a Termination, Settlement and Release Agreement of the Distribution Agreement (the "Termination Agreement").

9. Pursuant to the Termination Agreement:

> "Remington must complete all sales of existing Products, Units, spare parts and demo systems in its inventory ("Existing Inventory") by no later than April 15, 2008 and shall not be entitled to sell, promote or distribute any Existing Inventory after that date."

*Termination Agreement, Section 2.*

10. Paragraph 8 of the Termination Agreement provides:

> "ODF will assume all warranty claims from Remington, and will provide all warranty and service obligations on its existing terms for all Units or Products that have been sold by Remington through April 15, 2008, at a customer's sales price of at least $2,500 per unit."

11. Remington represented that as of November 8, 2007, it had 1670 Eyeball kits in its inventory.

12. ODF had already improved the Eyeballs Kits to give them a better range and durability and accessories. If Remington was able to sell its inventory over a long period of time, it would damage the market for the Eyeball Kits and as damage ODF as a result of Remington's failure to properly maintain the Eyeballs.

13. ODF insisted on the reduced sell-off window so that its current product would not have to compete with and/or be affected by its previous versions of the product being sold in the market.

14. Remington failed to provide to ODF a list of the remaining inventory on or before May 16, 2008 as required by paragraph Number 2 of the Termination Agreement.

15. After commencement of this action, Remington submitted a copy of the April 14, 2008 "Sale to and Service Agreement with Blue Star Consortium Inc. ("Blue Star") for ODF R1 Eyeball Kits" to the Court. (the "Blue Star Agreement")

16. The Blue Star Agreement is a sham agreement made for the purposes of attempting to circumvent the terms of the Termination Agreement.

17. The Blue Star Agreement specifies that Remington "transferred" 1097 EyeBall kits to Blue Star for $1.00. As detailed in paragraph 2 of the Blue Star Agreement:

> Remington will store and maintain the eyeball kits **and ship directly to**

**customers** in accordance with instructions from Blue Star and in Pelican Cases **to be supplied by Remington** where the kit does not already have one." (Emphasis Added.) Remington cannot dispute that the Blue Star Agreement violates the Termination, Settlement and Release Agreement which states that Remington "shall not be entitled to sell promote or distribute any Existing Inventory after" April 15, 2008. The Blue Star Agreement specifies that Remington is distributing the Eyeballs kits.

18. Blue Star is a new company, with no financial history according to a Dun & Bradstreet report submitted to the Court. Its largest high credit is listed as $750.00. It is listed as in the business of "facilitating & brokering" to the Department of Defense.

19. Remington, a multi-million dollar corporation (if not larger) entered into a "sale" of the 1,072 Eyeball Kits, which would have a low end street value (if properly maintained by Remington) of $2.5 million, with a company with no credit history and which has reported to be in the business of being a broker.

20. The only reason for Remington to have entered into the Blue Star Agreement was that Blue Star was just an alter ego or "face" for Remington to avoid the terms of the Termination Agreement with ODF.

21. The Blue Star Agreement is a broker/agent agreement, where Blue Star would act as Remington's agent/represeentative to avoid the terms of the Termination Agreement and the two companies would split the profits.

22. Blue Star would be paid handsomely for helping Remington out in trying to circumvent the Termination Agreement.

23. Remington received one dollar, which is no consideration for the "transfer" of the 1097 Eyeball kits to Blue Star. Additionally, Remington did not ever actually transfer

anything to Blue Star, as the subject Kits are still in Remington's warehouse and Remington agreed to remain responsible for maintenance and shipping the kits to third-parties.

24. Blue Star has no duty to pay Remington any monies beyond the $1.00 payment **for two years** at which time Blue Star would owe Remington $400 per remaining kit for Remington to "remove and store" such kits. Blue Star Agreement, paragraph 4.

25. Revenue from any sales during the two year period would be split between Remington and Blue Star.

26. Remington was not required to invoice Blue Star for monies owed until after Remington received a monthly statement of sales by Blue Star, for products which Remington was shipping.

27. Only when Remington had fulfilled its distribution activities within the framework of the Blue Star Agreement would Remington be entitled to invoice for the sale(s).

28. Given Blue Star's lack of financial stability and minimal creditworthiness, the parties to the Blue Star Agreement clearly did not expect that Blue Star would be in a position to pay for any kits remaining at the end of the two year period.

29. Remington in reality was attempting to extend the two month sales window it had received under the Termination Agreement for an additional two years.

