Robert L. Rimberg, Esq. (RLR2453)
Joel S. Schneck, Esq. (JSS7019)
GOLDBERG & RIMBERG, PLLC
115 Broadway – 3rd Floor
New York, New York 10006
Phone: (212)697-3250
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

O.D.F. OPTRONICS LTD. and
WAVE GROUP LTD.                              Docket No.  1:08-cv-04746(DLC)

                    Plaintiffs,

        -against-

REMINGTON ARMS COMPANY, INC.,
MIGUEL PEREZ d/b/a TACTICAL DEPOT
and John Does 1-10, being defendants whose
names are currently unknown but are engage
in the wrongdoing alleged in the complaint herein

                    Defendants.
-------------------------------------------------------X

## PLAINTIFFS' PRE-HEARING MEMORANDUM OF LAW

*Table of Authorities*

## Cases

*Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir.1985)………………………........ 10

*Beckerman v. Sands*, 364 F.Supp. 1197 (S.D.N.Y. 1973)………………………………........ 13

*Bershad v. McDonough*, 428 F.2d 693, 697 (7th Cir. 1970), *cert. denied*, 400 U.S. 992
(1971)……………………………………………………………………………………….. 11

*Brenntag Int'l Chems. Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999)…………… 8

*Church of Scientology Intern. v. Elmira Mission of the Church of Scientology*, 794 F.2d 38
(2nd Cir. 1986)…………………………………………………………………………… 19

*Ecolab, Inc. 11- v. Paolo*, 753 F.Supp. 1100, 1110 (E.D.N.Y. 1991)………………………… 8

*Elite Licensing v. Thomas Plastics, Inc., 250 F.Supp.2d 372 (S.D.N.Y. 2003)*……………… 19

*EMI Latin v. Bautista*, 2003 WL 470333, at *14 (S.D.N.Y. 2003)…………………………… 8

*Goodman v. Reisch*, 220 A.D.2d 383, 631 N.Y.S.2d 890 (2nd Dept. 1995)………………… 15

*Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953)……………… 10

*Harper & Row*, 105 S.Ct. 2218, 471 U.S. 539, 552 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). 17

*In re PCH Associates*, 60 B.R. 870 (S.D.N.Y. 1986)…………………………………………… 12

*In re PCH Associates*, 804 F.2d 193 (2d. Cir. 1986)……………………………………………… 11

*Luxottica Group S.p.A. v. Bausch & Lomb Inc.*, 160 F.Supp.2d 545 (S.D.N.Y. 2001)……... 18

*Matlins v. Sargent*, 1991 WL 79219 (S.D.N.Y. 1991)…………………………………………… 14

*Painewebber Inc. v. Nwogugu*, 1998 WL 545327, at *2 (S.D.N.Y. 1998)…………………… 9

*Popkin v. Dingman*, 366 F.Supp. 534 (S.D.N.Y. 1973)………………………………………… 13

*Register.com, Inc. v. Verio, Inc.*, 126 F.Supp.2d 238, 248 (S.D.N.Y. 2000)………………… 9

*Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990)………………… 7, 8

*Roso-Lino Beverage Distribs., Inc. v. Coca -Cola Bottling Co. of New York, Inc.*, 749 F.2d
124, 126 (2d Cir. 1984)…………………………………………………………………… 7, 11

*Ryan v. Volpone Stamp Co., Inc.*, 107 F.Supp.2d 369 (S.D.N.Y. 2000)……………………… 18, 19

*S.E.C. v. Princeton Econ. Int'l, Ltd.*, 73 F. Supp. 2d 420, 425 (S.D.N.Y. 1999)…………… 8

*Sacco v. Iselin*, 1986 WL 14908 (S.D.N.Y. 1986)……………………………………………… 13

*Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582-83 (2nd Cir. 1983)………………… 15

*Smith v. Goord*, 2007 WL 2229832 (W.D.N.Y. July 31, 2007)………………………………… 7

*SR Inter. Business Ins. Co., Ltd. v. World Trade Center Properties, LLC*, 375 F.Supp.2d
238 (S.D.N.Y. 2005)………………………………………………………………………… 12

*Thompson v. Cooper*, 24 A.D.3d 203, 806 N.Y.S.2d 32 (1st Dept. 2005)…………………… 15

*Tom Doherty Assocs. v. Saban Entmt., Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995)…………….. 7, 8

*Travelers Int'l AG v. Trans World Airlines, Inc.*, 684 F. Supp. 1206, 1216 (S.D.N.Y. 1986). 11

