UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
O.D.F. OPTRONICS LTD. and WAVE GROUP    :
LTD.,                                   :
                          Plaintiffs,   :     08 Civ. 4746 (DLC)
                                        :
             -v-                        :     OPINION AND ORDER
                                        :
REMINGTON ARMS COMPANY, INC., MIGUEL    :
PEREZ d/b/a TACTICAL DEPOT and John     :
Does 1-10 being defendants whose names  :
are currently unknown but are engaged   :
in the wrongdoing alleged in the        :
complaint herein,                       :
                          Defendants.   :
                                        :
----------------------------------------X


Appearances:

For Plaintiffs O.D.F. Optronics Ltd. and Wave Group Ltd.
Robert L. Rimberg
Joel S. Schneck
Goldberg & Rimberg, PLLC
115 Broadway, 3rd Floor
New York, NY 10006

For Defendant Remington Arms Company, Inc.:
Marc S. Mulholland
Matthew F. Didora
Ruskin Moscou Faltischek, P.C.
East Tower, 15th Floor
1425 RexCorp Plaza
Uniondale, NY 11556-1425

John F. Morrow, Jr.
Pro Hac Vice
Womble Carlyle Sandridge & Rice, PLLC
One West Fourth Street
Winston-Salem, NC 27101

DENISE COTE, District Judge:

Plaintiffs O.D.F. Optronics Ltd. ("ODF") and Wave Group Ltd. ("Wave") have moved, by order to show cause, for a preliminary injunction enjoining defendant Remington Arms Company, Inc. ("Remington") from selling, promoting, distributing, or otherwise disbursing any ODF EyeBall kits, spare parts, demo systems, or other ODF or Wave products in Remington's possession or control. For the reasons more fully described below, the motion for a preliminary injunction is granted.

This action was filed on May 21, 2008. In an order filed on June 17, the hearing on plaintiffs' preliminary injunction motion was set for September 22, 2008. The parties were given an opportunity to conduct discovery in the interim, but they took no discovery. On August 28, 2008, they submitted their preliminary injunction papers. With the parties' agreement, the direct testimony of the witnesses was submitted by affidavit. The plaintiffs' sole witness was Eran Tibon, the CFO and COO for ODF and Wave. The defendants' witnesses were Robert Pantle, Vice President of Remington's Government Sales Directorate; Charles Lawson, a Contract Analyst with Remington's Government Sales Directorate; Linda Duncan, CFO and Vice President of Blue Star Consortium, Inc. ("Blue Star"); and Daniel Barks, CEO of Blue Star.

At a September 17, 2008 conference with the Court, the parties agreed to waive cross-examination of the witnesses and to rely solely on the witness affidavits and documentary evidence that had been submitted to the Court. The following constitutes this Court's findings of fact based on an evaluation of all the evidence received, and conclusions of law.

BACKGROUND

ODF is based in Israel and creates technologies that utilize optics to enhance surveillance in urban settings. Wave is ODF's parent corporation.

The EyeBall is marketed as a 360° reconnaissance wireless deployable sensor. It is slightly larger than a baseball, and is designed to be thrown into an area of up to 50 meters away that the owner, often the military or law enforcement, needs to survey. It rights itself and rotates, providing up to 2.5 hours of 360° video and audio coverage of the area during the day or night.

The EyeBall is protected by two patents, and the word mark Eye Ball is registered as a trademark. The EyeBall is used by the Israeli Ministry of Defense and the United States Armed Forces. It has won several prestigious technology awards.

A ten year distribution agreement ("Distribution Agreement") dated July 19, 2004 appointed Remington the

exclusive distributor of the EyeBall and other ODF products in the United States (and its territories and possessions) and Canada. The Distribution Agreement required Remington to use commercially reasonable efforts to market, promote, and sell the EyeBall. In turn, ODF was to manufacture the product and provide reasonable technical support to Remington. ODF warranted that the EyeBall was free from defects and that it would repair or replace any defective item following the sale of the item for a period to be negotiated, but that was expected to extend for up to twelve months.

The Distribution Agreement provided that upon its termination, ODF would repurchase Remington's inventory at the net invoice price Remington had paid for the EyeBalls or permit Remington to sell its inventory "within six (6) months of the termination date and fully perform all its obligations required by" the Distribution Agreement. The termination provision reads as follows:

> 15. EFFECT OF TERMINATION
> (a) Upon expiration or termination of this Agreement for any reason, REMINGTON'S rights under this Agreement shall immediately terminate and <u>REMINGTON shall cease selling, promoting or distributing the Products</u>, and otherwise representing in any manner that REMINGTON is authorized to distribute the Products.
>
> (b) Upon expiration or termination of this Agreement for any reason, ODF shall, at its option, (i) repurchase REMINGTON'S inventory of the Products at the net invoice price paid to ODF by REMINGTON for

such Products; or (ii) permit REMINGTON to sell such
inventory, provided that REMINGTON must complete all
such sales within six (6) months of the termination
date and fully perform all its obligations required by
this Agreement.