30. ODF's "market price" for the Eyeballs kits is $4,800.00.

31. ODF was in contact with the police Department for Fresno California for the purchase of Eyeballs kits. ODF was told by the representative that ODF's quote was too high - they have a quote from Remington dated March 28, 2008 with a 90 day validity

(until June 28th, 2008) for 5 units at $2500 each.

32. The March 28, 2008 quote says that is "good for 90 days" which makes it an offer from Remington beyond the April 15, 2008 date for which Remington could not longer sell, promote or distribute existing inventory.

33. ODF will suffer tremendous irreparable harm as a result of Remington's various violations of both the Termination Agreement and the Distribution Agreement.

34. The inventory which is still in Remington's possession is old and was not maintained.

35. Since Remington received the last shipment of Eyeball kits from ODF in September 2007, ODF has modified the Eyeballs' antennas to increase the range and made additional improvements to the Eyeballs and accessories.

36. The improvements to the Eyeballs was a strong consideration for the time frame for sell-off of Remington's inventory as contained in the Termination Agreement.

37. The batteries for the Eyeballs must be recharged every three months in order to maintain their proper battery life.

38. Remington was not following ODF's prescribed maintenance procedure. The Los Angeles Police Department (LAPD) received three Eyeballs Kits (each Kit contains two eyeballs and a PDU unit) from Remington between January 2008 and March 2008. All three Kits were returned to ODF because the batteries did not work when LAPD received the Kits. The reason was that they were not properly charged/maintained.

39. In the past 4 months, ODF received another 18 Eyeball Kits which were sold in the United States by Remington and which were returned because of weak or dead batteries in the Eyeballs.

40. By continuing to release what are essentially defective ODF products to the Market, Remington will injure ODF's good will and reputation. ODF's name and marks will be associated with an inferior product.

41. By selling the Eyeballs kits without ODF's permission, Remington is infringing on ODF's patents, marks and other intellectual property.

42. Unless an injunction is issued against Remington for its blatant violation of the Termination Agreement, it will have long-lasting impact on ODF and would affect ODF's ability to continue as a going concern.

43. Remington did not "sell" the subject Eyeballs before April 15, 2008 as the Blue Star Agreement was a sham.

44. The terms of the Blue Star Agreement make it clear that it is nothing more than a distribution/agency/partnership agreement where Remington has Blue Star as its front and the two parties will be splitting revenue.

45. The Blue Star Agreement is a sham transaction.

46. Remington entered into a licensing agreement, in which Remington acknowledged that ODF owned certain intellectual property that Remington was contractually permitted to resell in ODF's stead. ODF retained its interest to protect its intellectual property and was specific as to what Remington could and could not do. Defendants should be enjoined from the unauthorized sail of the Eyeballs which contain Plaintiffs' patents.

47. ODF has shown that it will be irreparable harmed if an injunction is not issued.

48. ODF has shown that it is likely to succeed on the merits of its underlying

claims.

49.  ODF has shown that a balance of hardships tips in its favor.

50.  A preliminary injunction should be issued as requested by the plaintiffs.

### Proposed Conclusions of Law

1.  ODF has shown that it will be irreparable harmed if an injunction is not issued.

2.  ODF has shown that it is likely to succeed on the merits of its underlying claims.

3.  ODF has shown that a balance of hardships tips in its favor.

4.  Remington failed to "sell" the subject Eyeballs before April 15, 2008.

5.  The terms of the Blue Star Agreement make it clear that it is nothing more than a distribution/agency/partnership agreement where Remington has Blue Star as its front and the two parties will be splitting revenue.

6.  The Blue Star Agreement is a sham transaction.

7.  The Blue Star Agreement expressly contemplates that Remington will "distribute" the subject Eyeballs in violation of the Termination Agreement.

8.  Plaintiffs should also be granted injunction relief based upon their patents and trademarks which are being violated by Remington.

9.  The "first sale doctrine" does not apply to the facts and circumstances before the Court.

10. Remington entered into a licensing agreement, in which Remington acknowledged that ODF owned certain intellectual property that Remington was contractually permitted to resell in ODF's stead.  ODF retained its interest to protect its

intellectual property and was specific as to what Remington could and could not do. Defendants should be enjoined from the unauthorized sail of the Eyeballs which contain Plaintiffs' patents.

    11.    A preliminary injunction should be issued as requested by the plaintiffs.

Dated: New York, New York
       August 27, 2008

                                            GOLDBERG & RIMBERG, PLLC

                                            By: _____
                                            Joel S. Schneck (jss7019)
                                            Robert L. Rimberg (rlr2453)
                                            Attorneys for Plaintiff
                                            115 Broadway, 3rd Floor
                                            New York, New York 10006
                                            (212) 697-3250