*U.S. v. Acosta*, 963 F.2d 551 (2d Cir. 1992), …………………………………………………….. 18

*Velez v. Prudential Health Care Plan of N.Y.*, 943 F. Supp. 332, 338 (S.D.N.Y. 1996)……. 7

*Xelus, Inc. v. Servigistics, Inc.*, 371 F.Supp.2d 387, 390 (W.D.N.Y. 2005)………………… 8

## Statutes

N.Y. Partnership Law §10 (McKinney 1988)……………………………………………………… 13

*21 U.S.C. § 802(11)*……………………………………………………………………………… 18

40 C.F.R. § 80.2( *l* ) ………………………………………………………………………… 19

## Other Authorites

*Black's Law Dictionary, 2004 Ed*.………………………………………………………………… 17

PRELIMINARY STATEMENT

Plaintiffs, ODF Optronics Ltd. ("ODF") and Wave Group Ltd. ("Wave") (collectively referred to as the "Plaintiffs") submit this Memorandum of Law in support of their order to show cause seeking orders: (a)  pursuant to F.R.C.P.R. 65 (a) and (b) granting a temporary restraining order and preliminary injunction enjoining Remington Arms Company, Inc. ("Remington") from selling, promoting, distributing or otherwise disbursing any ODF Eyeball kits, spare parts, demo systems or other ODF or Wave products and (b) granting such other and further relief as to this Court seems just and proper.

FACTS

The facts and circumstances are detailed in the accompanying Direct Testimony of Eran Tibon, Chief Financial Officer and Chief Operating Officer for the Plaintiffs.  The Court is respectfully referred to Mr. Tibon's Declaration (the "Tibon Declaration") for a full recitation of the facts.

ODF is a foreign corporation based in Israel which creates technologies that utilize optics to enhance surveillance in urban settings.  Wave is ODF's parent corporation.  Tibon Declaration, ¶3.  ODF is best known for its "Eyeball R1 Surveillance System" ("Eyeball"), which consists of a hardened sphere that houses a sophisticated camera system (with IR lamination) and comes with a wireless display unit. Tibon Declaration, ¶4.  The durable Eyeballs can be thrown over walls, into streets, tunnels, houses or any other place of interest. *Id.*  Once the sphere hits the ground, it establishes a 360-degree video image of the surrounding area and feeds it to operators holding the small display unit.  *Id.* It also features audio sensors as well as sensors which distinguish between daytime and nighttime.  *Id.*  A copy of a product description and data

2

sheet for the Eyeball is submitted to the Court as **Plaintiffs' Exhibit 1**[1].

**Intellectual Property**

The Eyeball has unique characteristics covered by various patents, including two United States Patents registered to ODF: (a) 7,253,969, "Spherical and nearly spherical view imaging assembly" (the "969 Patent"), and (b) 7,362,516, "Optical lens providing omni-directional coverage and illumination" (the "516 Patent"). Tibon Declaration, ¶5. Copies of the filings for the 969 Patent and the 516 Patent are submitted as **Plaintiffs' Exhibits 2 and 3** respectively.

ODF has also registered the "Eyeballs" mark with the United States Patent and Trademark Office, Serial Number 78535193. Tibon Declaration, ¶6. A copy of the "Eyeballs" mark registration are submitted as **Plaintiffs' Exhibit 4.**

**ODF's Accolades and Good Will**

Since its release, the Eyeballs has garnered many accolades and awards as well as an impeccable reputation in its market.[2] Tibon Declaration, ¶7. The Eyeballs has been well received and used by the Israeli Ministry of Defense, the United States Armed Forces, as well as other NATO armed forces. Tibon Declaration, ¶8.

The Eyeballs has won: (a) the the United States Law Enforcement Technology Organization's "Most Innovative Tactical Product of the Year" (2006), (b) the Israel Defense Force (IDF)'s Creative Thinking Award (2006), and (c) The 2007 Frost & Sullivan EMEA Excellence in Technology Award in the field of digital imaging. Tibon Declaration, ¶9.

---

[1] Plaintiffs will provide an example of an Eyeball at the scheduled hearing.
[2] As explained more thoroughly below, Remington's sales of Eyeballss which Remington failed to maintain has already possibly injured ODF's business reputation.

## AGREEMENTS WITH REMINGTON

### The Distribution Agreement

On July 19, 2004 ODF entered into a "Distribution Agreement" with defendant

Remington Arms Company, Inc. ("Remington"), a corporation organized under the laws of

Delaware, having offices at 870 Remington Drive, Madison, North Carolina. Tibon Declaration,

¶10.  Copies of the July 19, 2004 agreement, a September 11, 2005 Amendment[3], and a November

23, 2006 Amendment No. 2 (collectively referred to as the "Distribution Agreement") is submitted

as **Plaintiffs' Exhibit 5.**

Pursuant to the Distribution Agreement, subject to the terms and conditions contained

therein, ODF appointed Remington as the "exclusive distributor of Products in the Markets

located in the Territory for the term of" the Agreement.  Distribution Agreement, Section 1(a).