(c)  Neither termination nor expiration shall relieve
either party from the duty to discharge in full all
obligations accrued or due prior to the date thereof.

(Emphasis supplied.)  Finally, the Distribution Agreement

contained a New York choice of law provision.

Remington did not have the success it anticipated in

selling to law enforcement agencies in the United States and

negotiated two amendments to improve the terms of the

Distribution Agreement from Remington's standpoint.  The

Distribution Agreement was amended on September 11, 2005 and on

November 23, 2006.

Remington was ODF's largest customer.  In 2006, Remington

paid close to $5 million for EyeBall units; in 2007, it paid

over $3.75 million for such units.  The final shipment of

EyeBall units to Remington was a shipment of 100 units in August

2007.

In early November 2007, Pantle notified ODF that Remington

wanted to end the Distribution Agreement.  Remington represented

that it had 1,670 EyeBall units as of that time.  It later

explained that it shipped 131 units between November 8, 2007 and

March 24, 2008, retaining 1,539 units in its inventory.  By

April 11, 2008, it had disposed of all but 1,097.  Remington

represents that it had paid ODF approximately $3.8 million for the units remaining in its inventory.

As described above, the Distribution Agreement had a termination clause that contemplated a six month period for Remington to sell its inventory. The parties, however, negotiated a shortened sell-off period of two months.

ODF had several reasons for demanding a shortened sell-off period. While ODF's normal retail price for a unit was $4,800, it expected that Remington would be selling its inventory for substantially reduced prices and wanted to limit the period in which customers would have the opportunity to buy the units cheaply. In addition, since every unit in Remington's inventory had been delivered prior to August 2007, ODF was concerned that an extended sell-off period could exacerbate any maintenance issues; the batteries for the EyeBall units have to be charged every three months or they will fail. Finally, ODF had developed an improved version of the EyeBall unit with a better range and greater durability. It did not want its outdated units sold in competition with the improved version and feared that its business reputation might suffer if customers were unhappy with the performance of the older units.

Effective February 15, 2008, the parties terminated the Distribution Agreement through a Termination, Settlement and Release Agreement ("Agreement"). Remington was required to pay

ODF $465,820 by February 22, 2008, "in payment for any and all Units or Products that have been supplied prior to" the date of the Agreement.  With this payment, ODF waived its right to claim any further sums from Remington, and Remington waived its right to claim any payments from ODF for any sales of remaining units by Remington "at prices below $4,800."

The Agreement revised the termination terms of the Distribution Agreement by reducing the period in which Remington could sell its inventory.  It provided that

> Section 15(b) of the Agreement shall be amended by replacing "six (6)" by "two (2)", [sic] it being thereby agreed that <u>REMINGTON must complete all sales of existing Products, Units, spare parts and demo systems in its inventory ("Existing Inventory") by no later than April 15, 2008, and shall not be entitled to sell, promote or distribute any Existing Inventory after that date</u>.  Remington will provide to ODF a list of the remaining inventory on or before May 16, 2008.

(Emphasis supplied.)  The Agreement also relieved ODF of its warranty obligation for any items sold before April 15, 2008 at a price of less than $2,500.  It provided:

> ODF shall assume and be responsible for handling and resolving all warranty claims for all Units or Products sold by Remington on or before April 15, 2008 at a customer's sales price of at least $2,500 per Unit. . . . ODF will assume all warranty claims from Remington, and will provide all warranty and service obligations on its existing terms for all Units or Products that have been sold by Remington through April 15, 2008, at a customer's sales price of at least $2,500 per Unit.[1]

---

[1] A later paragraph provided that in the event Remington sold units at prices below $4,800, Remington waived its right to

The Agreement recited that it was the "full, final and complete settlement and release of all demands, claims and rights that each party may have against the other." It added that,

> "[o]ther than any claims arising out of the non-performance of this Termination Agreement, each of the parties hereby releases and waives absolutely and irrevocably any demand, claim or right against the other party . . . in connection with any matter related to the Distribution Agreement, its execution, amendments, performance or termination."

On May 5, ODF wrote to notify Remington that it had received "disturbing" information that Remington was not in compliance with the Agreement. ODF had information that Remington offered to give two companies its remaining inventory free of charge with payment to be made only "if and when" the companies sold the stock. The letter characterized the "buy now – pay later" arrangements as a breach of both the Distribution Agreement and the Agreement. ODF explained that such sales might damage ODF's goodwill and expose it to liability towards the ultimate purchasers.