The Eyeball was included in the Products defined in the Distribution Agreement.  ODF and

Remington transacted business pursuant to the Distribution Agreement from 2004 through 2007.

Tibon Declaration, ¶14.  By letter dated November 8, 2007, Robert M. Pantle, Vice President of

Remington, expressed Remington's desire to terminate the Distribution Agreement.  Tibon

Declaration, ¶14.  Mr. Pantle acknowledged that Remington had 1,670 Eyeball kits in its

inventory.  Tibon Declaration, ¶15.

### The Termination, Settlement and Release Agreement

By agreement dated February 15, 2008, ODF, Wave, and Remington entered into a

Termination, Settlement and Release Agreement of the Distribution Agreement (the "Termination

Agreement"). Tibon Declaration, ¶16.  A copy of the Termination Agreement is submitted as

---

[3] One of the changes made in Amendment No. 1 of the Distribution Agreement was to add Wave
as a party to the agreement.

**Plaintiff's Exhibit 6.**

Pursuant to the Termination Agreement:

"Remington must complete all sales of existing Products, Units, spare parts and demo systems in its inventory ("Existing Inventory") by no later than April 15, 2008 **and shall not be entitled to sell, promote or distribute** any Existing Inventory after that date."

*Termination Agreement, Section 2* (Emphasis Added.)

Paragraph 8 of the Termination Agreement provides:

"ODF will assume all warranty claims from Remington, and will provide all warranty and service obligations on its existing terms for all Units or Products that have been sold by Remington through April 15, 2008, at a customer's sales price of at least $2,500 per unit."

It is important to note that the Termination Agreement shortened the period in which Remington had to sell its Existing Inventory from 6 months to 2 months. This was a bargained for provision which was negotiated between the parties as they went back and forth with proposals. Tibon Declaration, ¶21. ODF was aware that Remington would likely sell the remaining Eyeball Kits for prices below those which ODF's normal "market price" of $4,800.00 (*See*, Tibon Declaration, ¶42). ODF was concerned about the long term effects if Remington sold the Eyeball Kits at below cost for a long period of time – the damage to ODF would affect ODF's "market price" in the long run and would affect ODF's business as a going concern. By reducing the amount of time which Remington could sell its inventory, ODF believed that that it had limited the negative impact to ODF's business. Tibon Declaration, ¶21.

Additionally, as explained in paragraphs 47-50 of the Tibon Declaration, ODF was concerned with certain quality issues with respect to the Eyeballs Kits in Remington's possession. The last shipment of Eyeballs to Remington was 100 units on August 26, 2007. The sales to Remington before that last sale were: June 28, 2007 – 156 units, June 7, 2007 – 169 units, May 10,

2007 – 171 units, March 29, 2007 – 128 units, March 6, 2007 – 156 units. All of Eyeball kits in

Remington's possession were delivered to Remington over a year ago. If the Eyeballs were not

properly maintained, then there could be issues with respect to the battery charges.

Further, ODF had already improved the Eyeballs Kits to give them a better range and

durability and accessories. Tibon Declaration, ¶23. If Remington was able to sell its inventory

over a long period of time, it could significantly injure ODF's reputation by making it appear as if

ODF was making a faulty product. Tibon Declaration, ¶23.

ODF insisted on the reduced sell-off window so that its current product would not have to

compete with and/or be affected by its previous relatively inferior product being sold in

competition with it. Tibon Declaration, ¶24.

After commencement of this action, Remington submitted a copy of the April 14, 2008

"Sale to and Service Agreement with Blue Star Consortium Inc. ("Blue Star") for ODF R1 Eyeball

Kits" to the Court. (the "Blue Star Agreement") A copy of the Blue Star Agreement is submitted

to the Court as **Plaintiffs' Exhibit 9.**

The Blue Star Agreement specifies that Remington "transferred" 1097 EyeBall kits to

Blue Star Consortium, Inc. ("Blue Star") for $1.00. As detailed in paragraph 2 of the April 14,

2008 Agreement:

> Remington will store and maintain the eyeball kits **and ship directly to customers** in
> accordance with instructions from Blue Star and in Pelican Cases **to be supplied by
> Remington** where the kit does not already have one."

(Emphasis Added.)