On May 7, Remington responded that "[p]rior to April 15, 2008," it had "reached full terms for the sale of some of its inventory to Blue Star Consortium, Inc." for "[v]aluable

claim payments from ODF, and that such "waiver shall not derogate from ODF's obligation to take over all warranty and service obligations that may exist for Units or Products sold by REMINGTON on or before April 15, 2008 . . . ."

consideration . . . and full legal title to the units passed to Blue Star prior to April 15, 2008." Remington explained that Blue Star would only resell the units to military and law enforcement agencies.

Pantle had negotiated the sale of Remington's inventory to Blue Star. Blue Star operates from an address in Arlington, Virginia, has three employees, and began business in 2007. It identifies itself as engaged in the business of "facilitating and brokering" to the Department of Defense. Pantle contacted Barks, Blue Star's CEO, in February and advised him of the April 15 deadline for any sale. Pantle asserts that on March 24, Barks proposed that "ODF" would take ownership of the inventory immediately. (While Pantle indicates that ODF would take ownership, read in context he must have intended to say that Blue Star would take ownership.) Barks testified that at this point the parties had agreed on the material terms of the sale. Pantle, however, testified that he informed Blue Star that Remington agreed to Blue Star's "proposed terms" sometime between March 24 and April 10, and that he called Blue Star on April 10 to "reiterate that Remington agreed to the proposed terms." Barks advised Pantle on April 10 that Blue Star was drafting the agreement.

On April 11, Lawson advised Blue Star that Remington had 1,097 EyeBall units and only 25 Pelican cases. Pelican cases

are hard-shell containers purchased by Remington to house the EyeBall units safely. Duncan expressed her surprise that Remington only had 25 such cases. At some point on April 14, Duncan reported to Barks that there might be fewer Pelican cases than Blue Star had originally thought.

Barks signed the sales agreement on behalf of Blue Star on either April 14 or 15. While he asserts that he signed the agreement on the 14th, on that evening Duncan was still unclear as to the exact number of Pelican cases and she emailed Pantle to "finalize the exact number." The Blue Star Agreement includes the exact number of both EyeBall units and Pelican cases (1,097 and 25, respectively) that Remington was selling to Blue Star, and Blue Star did not confirm that number until April 15, when Duncan spoke with Pantle. Barks also spoke with Pantle on April 15 and quickly advised him that Blue Star had accepted the explanation about the Pelican case numbers and "the Agreement as written was reflective of [his] understanding." Blue Star sent the signed agreement to Remington on April 15.

On April 21, in response to a question from one of Blue Star's customers, Duncan began a discussion with Pantle regarding the charging and maintenance protocol for the EyeBall units; the two sides had "various email and phone conversations" related to the maintenance issue and "as a result" of these conversations "reached agreement on the detailed maintenance of

the eyeballs while in storage." In the process of reaching agreement on the issue of the maintenance of the EyeBall units while in storage, the parties reviewed Appendix A to the Blue Star Agreement, which was an ODF protocol document.[2] Duncan and Pantle wanted to place information about those topics "in a document that could be referenced by" Blue Star customers to assure that proper maintenance procedures were followed.

Pantle received an executed agreement from Blue Star and asserts that he signed it on behalf of Remington on April 22. Since neither signature on the document is accompanied by a date, it is unclear how he has determined that this was the date on which he signed it. Blue Star sent a check to Remington for $1 some time after April 15.

The document executed by Remington and Blue Star is entitled "Sales to and Service Agreement with Blue Star Consortium Inc. for ODF R1 Eyeball kits" ("Blue Star Agreement"), is dated April 14, 2008, despite not having been fully executed until at least April 22, and purports to reflect a sale of 1,097 EyeBall units, which was Remington's remaining inventory, to Blue Star. The sale purported to transfer the

---

[2] The first page of the Blue Star Agreement recites that Remington would store and maintain the EyeBall units in accordance with ODF maintenance protocol as per Appendix A. "Appendix A" is not attached to the Blue Star Agreement submitted to the Court in connection with the instant motion.

inventory and title for the units to Blue Star for $1, although

the units were to remain with Remington, which would store and

ship them to Blue Star's customers.  Remington was entitled to a

minimum of $400 for each sale, and if a unit were sold for more

than $800, then to 50% of the revenue raised in the sale.  There

was no territorial limitation on resale, and Blue Star was free

to "sell the products across the Globe."  The document provides:

> 1.   SALE OF ASSETS
> <u>Remington will transfer all their [sic] remaining
> inventory of ODF R1 eyeballs</u>, consisting of 25 Kits
> with Pelican Cases and another 1,072 Kits without the
> Pelican Cases, making a total of 1097 kits, <u>and full
> title to Blue Star, for the sum of $1</u>.
>
> 2.   SERVICES
> <u>Remington will store and maintain the eyeball kits</u> in
> accordance with ODF maintenance protocol as per
> Appendix A <u>and ship directly to customers</u> in
> accordance with instruction from Blue Star and in
> Pelican Cases to be supplied by Remington where the
> kit does not already have one.