It is simply incredulous that Remington can argue that the Blue Star Agreement does not violate

the Termination, Settlement and Release Agreement which states that Remington "shall not be

entitled to sell promote or distribute any Existing Inventory after" April 15, 2008. The Blue Star

Agreement specifies that Remington is distributing the Eyeballs kits. Tibon Declaration, ¶33.

6

**ARGUMENT**

Point I

A PRELIMINARY INJUNCTION SHOULD BE ISSUED

A preliminary injunction should be issued to stop Remington from breaching the express terms of the Termination Agreement.

As this Court is well aware, a "party seeking preliminary injunctive relief must establish (a) that the injunction is necessary to prevent irreparable harm and (b) either that (i) it is likely to succeed on the merits of the underlying claim or (ii) there are sufficiently serious questions going to the merits of the claim as to make it a fair ground for litigation and (c) that the balance of the hardships tips decidedly toward the movant." *Tom Doherty Assocs. v. Saban Entmt., Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995) (citations omitted). *See also Velez v. Prudential Health Care Plan of N.Y.*, 943 F. Supp. 332, 338 (S.D.N.Y. 1996).

"In the Second Circuit, the standard for a temporary restraining order is the same as for a preliminary injunction." *Smith v. Goord*, 2007 WL 2229832 , at * 1 (W.D.N.Y. July 31, 2007). In determining whether a temporary restraining order or preliminary injunction should issue, the most critical factor is the showing of irreparable harm. *See e.g., Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990); *Roso-Lino Beverage Distribs., Inc. v. Coca -Cola Bottling Co. of New York, Inc.*, 749 F.2d 124, 126 (2d Cir. 1984).

Here, Plaintiffs have established all of the criteria necessary to grant a temporary restraining order and subsequent preliminary injunction. Plaintiffs have shown that if Remington is not restrained from shipping and selling the Eyeballs in its possession, it will essentially be allowed to breach the terms of the Termination Agreement with impunity.

7

Potential Irreparable Harm Exists

It is well-settled that irreparable harm exists where, "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems. Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) (internal citation omitted); *S.E.C. v. Princeton Econ. Int'l, Ltd.*, 73 F. Supp. 2d 420, 425 (S.D.N.Y. 1999). That is plainly the case here. The potential damage to the Plaintiffs' reputation and goodwill will be irreversible.

Irreparable harm exists when a business will suffer a significant loss of goodwill or reputation. *See Tom Doherty Assocs.*, 60 F.3d at 37-39 (holding that a loss of prospective goodwill can constitute irreparable harm); *Reuters Ltd.*, 903 F.2d at 908-909 (same); *Ecolab, Inc. 11- v. Paolo*, 753 F.Supp. 1100, 1110 (E.D.N.Y. 1991); *EMI Latin v. Bautista*, 2003 WL 470333, at *14 (S.D.N.Y. 2003)(same); *Xelus, Inc. v. Servigistics, Inc.*, 371 F.Supp.2d 387, 390 (W.D.N.Y. 2005) (same). That is also plainly the case here.

The Second Circuit has recognized that damage to business relationships is a significant harm. *See Xelus, Inc.,* 371 F.Supp.2d at 390 (citing *TVT Records v. Island Def Jam Music*, 225 F.Supp.2d 398, 405 (S.D.N.Y. 2002). In *EMI Latin*, for example, this Court enjoined a musical recording artist from interfering with EMI's rights to exploit certain recordings on an album that was to be released by EMI, because its failure to release the album on the scheduled release date could result in EMI's loss of goodwill and reputation with the distributors and retail stores marketing the album. *See EMI Latin*, 2003 WL 470333, at *14.   Irreparable harm also exists where a plaintiff demonstrates an injury for which monetary damages are not adequate compensation or cannot be reasonably determined. *EMI Latin*, 2003 WL 470333, at *14.

8

Plaintiffs have no way of calculating the monetary damages to which they would be entitled if Defendants are not enjoined from selling Eyeballs.

The injury stemming from the loss of consumer and retail loyalty and the damage to Plaintiffs' reputation cannot be easily quantified or adequately compensated by money damages. *See Register.com, Inc. v. Verio, Inc.*, 126 F.Supp.2d 238, 248 (S.D.N.Y. 2000) ("[n]either this Court nor the parties to this action could calculate with any precision the amount of the monetary loss which has resulted and which would result in the future from the loss of [plaintiff's] relationships with customers and co-brand partners"). Where the harm to the plaintiff is the undermining of 13- "the confidence of present and future customers and creditors…[t]he extent of damages are incalculable." *Painewebber Inc. v. Nwogugu*, 1998 WL 545327, at *2 (S.D.N.Y. 1998).