(Emphasis supplied.)

Remington provided its own warranty for the units to be

resold by Blue Star.  The Blue Star Agreement expired after

twenty-four months, and according to the contract, "Remington

shall not have to pay for storage and maintenance and shipping

of the kits" during that two-year period.

In consideration of the services that Remington was

providing during the two year contract term, "Blue Star agree[d]

to pay 50% of revenue raised from every eyeball kit sold during

the period . . . . Blue Star will pay to Remington, not less

that $400 per kit sold."[3]   In the event units remained unsold at

the end of the two-year period, "they will be removed and stored

by Blue Star in return for a payment of $400.00 per remaining

kit to Remington."

Although Remington takes the position that the Agreement

does not preclude it from selling outside the territory

identified in the Distribution Agreement, to wit the United

States and Canada, it obtained an oral agreement from Blue Star

that it would only sell the inventory to military and law

enforcement agencies in the United States.  Remington has stored

all of the EyeBall units purchased from ODF in a storage

facility in Memphis, Tennessee leased by Remington and Ozburn-

Hessey Logistics, Inc. ("OHL").  The facility's employees work

for OHL, except for a quality control manager who is employed by

Remington.  The inventory sold to Blue Star remains in this

facility.

As discussed above, part of the reason ODF negotiated a

shortened sell-off period for Remington's inventory was because

of its concern that problems with the batteries in the old units

would harm its goodwill with customers.  ODF reported that the

Los Angeles police department received three EyeBall kits (each

---

[3] The payment terms included an additional provision related to
the cost of the additional Pelican cases that had to be provided
by Remington to house each unit.

kit containing 2 EyeBalls) from Remington between January and March 2008, and that all six EyeBall units were returned with dead batteries. From April 2008 to August 2008, customers returned another 18 EyeBall units to ODF because of weak or dead batteries.

ODF contends that there was no completed sale between Remington and Blue Star on or before April 15, 2008, and thus the sale to Blue Star violated the Agreement because it was not executed before the date specified therein. ODF further contends that the Blue Star Agreement is a sham and simply parks the inventory with Blue Star as Remington attempts to circumvent the Agreement's two month sell-off period. It argues that Remington will be "distributing" the units in violation of the Agreement when it ships units to any Blue Star customer.

DISCUSSION

To obtain a preliminary injunction, a party must show "(1) a likelihood of irreparable harm in the absence of the injunction; and (2) either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the movant's favor." Doninger v. Niehoff, 527 F.3d 41, 47 (2d Cir. 2008).

A.    Irreparable Harm

     "The showing of irreparable harm is perhaps the single most
important prerequisite for the issuance of a preliminary
injunction."  Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir.
2002) (citation omitted).  To establish irreparable harm, a
party must show that "there is a continuing harm which cannot be
adequately redressed by final relief on the merits and for which
money damages cannot provide adequate compensation."  Id.
(citation omitted).  Proof of a monetary loss will not suffice.
The movant must show "evidence of damage that cannot be
rectified by financial compensation."  Tucker Anthony Realty
Corp. v. Schlesinger, 888 F.2d 969, 975 (2d Cir. 1989).
Irreparable harm is found where, "but for the grant of equitable
relief, there is a substantial chance that upon final resolution
of the action the parties cannot be returned to the positions
they previously occupied."  Brenntag Int'l Chemicals, Inc. v.
Bank of India, 175 F.3d 245, 249 (2d Cir. 1999); see also Time
Warner Cable v. Bloomberg L.P., 118 F.3d 917, 925 (2d Cir. 1997)
(adverse consequence "that could not be adequately remedied
after the fact" established irreparable harm).

     Irreparable harm must be shown to be "actual and imminent,
not remote or speculative."  Kamerling, 295 F.3d at 214.  The
"mere possibility of irreparable harm is insufficient to justify

the drastic remedy of a preliminary injunction." Borey v.
National Union Fire Ins. Co., 934 F.2d 30, 34 (2d Cir. 1991).

Injunctive relief "is not the conventional remedy for
breach of contract, but there is certainly no ironclad rule
against its use" if the standard for obtaining such relief is
met. Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 404 (2d
Cir. 2004). A company's "loss of reputation, good will, and
business opportunities" from a breach of a contract can
constitute irreparable harm justifying a preliminary injunction.
See id. (affirming finding of irreparable harm where "district
court found it impossible to estimate with any precision the
amount of the monetary loss which ha[d] resulted and which would
result in the future from the loss of [movant's] relationships
with customers and co-brand partners by reason of" the
defendant's actions). Similarly, in the context of an
employee's breach of a covenant not to compete, irreparable harm
to support an injunction was found because "it would be very
difficult to calculate monetary damages that would successfully
redress the loss of a relationship with a client that would
produce an indeterminate amount of business in years to come."
Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69 (2d Cir. 1999).