Here, Mr. Tibon has testified that ODF will suffer tremendous irreparable harm as a result of Remington's various violations of both the Termination Agreement and the Distribution Agreement. The inventory which is still in Remington's possession is old and not well maintained. Since Remington received the last shipment of Eyeballs kits from ODF in September 2007, ODF has made several significant improvements to the Eyeballs. Tibon Declaration, ¶¶22-23.

Additionally, the batteries for the Eyeballs must be recharged every three months in order to maintain their proper battery life. A copy of ODF's Eyeballs R1 User Manual is submitted to the Court as **Plaintiffs' Exhibit 14.** As stated on page 27 of the User Manual:

> "*Warning: Fully charge the PDU and each Sensor every three months. If this is not performed, the units may be permanently damaged*

It appears that Remington was not following ODF's prescribed maintenance procedure. The Los Angeles Police Department (LAPD) received three Eyeballs Kits (each Kit contains two eyeballs and a PDU unit) from Remington between January 2008 and March 2008. Tibon Declaration, ¶49. All three Kits were returned to ODF because the batteries did not work upon LAPD's receipt as they were not properly charged/maintained. *Id.* A copy of Mr. Gendelman's email explaining that all six Eyeballs and three PDUs which were returned had dead batteries is submitted to the Court as **Plaintiffs' Exhibit 15**. Additionally, in the past 4 months, ODF received another 18 Eyeball Kits which were sold in the United States by Remington which were returned because of weak or dead batteries in the Eyeballs. Tibon Declaration, ¶50.

By continuing to release what are essentially defective ODF products to the Market for at least the next two years, Remington will injure ODF's good will and reputation. Tibon Declaration, ¶51. ODF's name and marks will be associated with an inferior product. Remington has claimed that it was necessary to enter into its agreement with Blue Star because it had to mitigate its damages. Tibon Declaration, ¶52. However, that does not justify Remington's improper conduct.

## Plaintiffs Have Shown a Likelihood of Success on the Merits

It is well established that a party seeking injunctive relief based on a likelihood of success need not show that success is an absolute certainty. The movant "need only make a showing that the probability of his prevailing is better than fifty percent. There may remain considerable room for doubt." *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir.1985); *see also Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953). To the extent that Defendants' actions create an "imbalance of hardships" in favor of Plaintiffs, Plaintiffs "need not

show a likelihood of success, but need only raise substantial questions going to the merits of the case." *Travelers Int'l AG v. Trans World Airlines, Inc.*, 684 F. Supp. 1206, 1216 (S.D.N.Y. 1986); *Roso-Lino Beverage. Distribs., Inc.*, 749 F.2d at 127.

The Blue Star Agreement is nothing more than a sham agreement concocted by Remington to circumvent the restrictions imposed by the Termination Agreement. The Termination Agreement unconditionally required Blue Star to cease selling the Eye Ball on April 15, 2008. As is evident from the Blue Star Agreement, Remington still had 1,097 units on hand one (1) day before Remington was required to cease all of its involvement with the resale, promotion and distribution of its existing inventory of the Eye Ball. Seeing the potential for a great loss on the units, Remington attempted to enter into an "agreement" with Blue Star, the terms of which imply that all Blue Star had to do was find customers to be entitled to 50% of any profit. The Blue Star Agreement was nothing more than a ploy by Remington, in conjunction with Blue Star, for Remington to extend its time period to sell Eyeballs, indefinitely.

**Remington Failed to "Sell" the Subject Eye Balls Before April 15, 2008**

The Court should look at the commercial substance of the transaction rather than its form and "should guard against sham transactions". *Bershad v. McDonough*, 428 F.2d 693, 697 (7th Cir. 1970), *cert. denied*, 400 U.S. 992 (1971). The Court is not bound by the four corners of a document that purports to be a sale but whose contents indicate a different transaction, such as a partnership. The Court does not have to abide by the title a party puts on an instrument if the title conflict with the terms. *In re PCH Associates*, 804 F.2d 193 (2d. Cir. 1986).

"If two parties draw a picture of an animal that has four legs and a tail, and the parties agree to label it 'A Horse,' it would be reasonable to conclude that the picture is in fact a drawing of a horse. If, however, the animal not only has four legs and a tail, but also has large

11

floppy ears and a long trunk in place of a nose, then it would be unclear whether the parties

actually intended to draw a horse or whether they meant to draw something else- i.e., an

elephant." *In re PCH Associates*, 60 B.R. 870 (S.D.N.Y. 1986).  Here, although Remington and

Blue Star have labeled their agreement as a "sales" agreement, the actual contents show that it is

not a sales agreement.