The cases involving irreparable harm from a loss of
goodwill or business relationships typically involve a situation
in which a dispute between parties leads to the inability of one

party to provide its product or products to the market or its customers.  See Tom Doherty Associates, Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 37-39 (2d Cir. 1995).  For example, irreparable harm to a distributor has been found where its supplier stopped providing it with the unique good that it distributed to customers.  See Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907-08 (2d Cir. 1990) (fact that customers "expect and rely on the distributor for a continuous supply of that product almost inevitably creates irreparable damage to the good will of the distributor").  Additionally, irreparable harm has been found where a manufacturer terminated a car dealership's franchise, because "the right to continue a business . . . is not measurable entirely in monetary terms." Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir. 1970).  The Second Circuit has "reversed a finding of irreparable harm where the facts demonstrate no loss of goodwill, but only provable monetary damages from the loss of a profitable line of business."  Tom Doherty Assocs., 60 F.3d at 37 (citing Jack Kahn Music Co. v. Baldwin Piano & Organ Co., 604 F.2d 755, 763 (2d Cir. 1979)).

In Tom Doherty Assocs., the Second Circuit undertook a review of the cases asserting a loss of goodwill from a terminated product, and stated that

"[g]enerally, where we have found no irreparable harm,
the alleged loss of goodwill was doubtful, and lost
profits stemming from the inability to sell the
terminated product could be compensated with money
damages determined on the basis of past sales of that
product and of current and expected future market
conditions.  In contrast, where we have found
irreparable harm, the very viability of the
plaintiff's business, or substantial losses of sales
beyond those of the terminated product, have been
threatened."

Id. at 38 (citation omitted).

Although it is a close question, the plaintiffs have shown
that they will suffer irreparable harm in the absence of an
injunction.  This is not a typical breach of contract action in
which the amount of monetary damages from a breach is clear from
the terms of the contract and therefore an injunction is
inappropriate.  Nor is this a case in which the issue is the
termination of a specific line of products, where the damages
from such termination can be easily calculated based upon past
sales of that product.  In this case, ODF specifically
negotiated for a shortened sell-off period for Remington's
inventory in order to limit the number of outdated products
received by law enforcement and military customers.  The harm to
ODF's goodwill and loss of customer relationships from sales and
distributions of the outdated EyeBall units which would occur
without an injunction is difficult if not impossible to quantify
with any degree of precision and relief upon final resolution
would be unable to restore ODF to its previous position.

B. <u>Likelihood of Success on the Merits</u>

ODF claims that Remington breached the Agreement by, <u>inter alia</u>, 1) executing a "sale" with Blue Star after April 15, 2008, the cutoff date in the Agreement, and 2) by entering into an agreement that will require Remington to distribute EyeBall units to Blue Star's customers after April 15, 2008. The elements of a breach of contract claim under New York law[4] are as follows: (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages. <u>See</u> <u>Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.</u>, 375 F.3d 168, 177 (2d Cir. 2004). <u>See also</u> <u>Harsco Corp. v. Segui</u>, 91 F.3d 337, 348 (2d Cir. 1996).

1. <u>Time of Formation of the Blue Star Agreement</u>

The first issue to determine is whether Remington and Blue Star intended to have a binding agreement only in the event that they executed a written contract. If they required their agreement to be in writing, then the plaintiffs have shown that

---

[4] Both parties rely on New York law in arguing this case, and in doing so have adopted it for the determination of these issues. <u>See</u> <u>Photopaint Technologies, LLC v. Smartlens, Corp.</u>, 335 F.3d 152, 160 n.8 (2d Cir. 2003).

Remington did not sell Blue Star EyeBall units until after April 15, 2008, the Agreement's cutoff date for any sale by Remington.

"Under New York law, if parties do not intend to be bound by an agreement until it is in writing and signed, then there is no contract until that event occurs." R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 74 (2d Cir. 1984).

> On the other hand, where there is no understanding that an agreement should not be binding until reduced to writing and formally executed, and where all the substantial terms of a contract have been agreed on, and there is nothing left for future settlement, then an informal agreement can be binding even though the parties contemplate memorializing their contract in a formal document.

Id. (citation omitted).

In determining when the parties intended to be bound, "[w]hat matters are the parties' expressed intentions, the words and deeds which constitute objective signs in a given set of circumstances." Id. In conducting this inquiry, courts generally look to four main factors: 1) "a party's explicit statement that it reserves the right to be bound only when a written agreement is signed"; 2) "whether one party has partially performed, and that performance has been accepted by the party disclaiming the contract"; 3) "whether there was literally nothing left to negotiate or settle, so that all that remained to be done was to sign what had already been fully agreed to"; and 4) "whether the agreement concerns those complex

and substantial business matters where requirements that contracts be in writing are the norm rather than the exception." Id. at 75-76; see also Ciaramella v. Reader's Digest Ass'n, Inc., 131 F.3d 320, 323 (2d Cir. 1997).