    "When evaluating the effect of a corporate transaction, courts 'will look behind the form

[of the transaction] to the substance [because] the term or title given by the parties to a particular

transaction  or agreement is not conclusive as to what it may actually be in practical operation.'"

*SR Inter. Business Ins. Co., Ltd. v. World Trade Center Properties, LLC*, 375 F.Supp.2d 238

(S.D.N.Y. 2005) (citing 15 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private*

*Corporations,* § 7042 (2004)).  "Although courts apply this doctrine most often in the setting of

corporate mergers and acquisitions, the judicial preference for substance over form applies

equally to real estate transactions and the sale or lease of corporate assets." *Id.*

    The Blue Star Agreement specifies that Remington "transferred" 1097 EyeBall kits to

Blue Star Consortium, Inc. ("Blue Star") for $1.00.  As detailed in paragraph 2 of the April 14,

2008 Agreement:

> Remington will store and maintain the eyeball kits and ship directly to customers in
> accordance with instructions from Blue Star and in Pelican Cases to be supplied by
> Remington where the kit does not already have one.

(Emphasis Added.)

    Remington received no consideration for the "transfer" of the 1097 Eyeball kits to Blue

Star.  Remington did not actually transfer anything to Blue Star, as it retained possession of the

subject kits and was responsible for maintaining the kits and shipping the kits to third-parties.

Blue Star had no duty to pay Remington any monies beyond the $1.00 payment **for two years** at

which time Blue Star would owe Remington $400 per remaining kit for Remington to "remove

and store" such kits. Blue Star Agreement, paragraph 4. Revenue from any sales during the two year period would be split between the parties.

**The Blue Star Agreement Is a Partnership Agreement**

The terms of the Blue Star Agreement make it clear that it is nothing more than a partnership agreement where Remington and Blue Star would split any revenue raised from the sale of any Eye Ball Kits. In fact, Remington was not required to invoice Blue Star for monies owed until after Remington received a monthly statement of sales by Blue Star, for products which Remington was shipping. In other words, only when Remington had fulfilled its distribution activities within the framework of the *de facto* partnership arrangement would Remington be entitled to invoice for the sale.

A partnership is an association of two or more persons, to carry on as co-owners a business for profit. *Popkin v. Dingman*, 366 F.Supp. 534 (S.D.N.Y. 1973). "Profit sharing is the essence of partnership." *Id*. Whether a partnership exists is... largely a question of the intentions of the parties. *Sacco v. Iselin*, 1986 WL 14908 (S.D.N.Y. 1986); *Beckerman v. Sands*, 364 F.Supp. 1197 (S.D.N.Y. 1973).

"[A] partnership may result not only from an express agreement, but from circumstantial evidence as well." *Sacco*, 1986 WL 14908 (S.D.N.Y. 1986) (citing *In re Wells' Will*, 36 A.D.2d 471, 321 N.Y.S.2d 200 (4th Dept. 1971), *aff'd*, 29 N.Y.2d 931, 280 N.E.2d 95, 329 N.Y.S.2d 322 (1972).

Section 10 of the New York Partnership Law defines a partnership as "an association of two or more persons to carry on as co-owners of a business for profit." N.Y. Partnership Law §10 (McKinney 1988). Section 11 of the partnership law establishes guidelines for determining whether a partnership exists. In pertinent part, § 11 states:

13

In determining whether a partnership exists, these rules shall apply:

1. Except as provided by section twenty-seven persons who are not partners as to each other are not partners as to third parties.
2. Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or part ownership does not of itself establish a partnership, whether such co-owners do or do not share any profits made by the use of the property.
3. The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived.
4. The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment ..."

*Matlins v. Sargent*, 1991 WL 79219 (S.D.N.Y. 1991). Here, Remington would be sharing the profits from "Blue Star's sales" of the subject Eyeballs.

It is important to note that factors need to be considered in determining whether a partnership exists, including the sharing of the profits and losses, but a failure to share the losses does not necessarily mean that no partnership exists. Sharing of profits and losses is not an essential element of a partnership. *Id.*

**The Blue Star Agreement is An Agency Agreement**

Rather than a sale, the Blue Star Agreement really has Blue Star acting as Remington's **broker or agent**. As explained in the Tibon Declaration, Blue Star is listed with Dun & Bradstreet as a broker to the Department of Defense. Tibon Declaration¶34 . As can be seen from the D&B Report (Exhibit 10), Blue Star is a brand new company, with no financial history. Its largest high credit is listed as $750.00. It is listed as in the business of "facilitating & brokering" to the Department of Defense. Remington, a multi-million dollar corporation (if not larger) entered into a "sale" of the 1,072 Eyeball Kits, which would have a low end street value (if properly maintained by Remington) of $2.5 million, with a company with no credit history and which has reported to be in the business of being a broker. Clearly, the Blue Star Agreement

14

is a broker agreement, where Blue Star would act as Remington's agent to avoid the terms of the Termination Agreement and the two companies would split the profits. Blue Star would be paid handsomely for helping Remington out in trying to circumvent the Termination Agreement.