As for the first factor, the Second Circuit in R.G. Group found that one party's statement to the other side on the telephone that they had a "handshake agreement" was not enough to show that the parties intended to be bound before executing a written contract when there had been "repeated references to the need for a written and signed document" during the course of the parties' bargaining and where the written agreement itself stated on its face that it would set forth the parties' rights and obligations "when duly executed" and "any modification in the agreement would also have to be in writing and signed." R.G. Group, 751 F.2d at 76. Similarly, in Ciaramella, the Second Circuit noted that the "oral statement, 'we have a deal,' made by one attorney to another did not in and of itself preclude a finding that the parties intended to be bound only by an executed contract." 131 F.3d at 325 (citation omitted). The court found that the parties intended to be bound only by a written, executed contract, based on evidence that included a clause in the parties' contract stating: "NOW, THEREFORE, with the intent to be legally bound hereby, . . . [the parties] agree

to the terms and conditions set forth below: . . . ." Id. at
324.

As for the third factor, whether there was nothing left to
negotiate, the Second Circuit has found "that the existence of
even 'minor' or 'technical' points of disagreement in draft
settlement documents were sufficient to forestall the conclusion
that a final agreement on all terms had been reached."
Ciaramella, 131 F.3d at 325 (quoting Winston v. Mediafare
Entertainment Corp., 777 F.2d 78, 82-83 (2d Cir. 1986)).
Finally, as to the fourth factor, whether the transaction was
the type for which a written contract would be expected due its
"scale of investment and complexity," R.G. Group, 751 F.2d at
77, the Second Circuit has found "a four page settlement
agreement that contained obligations that would last over
several years sufficiently complex to require reduction to
writing." Ciaramella, 131 F.3d at 326 (citing Winston, 777 F.2d
at 83). The court in Winston found that a contract was of the
type that was usually written where the payment amount was
$62,500 and "payment was to be made over several years based on
a percentage of earnings." 777 F.2d at 83.

There was no written agreement to sell the EyeBall units to
Blue Star until April 22, 2008, at the earliest. Thus, to
complete a sale by the Agreement's April 15 cutoff date, the
jury must find that an oral agreement of sale was sufficient to

constitute a sale, and that such an agreement had been reached before April 15.  Applying the four factors just described to the instant case, however, ODF has shown a likelihood of proving at trial that Remington and Blue Star did not intend to be bound until there was a signed and executed agreement for the sale.

As to the first factor, the provisions of the contract reflect the parties' intention to be bound only by a written, signed contract.  For example, the Blue Star Agreement states that "[t]he individuals <u>executing</u> this document certify that they are authorized to <u>execute</u> this Agreement <u>and bind their respective Companies</u>."  (Emphasis supplied.)  The Blue Star Agreement goes on to state that the parties, "<u>intending to be legally bound, have executed this Agreement</u>."  (Emphasis supplied.)  The Blue Star Agreement also provides that "[n]o modification of any of the provisions contained in the Agreement shall be binding upon any Party to the Agreement unless made in writing and signed by such Party."  Finally, the Blue Star Agreement has a severability provision, stating that if any provision of the agreement is held unenforceable for any reason, the remaining provisions shall remain in effect, unless the severed provision goes to the essence of the Agreement.  These provisions indicate that the parties required an executed, written document in order to effect the sale.

As for the second factor, Blue Star sent Remington a check
for $1 sometime after April 15 but it is unclear if that was
before or after the Blue Star Agreement was fully executed.  The
third factor, whether there was anything left to negotiate, also
points towards a finding that the parties did not intend to be
bound until there was a signed agreement.  Barks testified that
the material terms of an oral agreement between Blue Star and
Remington were in place on March 24; Pantle testified that there
was an oral agreement by April 10.  Thus, there is no agreement
on when the parties had an oral agreement or even its terms.
The exact number of EyeBalls in Remington's inventory was not
communicated to Blue Star until April 11, and the Pelican case
issue was not ironed out until April 15.  Furthermore, the
parties to the Blue Star Agreement did not reach agreement on
"the detailed maintenance of the eyeballs while in storage"
until after conversations between Duncan and Pantle that began
on April 21.