Blue Star is nothing more than an agent or nominee for Remington, used as a straw man to attempt to circumvent the Termination Agreement. *See, Goodman v. Reisch*, 220 A.D.2d 383, 631 N.Y.S.2d 890 (2nd Dept. 1995), and *Thompson v. Cooper*, 24 A.D.3d 203, 806 N.Y.S.2d 32 (1st Dept. 2005)(In both cases, the New York Court's found that the pleadings had sufficiently alleged claims that corporations or individuals were acting as nominees for a debtor to avoid creditors.) Blue Star's conduct with respect to the subject Eyeballs should be attributed to Remington; therefore, Remington should be deemed to be attempting to sell its inventory beyond the agreed upon April 15, 2008 deadline.

**The Blue Star Agreement is a Sham Transaction**

The circumstances herein are analogous to New York's fraudulent conveyance doctrines, with ODF as a creditor of Remington. Under Second Circuit case law, certain "badges of fraud" can be used to establish actual intent, because actual intent is rarely susceptible to direct proof. These badges of fraud include:

(a) lack or inadequacy of consideration; (b) family, friendship or close associate relationship between the parties; (c) retention of possession, benefit or use of the property in question by the debtor; (d) the financial condition of the transferor before and after the transfer in question; (e) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the debt is incurred, the onset of financial difficulties, or pendency of threat of suits by creditors, and (f) the chronology of the events and transactions under inquiry.

*Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582-83 (2nd Cir. 1983).

Analyzing the facts surrounding the Blue Star Agreement as if Remington was a subject debtor:

    (a)    contains an inherent lack of consideration - $1.00 for property which has a low end "street value" (if properly maintained) of $2.5 million (*see* Tibon Declaration ¶35) – this badge is satisfied;

    (b)    Remington has entered into an agreement where Blue Star, a corporation with no known assets, and which is required to pay substantial monies during the course of the next two years makes their relationship quite suspect;

    (c)    Remington retained possession of the inventory and will receive 50% of any subsequent sales of the property in question – this badge is satisfied;

    (d)    while the transaction did not make Remington insolvent, it allowed Remington to "sell off" the remaining inventory by April 15, 2008 – this badge is satisfied;

    (e)    if Remington did not enter into the transaction, it would have been saddled with Eyeball kits which it could not sell, so they would have become worthless – this badge is satisfied;

    (f)    the facts and circumstances detailed in the Tibon Declaration show that Remington originally attempted to negotiate for a longer sell-off period rather than the two month period for which it expressly agreed.  Remington then turned around and entered into the agreement with this badge is satisfied.

As in a fraudulent transfer, the Blue Star Agreement should be deemed to be a sham transaction entered into by the parties for the purposes of defrauding ODF; or, at the least entered into for the purposes of improperly circumventing the agreed upon terms of the Termination Agreement.

**The Blue Star Agreement Expressly Contemplates**
**That Remington Will "Distribute" The Subject Eye Balls**

The Termination Agreement specifies that Remington "shall not be entitled to sell, promote **or distribute** any Existing Inventory after" April 15, 2008. (emphasis added.)

The Blue Star Agreement specifically states that, "Remington will . . . ship directly to customers in accordance with instructions from Blue Star."

There is absolutely no question that by shipping directly to customers, Remington would be "distributing" the inventory in violation of the Termination Agreement. Below are various definitions of "distribute" which show that Remington shipping the goods would clearly clarify as Remington "distributing" the goods:

*Black's Law Dictionary, 2004 Ed.,* defines "distribute" as:

distribute (di-strib-yoot), *vb.* 1. To apportion; to divide among several. 2. To arrange by class or order. 3. To deliver. 4. To spread out; to disperse.

In the context of the Copyright Act re: distribution of copyrighted materials, several courts (including the Supreme Court) that have wrestled with the Copyright Act have generally found, relying in part on the statute's legislative history, "distribution" and "publication" to be synonymous. *See Harper & Row,* 105 S.Ct. 2218, 471 U.S. 539, 552 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985).