Finally, the fourth factor is whether this transaction is
the type for which a written contract would be expected.  While
the Blue Star Agreement itself (without its Appendix) is only 3
pages, the terms of the payment arrangement are complex and
involve obligations over several years, as well as payments over
time based on a percentage of the sales price of the EyeBall
units.  Additionally, while ODF as a third party cannot invoke

the Statute of Frauds to void an oral agreement between
Remington and Blue Star, see, e.g., Dante v. 310 Associates, 503
N.Y.S.2d 786, 788 (1st Dep't 1986) (the "Statute of Frauds is a
personal defense which cannot be interposed by a third party");
see also Edwards Mfg. Co. v. Bradford Co., 294 F. 176, 181 (2d
Cir. 1923) (same), the fact that the Blue Star Agreement
contemplated a sale of goods for over $500, thus implicating the
New York Statute of Frauds for sales of goods, see McKinney's
Uniform Commercial Code § 2-201, is additional evidence that
this agreement was the type for which a written contract would
be expected.

In sum, the first, third, and fourth factors weigh heavily
on the side of finding that the parties did not intend to be
bound until there was a signed, written contract, and the second
factor is inconclusive. On this basis, the evidence strongly
suggests that ODF will prove at trial that Remington and Blue
Star did not intend to be bound until their written contract was
executed.

Remington's principal evidence for its argument that the
parties intended to be bound before a signed agreement was
executed are the statements of Pantle, Duncan, and Barks
claiming that they thought they had reached an oral agreement at
various different points in time. These assertions do not
overcome the strong evidence that Remington and Blue Star did

not intend to be bound until an agreement was signed and executed. Indeed, it was important to Remington to have a written contract if for no other reason than its desire to show ODF unambiguous evidence that the "sale" had occurred before the April 15 cutoff date. This may explain why the Blue Star Agreement does not have any indication of the dates on which Pantle and Barks signed the document, but it does contain the typewritten date of April 14 in its body.

Since the Blue Star Agreement was not executed until after April 15, there was no contract for sale between Remington and Blue Star until that time. Because the Blue Star Agreement represents a sales agreement that was formed after the April 15, 2008 cutoff date in the Agreement, ODF has shown a likelihood of success on the merits of its breach of contract claim.[5]

### 2. Interpretation of the Agreement

ODF has shown a likelihood of proving at trial that Remington is also in breach of the Agreement because the Blue

---

[5] Remington did not disclose to ODF until its August 28, 2008 submissions to the Court that it had not signed the Blue Star Agreement until after April 15, 2008. As a result, ODF's initial submissions assumed a fully executed agreement had been entered on or before April 15. Indeed, Remington's prior arguments and submissions had cultivated that misunderstanding. Because of this ignorance, ODF was only able in its reply papers to address the effect of the failure to execute the sales agreement by April 15, and the parties' prior submissions were largely confined to issues that became irrelevant.

Star Agreement contemplates that Remington will distribute
EyeBall units after April 15, 2008.  Under New York law,
contracts are to be read "as a whole, and if possible, courts
must interpret them to effect the general purpose of the
contract."  <u>Postlewaite v. McGraw-Hill, Inc.</u>, 411 F.3d 63, 67
(2d Cir. 2005).  In ascertaining the purpose or intent of the
parties, "lest form swallow substance, [the] goal must be to
accord the words of the contract their fair and reasonable
meaning."  <u>Sutton v. East River Sav. Bank</u>, 55 N.Y.2d 550, 555
(N.Y. 1982) (citation omitted).  "Put another way, the aim is a
practical interpretation of the expressions of the parties to
the end that there be a realization of [their] reasonable
expectations."  <u>Id.</u> (citation omitted).  "[E]mbraced in the
interpretative result should be any promises which a reasonable
person in the position of the promisee would be justified in
understanding were included."  <u>Id.</u> (citation omitted).  If the
contract "makes clear the parties' over-all intention, courts
examining isolated provisions should then choose that
construction which will carry out the plain purpose and object
of the [agreement]."  <u>Kass v. Kass</u>, 91 N.Y.2d 554, 567 (N.Y.
1998) (citation omitted).

        "[I]f a contract is straightforward and unambiguous, its
interpretation presents a question of law for the court to be
made without resort to extrinsic evidence."  <u>Postlewaite</u>, 411

F.3d at 67 (citation omitted).  Unambiguous contract terms "are given their plain meaning."  Krumme v. West Point Stevens, Inc., 238 F.3d 133, 139 (2d Cir. 2000) (citation omitted).  If contract language is ambiguous, courts may look to extrinsic evidence to interpret ambiguous terms and give effect to the parties' intent.  Proteus Books Ltd. v. Cherry Lane Music Co., 873 F.2d 502, 509-10 (2d Cir. 1989).  Contract language is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement."  Krumme, 238 F.3d at 139 (citation omitted).  "The language of a contract is not made ambiguous simply because the parties urge different interpretations."  Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992).  In determining whether a contractual term is ambiguous, courts are to consider "the entire contract to safeguard against adopting an interpretation that would render any individual provision superfluous."  RJE Corp. v. Northville Industries Corp., 329 F.3d 310, 314 (2d Cir. 2003) (citation omitted).