A distributor is defined by Environmental Protection Agency regulations as "any person who transports or stores or causes the transportation or storage of gasoline at any point between any gasoline refinery and any retail outlet or wholesale-purchaser-consumer's facilities." 40 C.F.R. § 80.2( *l* ).

In a criminal law context, the Second Circuit has found that "The term '**distribute**' means to **deliver** (other than by administering or dispensing) a controlled substance or a listed chemical." *U.S. v. Acosta*, 963 F.2d 551 (2d Cir. 1992), *21 U.S.C. § 802(11)*.

Patent and Trademark Infringement

Plaintiffs should also be granted injunction relief based upon their patents and trademarks which are being violated by Remington. Pursuant to 35 U.S.C. § 283, the Court may grant injunctive relief to a patent holder in order to prevent the violation of any right secured by patent. Here, there is no question that Plaintiffs are the patent holders of the identified patents and that Remington is trying to improperly sell ODF's patented products. Additionally, any argument by Remington that the first sale doctrine extinguishes ODF's patent claims is without merit. Remington, as the party asserting the first sale doctrine, bears the burden of proving the applicability, which it cannot do because it has violated the specific terms of the Termination Agreement. *Microsoft Corp. v. Harmony Computers & Electronics, Inc.*, 846 F. Supp. 208 (E.D.N.Y. 1994).

The first sale doctrine states that "with certain well defined exceptions, the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product." *Ryan v. Volpone Stamp Co., Inc.*, 107 F.Supp.2d 369 (S.D.N.Y. 2000) (citations omitted). Generally, when a manufacturer sells a branded product to a distributor without restriction, such manufacturer "cannot prevent the distributor from reselling the branded goods or demand that the distributor purchase a license or remove the mark." *Luxottica Group S.p.A. v. Bausch & Lomb Inc.*, 160 F.Supp.2d 545 (S.D.N.Y. 2001) (citations omitted). Here, the Eyeballs were sold to Remington with restrictions on when and where they could be sold.

Remington claims that ODF put the Eye Ball into the stream of commerce and has

therefore relinquished any right it has to restrict its resale is without merit. ODF's agreement(s) with Remington were specific as to Remington's limited ability to resale the Eye Ball and did not put the Eye Ball into an ordinary stream of commerce. A party's sale of a trademarked item "after the termination of a license agreement amounts to trademark infringement." *Ryan v. Volpone Stamp Co., Inc., supra* (citations omitted). The *Ryan* Court notes that "if a licensee could sell inventory manufactured during the term of the license over an indefinite period after its termination or expiration, the expiration date would have little force or meaning. One can imagine a scenario where a licensee intentionally creates a large surplus and thereby grants to itself a de facto extension of the license." *Id.*; *see also, Church of Scientology Intern. v. Elmira Mission of the Church of Scientology*, 794 F.2d 38 (2nd Cir. 1986). In this case, ODF and Remington entered into a licensing agreement, in which Remington acknowledged that ODF owned certain intellectual property that Remington was contractually permitted to resell in ODF's stead. ODF retained its interest to protect its intellectual property and was specific as to what Remington could and could not do. Defendants should be enjoined from the unauthorized sail of the Eyeballs which contain Plaintiffs' patents. *Elite Licensing v. Thomas Plastics, Inc., 250 F.Supp.2d 372 (S.D.N.Y. 2003)*.

## The Balance of Hardships Tips Towards Plaintiffs

Plaintiffs have shown that they could be possibly be put out of business if Remington is allowed to avoid the terms of the Termination Agreement and continue to sell the inventory in its possession beyond the already past April 15, 2008 sell-off date. At the least, Plaintiffs have shown that they will be irreparably harmed if Remington is allowed to sell the Eyeball kits.

CONCLUSION

PLAINTIFFS HAVE SHOWN THAT POTENTIAL IRREPARABLE HARM EXISTS

TO GRANT A PRELIMINARY INJUNCTION.

THERE WERE SPECIFIC AGREED UPON CONTRACTUAL PROVISIONS AS TO

REMINGTON'S SALES OF ODF'S PRODUCTS.  REMINGTON SEEKS TO DISREGARD

SUCH PROVISIONS.

AN INJUNCTION MUST BE ISSUED SO THAT REMINGTON CANNOT

BLATANTLY VIOLATE THE AGREEMENT BETWEEN THE PARTIES.

Dated: New York, New York
       August 27, 2008

GOLDBERG & RIMBERG, PLLC

By: _____
Joel S. Schneck (jss7019)
Robert L. Rimberg (rlr2453)
Attorneys for Plaintiff
115 Broadway, 3rd Floor
New York, New York 10006
(212) 697-3250