The Agreement between ODF and Remington states that Remington may not "sell, promote or distribute any Existing Inventory" after April 15, 2008.  (Emphasis supplied.)  The ordinary meaning of the word "distribute" is to "[t]o apportion; to divide among several," "[t]o arrange by class or order,"

"[t]o deliver," or "[t]o spread out; to disperse."  Black's Law
Dictionary (8th ed. 2004); see also United States v. Lorge, 166
F.3d 516, 518-19 (2d Cir. 1999) (citing Webster's Third New
International Dictionary, at 660 (unabridged 1981) as "defining
'distribution' as, inter alia, 'a spreading out or scattering
over an area or throughout a space'").

Using the plain meaning of the word "distribute," Remington
will be distributing its EyeBall inventory after the agreed upon
cutoff date.  Under the Blue Star Agreement, Remington is
keeping the inventory in its storage facility, and it is
delivering the products directly to Blue Star customers.  In
delivering the products, Remington is distributing them in
violation of the Agreement.

The fact that Remington is delivering products to which
Blue Star has title under the Blue Star Agreement does not take
its actions outside of the term "distribute."  An interpretation
of the word "distribute" in the Agreement that required a sale
or passage of title on the part of Remington would render the
prohibition against Remington "sell[ing]" the items after April
15 superfluous.  ODF has therefore also shown a likelihood of
success on the merits of its breach of contract claim based on
Remington's distributions under the Blue Star Agreement.

### 3. Patent and Trademark Claims

Finally, ODF argues that it is entitled to a preliminary injunction under its patent and trademark claims even without a separate showing of irreparable harm. In a motion for a preliminary injunction involving a trademark dispute, "a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm." Malletier v. Burlington Coat Factory Warehouse Corp., 426 F.3d 532, 537 (2d Cir. 2005) (citation omitted). "As a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner. Thus, a distributor who resells trademarked goods without change is not liable for trademark infringement." Polymer Technology Corp. v. Mimran, 975 F.2d 58, 61-62 (2d Cir. 1992) (citation omitted); see also Original Appalachian Artworks, Inc. v. Granada Electronics, Inc., 816 F.2d 68, 76 (2d Cir. 1987) ("[T]rademark rights are exhausted once the trademarked goods have been duly placed into the market."). Patent rights are likewise exhausted by a first sale of patented goods. See Quanta Computer, Inc. v. LG Electronics, Inc., 128 S. Ct. 2109, 2115 (2008) ("The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item.").

When the relationship between parties is that of a licensor and licensee, however, the Second Circuit has found that a former licensee "who once possessed authorization to use the trademarks of its licensor or franchisor becomes associated in the public's mind with the trademark holder." <u>Church of Scientology Int'l v. Elmira Mission of the Church of Scientology</u>, 794 F.2d 38, 44 (2d Cir. 1986). Thus, when a licensee "loses its authorization yet continues to use the mark, the potential for consumer confusion is greater than in the case of a random infringer." <u>Id.</u> Therefore, "a licensor that establishes infringing use and consumer confusion in a trademark suit brought against its former licensee has proved irreparable harm as a matter of law." <u>Id.</u>

ODF argues that Remington's sales and distributions in breach of the Agreement infringe upon ODF's patent and trademark rights. ODF, however, has not shown a likelihood of success on its patent and trademark claims.

Remington purchased the EyeBall products in question from ODF, and as such there was a first sale from ODF to Remington that exhausted the patent and trademark rights that ODF seeks to vindicate. This valid first sale distinguishes Remington's position from that of the licensee in <u>Church of Scientology Int'l</u>, 794 F.2d at 40, 44. Likewise, the main case relied on by ODF for the proposition that sales of a trademarked item after

the termination of a license agreement constitute trademark
infringement, Ryan v. Volpone Stamp Co., Inc., 107 F. Supp. 2d
369, 382 (S.D.N.Y. 2000), distinguished between a situation in
which a licensee was selling goods without a prior authorized
sale, and a case in which there was such a sale. The court
stated that if there is an authorized initial sale, and the
goods resold are genuine, there is no trademark infringement
"despite the fact that the goods were resold without the
trademark owner's consent." Id. Therefore, in light of the
first sale/exhaustion doctrine, ODF has not shown a likelihood
of success on the merits of its trademark and patent claims.

CONCLUSION

ODF has shown a likelihood of success on the merits on its
breach of contract claim and irreparable harm in the absence of
an injunction. ODF's May 21, 2008 motion for a preliminary
injunction is granted.

SO ORDERED:

Dated:    New York, New York
          September 26, 2008

                                    DENISE COTE
                            United States District Judge